1  UNITED STATES DISTRICT COURT

2  NORTHERN DISTRICT OF NEW YORK

3  ----------------------------------------------------------

4  UNITED STATES OF AMERICA,

5            -versus-                    08-CR-21

6  TODD BROXMEYER.

7  ----------------------------------------------------------

8            TRANSCRIPT OF SUPPRESSION HEARING

9  held in and for the United States District Court, Northern

10 District of New York, at the Federal Building,

11 15 Henry Street, Binghamton, New York, on THURSDAY,

12 August 14, 2008, before the HON. THOMAS J. McAVOY, Senior

13 United States District Court Judge, PRESIDING.

14

15 APPEARANCES:

16 FOR THE GOVERNMENT:

17 UNITED STATES ATTORNEY'S OFFICE

18 BY:  MIROSLAV LOVRIC, AUSA

19      Binghamton, New York

20

21 FOR THE DEFENDANT:

22 PATRICK KILKER, ESQ.

23 Vestal, New York

24

25

1          THE CLERK:  United States of America versus
2  Todd Broxmeyer, 2008-CR-21.  Please state appearances for the
3  record.
4          MR. LOVRIC:  Miroslav Lovric for the
5  government.  Good morning, your Honor.
6          THE COURT:  Morning, Mr. Lovric.
7          MR. KILKER:  Morning, your Honor.  Patrick
8  Kilker for Todd Broxmeyer, the defendant.
9          THE COURT:  Morning, Mr. Kilker.  Okay.  From
10  what the Court understands this morning we have a suppression
11  hearing and I believe the defendant is challenging the
12  proprietary of the search and seizure of his cellphone that
13  was taken from him I believe at the time he was arrested and
14  also the seizure of his computer which was taken from his
15  workplace and, Mr. Lovric, what kind of evidence do you have
16  to support the contention that those seizures and that search
17  was legitimate?
18          MR. LOVRIC:  Your Honor, we thought it best to
19  consent to a hearing on the matter and in which hearing we
20  would produce the actual investigator that was involved in
21  the seizure of both of these items and I have Detective
22  Sergeant Jason Ellis here.  He is from the Broome County
23  Sheriff's Department.  He has not only direct knowledge but
24  was the person that directly obtained those two items.  It's
25  our request that we be allowed to present at that hearing all

1    of the underlying facts and circumstances leading up to and

2    including the seizing or obtaining of those two items and it

3    is our position that they were lawfully obtained and then,

4    thereafter, search warrants were obtained in order to allow

5    the investigators to actually search those items.

6                    THE COURT:  All right.  Well, of course, I'd

7    be interested in hearing some of the facts leading up to it

8    so the Court can take a look at it from a probable cause

9    analysis standpoint.

10                   How about you, Mr. Kilker, what's your

11   position?

12                   MR. KILKER:  Thank you, your Honor.  It's our

13   position that the cellphone, even if it were lawfully seized,

14   was searched prior to an execution of a search warrant or a

15   search warrant application and that anything that was on

16   there should be suppressed.  We do have a factual witness who

17   will testify on behalf of the defendant that comments were

18   made by the investigator on the day this phone was seized and

19   also with regard to the computer that was seized at the

20   Sports Plex and how it was that that computer was seized.

21   Because the computer -- and there's a difference here.  The

22   cellphone may have been seized legally but searched

23   illegally.  The computer being seized illegally initially.

24   But that's our position with regard to both of those issues

25   and we do believe some of the background information is

1    important on probable cause.

2                    THE COURT:  Okay.  Well that's basically what

3    I understand.

4                    All right.  Mr. Lovric.  Why don't you call

5    Sergeant Ellis and we'll proceed.

6                    MR. LOVRIC:  Yes, Judge.  We're going to call

7    Detective Sergeant Jason Ellis from the Sheriff's Department.

8                    THE CLERK:  Sir, please state your full name

9    for the record.

10                   THE WITNESS:  Jason T. Ellis.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   J A S O N    E L L I S, having been called as a witness,

2   being duly sworn, testified as follows:

3                   MR. LOVRIC:  Good morning.  May I, your Honor?

4                   THE COURT:  Sure.

5   DIRECT EXAMINATION

6   BY MR. LOVRIC:

7       Q    Good morning, Detective Ellis.  Just for the

8   record, could you again state your full name, title and can

9   you tell us where you work and generally speaking what kind

10  of work do you do?

11      A    My name is Jason T. Ellis.  I'm a detective

12  sergeant with the Broome County Sheriff's Office.  I've been

13  there approximately 15 years.  Currently I supervise the

14  criminal investigations, juvenile, and warrants divisions.

15  And we conduct all types of criminal investigations from

16  robberies to burglaries to rape investigations, child

17  pornography and so on.

18      Q    And forgive me if I missed it.  How long have you

19  been approximately with the sheriff's department?

20      A    Approximately 15 years.

21      Q    And, Detective Ellis, I would like to talk with you

22  this morning about a case dealing with a Mr. Todd Broxmeyer.

23  Are you familiar with that matter?

24      A    Yes, I am.

25      Q    And just for the record, do you see Mr. Broxmeyer

Jason Ellis - Direct                                    6

1    in court today?

2        A    Yes, I do.

3        Q    Can you tell for the record, indicate where you see

4    him?

5        A    He's over to the right of where I'm sitting in the

6    orange jumpsuit.

7             MR. LOVRIC:  Indicating the defendant, I

8    believe, your Honor.

9             THE COURT:  Record will so reflect.

10       Q    Detective Ellis, going back to approximately

11   December 21 of 2007, did you on or about that date become

12   involved in the Todd Broxmeyer matter?

13       A    Yes, I did.  I was contacted in the early morning

14   hours of December 22 by Patrol Deputy Thomas Sienko.  He

15   advised me he was investigating a rape allegation in the Town

16   of Lisle in Broome County and filled me in on some details

17   involving that investigation.

18       Q    And can you tell us what it was, what kind of a

19   matter Thomas Sienko from the sheriff's department was

20   investigating on that date and what it was that he conveyed

21   to you he had learned about this matter.

22       A    He was interviewing a victim 15 years old by the

23   name of Jessica Croop.  She had made allegations that her

24   field hockey coach, Todd Broxmeyer, had engaged her in sexual

25   intercourse on or about December 1 of 2007.

Jason Ellis - Direct

7

1    Q    And do you know where it was, I don't mean specific

2    address, but just generally speaking where it was that

3    Officer Thomas Sienko had obtained this information from?

4    Where was that he was interviewing Miss Croop?

5    A    In the Town of Lisle at her parents' house.  I

6    couldn't give you a specific address.

7    Q    Okay.  And did Officer Sienko, was he the first

8    person to your knowledge to speak to Jessica Croop about

9    these matters that she was informing him about as it dealt

10   with Mr. Broxmeyer?

11   A    Yes.

12   Q    And we're talking now on December 21 of

13   approximately some time in the late evening hours?

14   A    Yes.  That's when the call was received.  He

15   responded out there and by the time he contacted me, we were

16   in the early morning hours of December 22.

17   Q    Okay.  So if I understand correctly, Officer Sienko

18   was the first officer to respond to this call from Jessica

19   Croop and her family I take it?

20   A    That's correct.

21   Q    And then after he obtained information from her he

22   contacted you sometime within a matter of hours you'd say?

23   A    That's correct.

24   Q    And then did he summarize for you what it was he

25   learned from Jessica Croop and her family?

Jason Ellis - Direct                                    8

1          A     Yes.

2          Q     Now, did you at that point then become involved in

3     this investigation?

4          A     Yes.  Initially, after speaking with him, couple

5     factors taken into place, as to the safety of the victim and

6     the situation with the offender, where they might be, do they

7     live with the victim and the distance of when the crime

8     happened.  The crime was alleged to have happened on

9     December 1.  She had made allegation there was another victim

10    that had been raped at the Sports Plex in the Town of Union

11    on December 21, however, that victim had not been located or

12    identified when I first spoke with Deputy Sienko.  I advised

13    him to continue his investigation and call me back if they

14    located this other victim.

15         Q     Okay.  Let me, if I can, just address that topic

16    that you just described.  You learned from Officer Sienko

17    about this event that Jessica Croop described happened

18    December 1, is that a fair statement?

19         A     Yes.

20         Q     And then did Officer Sienko relay to you

21    information as to why it was that Jessica Croop was calling

22    the police on December 21 about an event that happened on

23    December 1?

24         A     Yes.  She had received a text message from a third

25    female by the name of Jackie Bendick indicating that Todd

Jason Ellis - Direct                    9

1   Broxmeyer had sexual intercourse with a female on December 21

2   against her will and this caused Miss Croop to come forward

3   and report the incident from December 1 to us.

4        Q    Okay.  Did Miss Croop on or about the date that

5   we're talking about, now December 21, did she identify who it

6   was that Jackie Bendick told her had allegedly been also

7   assaulted by Mr. Broxmeyer?

8        A    Yes.  She identified, after some questioning from

9   Deputy Sienko, she identified that individual as Katelyn

10  Thorp.

11       Q    And did Jessica Croop indicate to Officer Sienko

12  where it was that she believed Katelyn Thorp was located on

13  that evening, that night, as she was relaying this

14  information to the officer?

15       A    She believed her to be either at or en route to a

16  local hospital.  Our dispatch center had checked the local

17  hospitals and not had been able to identify at the time I

18  first spoke to Deputy Sienko anybody at the hospital with

19  that name.

20       Q    Okay.  And did Jessica Croop, when she's

21  interviewed by Officer Sienko, indicate that this text

22  message that she received from Jackie Bendick about Katelyn

23  Thorp, that that was the cause for her to call the police on

24  that night?

25       A    Yes, that was the cause for her to come forward and

Jason Ellis - Direct                                      10

 1  stop these activities.

 2      Q    Okay.  Now did you or Officer Sienko at some point

 3  learn where Katelyn Thorp was that evening, sometime after

 4  you -- after the call was received from Jessica Croop?

 5      A    Yes.  Deputy Sienko had recontacted me

 6  approximately ten minutes after I first spoke to him and

 7  stated that they now determined that Katelyn Thorp was at

 8  Lourdes Hospital Emergency Room.  I then advised him I would

 9  respond to Lourdes Hospital and meet him to help him conduct

10  this investigation.

11      Q    And did you go to Lourdes Hospital?

12      A    Yes, I did.

13      Q    And at Lourdes Hospital did you at some point

14  locate Katelyn Thorp did?

15      A    Yeah.  I located her and her mother in the

16  emergency room.

17      Q    Now, we have been talking about three different

18  individuals that we've mentioned, Jessica Croop, Jackie

19  Bendick, and Katelyn Thorp.  These individuals -- are all

20  these three individuals teenagers under the age of 18 years?

21      A    Yes, they are.

22      Q    Did you actually have the opportunity to speak and

23  interview Katelyn Thorp at Lourdes Hospital sometime in the

24  early morning hours of December 22?

25      A    Yes, I did.

Jason Ellis - Direct

1    Q    And can you indicate what she informed you as far

2  as what had occurred on December 21 of 2007.

3    A    She indicated to me that on December 21 Jackie

4  Bendick and her were at the Oakdale Mall.  They wanted to

5  stay at the mall a little longer so in order to do that they

6  needed to find their own ride and they knew that Todd

7  Broxmeyer was at the sports complex at Robinson Hill, Town of

8  Union.  They engage in some texts with him.  He agreed to

9  come down to the mall and pick them up.  He picked them up

10  and took them back to the Sports Plex on Robinson Hill Road.

11  He said he had some Christmas presents to wrap and during the

12  course of being there at the Sports Plex, Katelyn Thorp

13  indicates that Todd Broxmeyer first started out by tickling

14  her and holding her down on the field and engaging in sexual

15  intercourse with her.

16    Q    Did she indicate whether or not that sexual

17  intercourse was consensual or not consensual?

18    A    She stated it was not consensual.

19    Q    And you mentioned she told you about the Sports

20  Plex on Robinson Hill Road.  Are you familiar with that

21  location?

22    A    Yes, I am.

23    Q    What is that, the Sports Plex on Robinson Hill, how

24  would you describe that?

25    A    It's a very large building.  Part of it contains a

Jason Ellis - Direct                                            12

1    church, I'm not sure of the name of it right now and the

2    other part is just a large -- when you get in the doors,

3    large open field that local sports teams will use for

4    practice, games, etcetera.

5        Q    Okay.  And after being informed of this assault

6    that Katelyn Thorp described for you, did you also at some

7    point speak to Katelyn Thorp about any other events or any

8    other occurrences that occurred between her and Mr. Todd

9    Broxmeyer?

10       A    Yes.  She had indicated to me there was a previous

11   incident on or around December 7 where her and Mr. Broxmeyer

12   were at his apartment, I'm sorry, his apartment on Main

13   Street, Town of Lisle, and he had taken her into a bedroom

14   and she stated she was having her period at the time.  She

15   felt he wanted to try to engage in sexual intercourse and she

16   ended up performing some oral and physical contact with him

17   and causing him to ejaculate.

18       Q    And this event she described occurred on or about

19   what date?

20       A    December 7, I believe.

21       Q    Okay.  And this event on December 7 she indicated

22   occurred at what location?

23       A    The Main Street, Town of Lisle residence where he

24   lived.  It's above an antique store.

25       Q    Okay.  And the December 21 event that she

Jason Ellis - Direct                              13

1    described, you indicated that event she described as

2    occurring at the Sports Plex location that you identified?

3         A     Correct.  The Sports Plex on Robinson Hill Road in

4    the Town of Union.

5         Q     Now, the information that Jessica Croop, the

6    initial caller of these events, the information that she

7    provided about sexual contact by Mr. Broxmeyer upon her of

8    December 1, what location did she describe or indicate that

9    that event occurred at?

10        A     At Mr. Broxmeyer's residence on Main Street in the

11   Town of Lisle.

12        Q     Now, during the course of interviewing and speaking

13   to Katelyn Thorp, the teenager that you located at Lourdes

14   Hospital, did you -- did you talk with her about any type of

15   photographs that were sent by Mr. Broxmeyer to her or any

16   photographs that she sent to Mr. Broxmeyer?

17        A     Yes.  We had discussion about text messages and

18   photographs.  She had indicated to me that she had received

19   three text messages right after the alleged rape occurred and

20   when we talked about photographs she said that Mr. Broxmeyer

21   had sent nude photos of himself to her and she had sent a

22   photo of herself to him via the cellphone.  Her photo she was

23   in her underwear but she had knowledge that Jackie Bendick

24   had sent topless photos of herself to Todd Broxmeyer.

25        Q     And these events that Katelyn Thorp is describing,

Jason Ellis - Direct                    14

1   she's describing photos that were sent to Mr. Broxmeyer and

2   then photos that she received from him via what mechanism?

3        A    Via a cellphone, picture trading over a cellphone.

4        Q    Okay.  And I take it she used her cellphone when

5   she sent things to him?

6        A    To my knowledge, yes.

7        Q    And did she indicate how he sent her the photos of

8   himself, the naked photos of himself?

9        A    From his cellphone and she knew that by the phone

10  number that came up with the photo being sent.

11       Q    Okay.  Now, at Lourdes Hospital, in addition to

12  Katelyn Thorp being interviewed, was she there also in order

13  to be physically examined by hospital personnel?

14       A    Yes.

15       Q    And do you know whether or not a rape kit was also

16  performed, a rape kit examination upon her?

17       A    Yes, it was.

18       Q    Now, you indicated that Katelyn Thorp, during your

19  interview of her, also indicated that Todd Broxmeyer had text

20  messaged her, Katelyn Thorp, sometime after this sexual

21  assault that he had described occurring at the Sports Plex.

22       A    That's correct.

23       Q    Did you either see those text messages or were you

24  informed by her what it was that Mr. Broxmeyer text messaged

25  her?

1       A     She physically showed me those text messages on her

2    phone, she had saved them.  I read them, made documentation

3    of them and seized her phone for evidence.

4       Q     Okay.  And did you record in your report, in sum or

5    substance or as close as possible verbatim, if I can call it

6    that, those text messages that she received from

7    Mr. Broxmeyer after this assault at the Sports Plex?

8       A     Yes.  In my report I have documented word for word

9    what was on those text messages.

10      Q     Could you read those into the record as far as what

11   it was, what the text messages said as you read them off her

12   phone?

13      A     Sure.  9:51 PM, sorry if you are mad that is the

14   last thing I wanted.  9:52 PM, I would never knowing do

15   something to hurt you.  I really thought we were just playing

16   again.  I'm really sorry.  9:55 PM, just tell me you don't

17   have me please.

18      Q     And these are the messages you directly took off of

19   Katelyn Thorps's phone?

20      A     That's correct.

21      Q     Now, at this point in time we're still talking

22   about your interview of Katelyn Thorp at Lourdes Hospital?

23      A     Yes.

24      Q     Some time after speaking to Katelyn Thorp, did you

25   at some point then go to the residence of Mr. Todd Broxmeyer?

1       A     Yes, I did.

2       Q     And just approximately about when was it that you

3   went to his residence?

4       A     Shortly after 4 AM, myself and Deputy Sienko went

5   to his residence and knocked on the door.  A male came to the

6   door and identified himself as Todd Broxmeyer.

7       Q     Okay.  Did you indicate to Mr. Broxmeyer why you

8   were there?

9       A     Told him that we wanted to speak to him and he

10  wanted us to go outside because his girlfriend was at the

11  apartment.  I indicated that or I asked him if he had been

12  with Jackie Bendick and Katelyn Thorp that evening.  He

13  indicated he had and stated -- I told him we wanted to bring

14  him down to the office and talk to him.  That's all that was

15  said as far as what we were there for.

16      Q     Okay.  Did Mr. Broxmeyer -- well, did you ask him

17  to accompany you or did you order him or did you arrest him

18  at that point in time?

19      A     I asked him to accompany us back to our office so

20  we can speak to him.

21      Q     What did he say as far as that was concerned?

22      A     He agreed to come along with us.  Put on some

23  clothes, got a jacket, shoes and we went down to the patrol

24  car and went down to the office.

25      Q     When you brought him down to the office, was he

Jason Ellis - Direct

1   under arrest at that point in time?

2        A    No.

3        Q    Was he handcuffed in any fashion?

4        A    No.

5        Q    When he went -- after -- let me back up.  When you

6   spoke to him was that outside of the apartment or residence?

7        A    The conversation began outside on the porch and he

8   was kind of inside the door and then we came into the

9   apartment with him while he was getting dressed.

10       Q    And when he got dressed and accompanied you down to

11  the office, other than clothes and things of that nature, did

12  he bring anything with him or take anything to your

13  knowledge?

14       A    At that time, not to my knowledge.

15       Q    And did he ask you any questions as far as anything

16  further about what was it about or what kind of things you

17  wanted to talk about or anything like that?

18       A    There's just some small talk in the car, nothing

19  about the case.  He said he was nervous and I told him, well,

20  we'll speak to you when we get down to our office and it was

21  a quiet ride on his part on the way down.  Deputy Sienko and

22  I were talking on the ride down about things in general.

23  Nothing about the case.

24       Q    And at that point in time he's not restrained and

25  he's not under arrest?

 1      A      Correct.

 2      Q      Now, in the vehicle that you drove Mr. Broxmeyer to

 3  your office, where was he sitting in the vehicle?

 4      A      He was in the rear of the vehicle.

 5      Q      And who was in the front?

 6      A      Deputy Sienko was driving, I was in the passenger's

 7  seat.

 8      Q      Okay.  So he's in the rear by himself?

 9      A      Correct.  Sitting behind me.

10      Q      Okay.  Now, at that time when this is occurring,

11  did you know at that time whether or not Mr. Broxmeyer in the

12  back of the vehicle, whether he was text messaging anyone?

13      A      At that time, no.

14      Q      Did you later learn whether or not while he was

15  sitting in the back of the vehicle by himself, whether he was

16  text messaging anyone?

17      A      Yes.  Upon interviewing Jackie Bendick, I had

18  learned that she had received a text message from

19  Mr. Broxmeyer on December 22 at 4:35 AM.

20      Q      Okay.  When you learned that -- I take it when you

21  said you learned that later.  I take it you learned it much

22  later after interviewing Mr. Broxmeyer?

23      A      That's correct.

24      Q      And that time and date, does that approximately

25  coincide with the time that you were bringing him to your

1   office?

2        A     Yes.

3        Q     And what was the text message that Mr. Broxmeyer

4   sent to Jackie Bendick around that time?

5        A     The text message was, why am I in a police car.

6        Q     And you learned this information from interviewing

7   Jackie Bendick?

8        A     That's correct.

9        Q     And when you brought Mr. Broxmeyer to your office,

10  this would be some time early morning hours of December 22,

11  is that correct?

12       A     Yes.

13       Q     Did you at some point speak to him or interview

14  him?

15       A     Yes, I did.

16       Q     And before speaking or interviewing him, did you

17  advise him of his Miranda rights?

18       A     Yes, I did.

19       Q     And this entire interview that we're just going to

20  touch upon was this, in fact, videotaped?

21       A     Yes, it was.

22       Q     And did Mr. Broxmeyer agree to speak to you without

23  having an attorney present and without asking for an attorney

24  at that point in time?

25       A     Yes, he did.

Jason Ellis - Direct                                    20

1     Q    And did you then speak with him about the topics

2  that you wanted to discuss with him?

3     A    Yes.  I advised him we were investigating a

4  complaint that had occurred at the Sports Plex on Robinson

5  Hill in the Town of Union and basically I kind of left it

6  open to him, did he have any idea why he might be there and

7  what we might want to talk about.  He indicated he didn't and

8  we started talking about some allegations that the girls made

9  against him as far as having sexual intercourse with him.

10    Q    And I take it you're referring to the information

11 that Jessica Croop and Katelyn Thorp had provided to you and

12 Officer Sienko?

13    A    Yes.

14    Q    And did Mr. Broxmeyer say anything whether or not

15 he was at the Sports Plex that previous evening with Katelyn

16 Thorp and another girl?

17    A    Yes.  He said he was there.  He admitted to being

18 on the field with Katelyn and tickling her, but denied any

19 type of sexual activity with her.  I had knowledge from

20 Katelyn Thorp regarding text messages and photos.  We talked

21 about that topic.  He did indicate that, you know, he thought

22 they were just joking.  They had sent him pictures and he had

23 also sent them pictures.  And I asked him, well, were they

24 clothed or naked and he stated both.

25    Q    Okay.  And so if I understand correctly,

Jason Ellis - Direct

1  Mr. Broxmeyer admitted that he had via his cellphone received

2  pictures from them and sent them pictures, some of which were

3  not clothed, some of which were clothed pictures?

4      A    Yes.

5      Q    Now, at some point in time after that interview,

6  did you place Mr. Broxmeyer under arrest?

7      A    Yes.  I was interviewing him and he was denying any

8  type of sexual activity.  At that point I asked him if he

9  wanted to take a voice stress analysis test.  He asked me for

10  some legal advice at that point and I told him I couldn't

11  give it to him.  He stated, well, this is getting kind of

12  hairy, I think I want to speak to a lawyer and at that point

13  I advised him that he was under arrest and not free to leave

14  and we had some paperwork to get through and we'd be going to

15  see a judge.

16      Q    And the arrest and charges that you were filing

17  against Mr. Broxmeyer that morning dealt with which victim

18  and which type of crime?

19      A    At that time it dealt with Katelyn Thorp, with the

20  crime occurring in the Town of Union, charge of rape and also

21  sexual abuse.  Both felonies.

22      Q    And I take it that's in connection with the events

23  that Katelyn Thorp described to you occurring at the Sports

24  Plex on operate Robinson Hill Road on the previous evening,

25  December 21?

1       A    That's correct.

2       Q    And at that time after Mr. Broxmeyer was placed

3  under arrest, did you seize or take any property that he had

4  brought or had with him?

5       A    Yes.  He had a jacket and in that jacket was a

6  cellphone that at that time I seized.  And Deputy Sienko also

7  assisted as far as the search of him incident to the arrest,

8  just to make sure there was no contraband or weapons.

9       Q    Okay.  Now, the cellphone that you took into

10 custody, that was a cellphone I take it that Mr. Broxmeyer

11 brought with him when he came down to your office?

12      A    Yes.

13      Q    And at that point in time I've asked you some

14 questions about information that you had learned from Katelyn

15 Thorp about usage of cellphones.  You at that point in time I

16 take it, you had that information from her from having

17 interviewed her?

18      A    Yes.  I had knowledge, number one, that at some

19 point there had been some photos traded.  Also that the text

20 messages incident to the crime occurring December 22 or

21 shortly there after, the text messages from him to her, so I

22 felt at that point there might be some evidence on that

23 cellphone so I felt I need to seize it for evidence and

24 obtain a search warrant to search it.

25      Q    Okay.  Now, your practice and your department's

Jason Ellis - Direct

23

1   practice, I'd just like to ask a couple questions about that.

2   When an individual is placed under arrest, is there a

3   protocol, practice, as far as the search of that person,

4   their clothing when they're placed under arrest, regardless

5   of whether or not there is any evidence that you may think

6   they may have on them?

7        A    I'm sure it varies from officer but we search the

8   individual.  Any property they have I, anyway, usually put it

9   in a paper bag, most officers do.  We secure their property

10  and that will follow them through the process whether they're

11  remanded to the jail.  We turn that property over to the jail

12  or if we go to a judge and they're released, the property's

13  turned back over to them.  But we do search people as a

14  course of business incident to arrest.

15       Q    And that's regardless of whether or not the items

16  that they may have with them has any evidentiary value?

17       A    That's correct.

18       Q    So if it's non evidentiary items, you would

19  nevertheless secure that in some fashion and place it into a

20  secure place within the sheriff's department?

21       A    Correct.

22       Q    Now, in this particular case, after you arrested

23  Mr. Broxmeyer -- let me withdraw that.  Prior to arresting

24  Mr. Broxmeyer, after you interviewed him, did you know

25  whether or not he had his cellphone with him?

Jason Ellis - Direct                                24

1      A     I did not.

2      Q     After you placed him under arrest, and when you

3   went to search him and his clothing and found the cellphone,

4   did you at that time believe whether -- did you believe

5   whether or not -- sorry.  Did you believe that phone to have

6   any evidentiary value at the time that you located it on

7   his -- in his person or property?

8      A     Well, I assumed that was his phone because it was

9   in his jacket and at that point I had to believe there was

10  probably evidence of either the alleged rape on December 21

11  or evidence of another crime on that phone and that's the

12  reason I seized it.

13     Q     Okay.  And I take it at the time when you seized

14  that phone, after arresting him, this is after he also had

15  already told you about using his cellphone to receive photos

16  and send photos?

17     A     Correct.

18     Q     Now, after Mr. Broxmeyer was arrested sometime in

19  the morning of December 22, 2007, did you at some point after

20  that go back to the apartment in Lisle, New York?

21     A     Yes, I did.

22     Q     What was your purpose in going to that apartment

23  later that morning?

24     A     Really twofold.  Number one, to inform her as to

25  what the situation was with Mr. Broxmeyer.  And second, to

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Jason Ellis - Direct                                     25

1   interview her and see if she had any knowledge of these

2   alleged crimes that had occurred.

3        Q    When you say her, you're referring to whom?

4        A    Todd Broxmeyer's girlfriend, Lindsey Wilcox.

5        Q    And prior to going back to that apartment to speak

6   to Miss Wilcox, had you met her when you were out there

7   before when you first came to talk to Mr. Broxmeyer?

8        A    Yes.  When we were in the apartment she had come

9   out of the bedroom and I don't recall whether we formally met

10  but, you know, I knew who she was.

11       Q    Okay.  And just approximately do you recall about

12  when it was that you went back out to Lisle, New York to

13  speak to Miss Wilcox at that apartment?

14       A    I might say sometime around 8:00 AM.

15       Q    And when you got there, did you speak to her, did

16  you find her there?

17       A    Yes, I did.

18       Q    And what was the conversation like and describe

19  what it was that you were asking her and what it was that she

20  was telling you.

21       A    I indicated to her that we had arrested Todd

22  Broxmeyer based on some allegations of some rape.  I had

23  talked to her about computers, phones, whether if she knew

24  there was any pictures or pornography of any young females in

25  their residence.  And I had indicated to her that we had

1  information that he had taken photos and exchanged photos and

2  just basically questioned her whether there was any -- or

3  whether she had any knowledge, etcetera, of any of these type

4  of activities.  She indicated to me that Todd spent a lot of

5  time at home by himself, she was a very busy person.  Field

6  hockey coach and coach in Newark Valley.  She does pottery,

7  does salsa dancing and there were a lot of occasions when he

8  was at the apartment by himself and she had indicated she

9  knew all the girls Broxmeyer had contact with because of her

10  also coaching at one time in Whitney Point.

11       Q    So at that point did she inform you that she used

12  to coach at Whitney Point but no longer was coaching there?

13       A    That's correct.

14       Q    And at that point she advised you that she was a

15  coach at what, in what school district?

16       A    The Newark Valley School District.

17       Q    And did she tell you what it was that she coached

18  at Newark Valley?

19       A    Field hockey.

20       Q    And did she at any point indicate what it was that

21  she had coached while at the Whitney Point School District?

22       A    Also field hockey.

23       Q    And this conversation that you're having with Miss

24  Wilcox occurred where?

25       A    Inside her apartment on Main Street in the Town of

Jason Ellis - Direct                                        27

1    Lisle.

2        Q    Now, this conversation that you had with her when

3    you started to ask her about computers and computer access,

4    cellphones, things of that sort, did she indicate whether or

5    not she knew if Todd Broxmeyer had any kind of a computer?

6        A    She indicated they didn't have any internet or

7    computer hook up in the house.  She said he did have a laptop

8    and she believed it to be at the Sports Plex on Robinson Hill

9    in the Town of Union.

10       Q    Did she tell you anything more about the Sports

11   Plex as far as why this laptop might be there?

12       A    She indicated he managed the Sports Plex, did the

13   scheduling and she provided me with the name of one of the

14   board members, Edward Yetsko, and also provided his numbers

15   so that I could contact him.

16       Q    Now when she advised you of this information about

17   the Sports Plex, did she also tell you anything about whether

18   or not Todd Broxmeyer had coached in any other areas besides

19   the Broome County area?

20       A    Yes.  She indicated that one day a week he traveled

21   back to the Cherry Hill area of New Jersey and did some

22   coaching with a Bobby Hoffman.

23       Q    And I take it the information that you're learning

24   from her is all related to coaching of field hockey, field

25   hockey sport?

Jason Ellis - Direct                                  28

1        A     That's correct.

2        Q     Now, at the point in time when you spoke to Lindsey

3    Wilcox somewhere around approximately 8:00 time frame on

4    December 22, was this in close proximity to after you had

5    arrested Todd Broxmeyer?

6        A     Yes.

7        Q     So he was arrested a few hours earlier I take it?

8        A     Correct.

9        Q     And at that point in time when you spoke to Lindsey

10   Wilcox, other than seizing and taking into custody

11   Mr. Broxmeyer's cellphone as you described, had you or to

12   your knowledge any one searched or looked through that

13   cellphone or gone through that cellphone?

14       A     No, we had not.  The only thing I did, once I

15   seized that phone is shut the power off to preserve the

16   battery in case there was any type of memory there that

17   needed power to keep -- so if there's evidence there I didn't

18   want it to obviously disappear because of the battery running

19   low and it was locked in a secured storage cabinet in my

20   office.

21       Q     Okay.  So at that point in time to your knowledge

22   no one went through and looked through that cellphone?

23       A     O, they did not.

24       Q     And at any point in time when you were speaking to

25   Lindsey Wilcox, did you, in talking with her, talk to her at

1    all about any of the information that you had obtained from

2    the victims that you had interviewed at that point about

3    photos either being sent to Mr. Broxmeyer or received from

4    Mr. Broxmeyer or the phone being used by any of those

5    victims?

6           A    I indicated to her that we had knowledge that there

7    were photos, both of Mr. Broxmeyer and these victims.  And we

8    also had knowledge that there were some text messages between

9    these individuals.  And that information that I gave her is

10   based on the knowledge I had from my interviews conducted up

11   to that point.

12          Q    Okay.  The interviews of Miss Croop and Thorp and

13   at least Miss Croop and Thorp by that point in time?

14          A    And Mr. Broxmeyer, by his admissions when I

15   interviewed him.

16          Q    Okay.  Now did Lindsey Wilcox, did she indicate or

17   tell you whether or not she had any knowledge about any

18   photos being sent by Mr. Broxmeyer to these teenage girls or

19   him receiving any from them?

20          A    She indicated she had no knowledge of any type of

21   activity such as trading of photos and she had no knowledge

22   of his sexual activity either.

23          Q    Now, at some point after speaking to Miss Lindsey

24   Wilcox, did you at some point soon thereafter proceed to the

25   Sports Complex on Robinson Hill Road that you described

Jason Ellis - Direct

1  earlier?

2      A    Yes, I did.  After speaking with her, I basically

3  left it with her, if she had any other information she could

4  contact me.  I believe I provided her one of my business

5  cards.  I then drove down to the Sports Plex on Robinson Hill

6  Road and in the course of driving down there, I attempted to

7  dial Ed Yetsko to speak to him to see if he would meet me at

8  the Sports Plex.

9      Q    How do you spell that last name for the record, so

10  the stenographer can get that?

11      A    Y-E-T-S-K-O.

12      Q    And when you were on your way to the Sports Plex,

13  you tried to contact Ed Yetsko, were you successful reaching

14  him on the phone?

15      A    I was able to reach his wife.  She stated to me he

16  was in en route to the Sports Plex.  I ended up arriving

17  there and waiting in the parking lot for him to arrive.

18      Q    And did you actually meet Ed Yetsko at some point

19  after he arrives at the Sports Plex?

20      A    Yes.  I observed a vehicle pull in and a male get

21  out.  I approached him, identified myself and he identified

22  himself as Ed Yetsko.  I explained to him that I was

23  investigating an alleged rape that had occurred there at the

24  Sports Plex and possibly some other conduct that had occurred

25  with some underage females and he proceeded to unlock the

Jason Ellis - Direct

31

1    Sports Plex and invite me inside.

2        Q    Okay.  Now, when you met Ed Yetsko at that complex,

3    you indicated you advised him about events that happened, at

4    least events that happened on December 21, the day before at

5    that complex?

6        A    Yes.

7        Q    And did you in so many words convey to him that you

8    were investigating Mr. Todd Broxmeyer?

9        A    Yes.

10       Q    Did you learn from him who he was, Ed Yetsko in

11   relation to that sports complex?

12       A    Yes.  He stated to me that the sports complex is

13   run by a nonprofit organization of which he is one of the

14   board members.  And he started to explain about, you know,

15   what the field's used for, a lot of sports teams practice

16   there.  Todd was employed by them to schedule and pretty much

17   manage the Sports Plex facility.

18       Q    Okay.  Now, when you're speaking to Ed Yetsko about

19   these -- about this information with respect to Mr.

20   Broxmeyer, are you and he at that point outside in the

21   parking lot, are you proceeding with him into the Sports Plex

22   or is it a combination of both at this point?

23       A    Combination of both.  We're talking, he's unlocking

24   it, we went in and we continued to talk.  He had turned some

25   lights on and, you know, I was just discussing with him about

1   the activities there at the Sports Plex and access to the

2   Sports Plex.  I also discussed with him whether or not, if he

3   knew that Mr. Broxmeyer had a laptop computer that he used

4   there at the Sports Plex.

5        Q    Okay.  So when Mr. Yetsko allowed you into the

6   Sports Plex, did he unlock it, did he open the Sports Plex?

7        A    Yes, he did.

8        Q    So he had a key to that location?

9        A    Yes, he did.

10       Q    And in talking with him did you learn whether or

11   not he was one of the individuals that had a key and access

12   to that entire Sports Plex?

13       A    He indicated he was one of many people that had

14   access to that Sports Plex.  He said all the board members

15   had keys to the facility and any coaches had keys to the

16   facility that might open the facility or stay late.  So there

17   are several individuals that could access that location.

18       Q    Now, you indicated that Mr. Broxmeyer -- did he use

19   the word employ or how did he describe the relationship

20   Mr. Broxmeyer had to that sports complex?

21       A    As I recalled, he indicated they employed him to

22   manage the location.

23       Q    Did he describe what it was that Mr. Broxmeyer,

24   generally speaking, did at that Sports Plex?

25       A    Scheduled practices, games, and it sounded like a

Jason Ellis - Direct

 1   day-to-day operation of the Sports Plex.

 2       Q    And in speaking with Mr. Yetsko about access to the

 3   Sports Plex, did you speak and talk to him about perhaps not

 4   specific numbers but the types of people that had access by

 5   way of key and permission to come and go from the Sports Plex

 6   as they utilized it?

 7       A    Yes.

 8       Q    And what did he describe for you?

 9       A    He indicated there were many people that had access

10   in the building to unlock, enter, and go to and from the

11   facility and that those people also had access to the offices

12   and areas in the whole facility.

13       Q    Okay.  Now, at the point in time that you speak to

14   Ed Yetsko about this matter, did you then also speak to him

15   about whether or not there was any office that was utilized

16   by Mr. Broxmeyer and any other persons who had keys to the

17   facility?

18       A    After I had asked him about Mr. Broxmeyer having a

19   laptop there and I also talked to him about internet access.

20   He stated they did have the internet there.  He, as we're

21   talking about that, unlocked an office that was behind a

22   concession stand and pointed out a laptop computer and bag

23   that were on a desk within that office.

24       Q    Okay.  And when he opened that office, did he

25   either at that point in time or any point in time describe

Jason Ellis - Direct

 1   for you who utilized that office space?

 2       A    He unlocked that office with a key and at that time

 3   he indicated to me it was a common office used by anybody

 4   that might be using the facility.  If people were there at

 5   the facility he said the office would be open.  There are

 6   automatic defibrillators they are required to have were

 7   stored in that office, people have to access those in case of

 8   an emergency.  He indicated anybody that had keys to the

 9   facility would be able to access that office.

10       Q    Did that include coaches that were training or

11   running programs or teams through that facility?

12       A    Yes.  Coaches, board members, yes.

13       Q    And did Mr. Yetsko indicate that in addition to

14   these other individuals, Mr. Broxmeyer also utilized that

15   space when he was performing whatever duties he's performing

16   at that complex?

17       A    Yes.  He indicated that desk was an area Mr.

18   Broxmeyer worked at and I would describe it as being like a

19   desk a manager might have at a convenience store.  A lot of

20   times they're in the back store room that's also used for

21   storage.  So it's kind of a common area yet there's a desk

22   there for someone to utilize to do some work.

23       Q    Okay.  Was, in that office area, was there also any

24   other type of equipment that was kept there, general working

25   equipment as far as utilizing the facility?

Jason Ellis - Direct

1    A    Again, as I recall the AEDs and I believe some

2  sports equipment but specifically I can't tell you what.

3    Q    When you're speaking to Mr. Yetsko and you

4  accompany him into the Sports Plex and into this office area,

5  was he -- was he aware that you were investigating

6  Mr. Broxmeyer?

7    A    Yes, he was.

8    Q    And did you ask him if you could come inside and

9  look around, specifically once you're in the Sports Plex, if

10  you can come inside and take a look at the office area?

11    A    I don't think I specifically asked him to directly

12  open the office so I could look.  I asked him about a laptop

13  and after doing that he unlocked the office and indicated,

14  yeah, that's his laptop on the desk.

15    Q    Mr. Yetsko, when he identified that laptop, he

16  indicates that's Mr. Broxmeyer's?

17    A    Yes.

18    Q    And at any point in time did you then speak to

19  Mr. Yetsko about seizing or taking custody of that laptop?

20    A    I told him that I wanted to seize that laptop,

21  however, prior to even touching anything, I contacted the

22  Broome County District Attorney's Office for some legal

23  advice.  I had some concerns.  There was a practice that

24  Mr. Broxmeyer was supposed to be having at 10:00 AM on that

25  Saturday morning.  Some rumors had already kind of gotten

Jason Ellis - Direct

1   around about what was going on with the -- with Katelyn Thorp

2   and Jessica Croop and I was concerned that laptop was going

3   to disappear at some point so I wanted to seize it and I was

4   afraid if I left to get a warrant to seize it, when I come

5   back it might have been gone.  So I contacted our DA's

6   office, told them my concerns.  It was in a common area.

7   They indicated to me go ahead and seize it and then I would

8   obtain a search warrant to have it searched.

9        Q    Now, at that point you spoke to someone from the

10  Broome County District Attorney's Office?

11       A    Yes, I did.

12       Q    I take it this someone was an Assistant District

13  Attorney?

14       A    Yes.  It was Karin Intermill.

15       Q    And you described this -- these events and then I

16  take it that she at least indicated to you that you could go

17  ahead and take custody of this laptop?

18       A    Yes.  After explaining the events and summarizing

19  the case for her, she was also concerned that could disappear

20  by the time I went and got a warrant and could get back, so

21  she felt that possibility that some evidence existed that

22  shouldn't disappear, I should seize it and then obtain a

23  search warrant to search it obviously.

24       Q    And in addition to speaking to the ADA, did you

25  also speak to Mr. Yetsko, convey to him what it was that you

Jason Ellis - Direct

1 would like to do as far as taking custody of this laptop?

2      A    Yes, I indicated to him that I had talked to the

3 District Attorney's Office and they indicated I should seize

4 it.  I told him I would like to do that and that I would

5 provide the complex with a receipt for anything I took off of

6 that property.

7      Q    Okay.  And did Mr. Yetsko agree to that or did he

8 have any difficulty or problem or did he express anything to

9 lead you to believe that he did not want you to remove that

10 laptop?

11     A    No.  He, you know, basically was, in my opinion, of

12 the opinion just do your job and I filled out a receipt after

13 securing the computer and the bag and left that there with

14 him.

15     Q    Okay.  And that morning when you're there at the

16 Sports Plex, after you and Mr. Yetsko were inside, did you

17 actually at some point in time see other persons arriving at

18 the Sports Plex?

19     A    Yes.  Parents and what appeared to be teenagers

20 were arriving and I assume that was the practice that was

21 supposed to be going on at 10:00 AM.

22     Q    And after -- after you took custody of the laptop

23 that you described, and after you gave Mr. Yetsko I take it

24 the receipt for the laptop?

25     A    Yes.

Jason Ellis - Direct

1      Q      Did you speak to Mr. Yetsko about him contacting

2   you in the future if there were any other questions or

3   anything else he needed?

4      A      Yes.  I had his contact information.  I thanked him

5   for his help, left a business card and asked him if he had

6   any problem with us speaking to him and he indicated he would

7   not.

8      Q      Okay.  And just to make it clear, when you asked

9   him or indicated to him that you wanted to take custody of

10  the laptop, did he have any objections to that?

11     A      No.

12     Q      And at any point did he object or in any way

13  indicate that he did not want you to look around in either

14  the office area or the sports complex?

15     A      No, he did not indicate he had any problem with me

16  entering that facility or going anywhere in that facility.  I

17  did walk out into the field and around the field a little bit

18  because twofold here, the computer, but also the fact that

19  was a crime scene from the incident that occurred on

20  December 21 and I just kind of did a cursory search of that

21  field to see if there was any type of evidence visible there

22  at that field.

23     Q      Now, after visiting the Sports Plex on the morning

24  of December 22, did you in connection with the investigation

25  then also at some point the following day interview Jackie

1    Bendick?

2         A     During the course of my investigation, I had

3    indicated or -- I'm sorry.  I interviewed Jessica Croop

4    myself and took a written statement and also Jackie Bendick

5    and took a written statement.  During the course of those

6    interviews the fourth victim came to light, Kayla Muller, and

7    she was subsequently during the investigation interviewed.

8         Q     And in connection with ongoing investigation then,

9    did you also approximately on December 27 meet with the FBI

10   in connection with this matter?

11        A     Yes, I did.  Myself and Lieutenant Eisenburg who

12   was my direct supervisor met with Jim Lyons from the FBI here

13   at the Binghamton office.

14        Q     And after meeting with the FBI in connection with

15   this matter, did you on or about December 28, 2007 apply for

16   a search warrant to search the computer that we've discussed

17   here today and the cellphone that we discussed here today?

18        A     Yes.  I applied for a total of three search

19   warrants in this case.  December 28 was the first search

20   warrant I applied for and that was for the computer, the

21   cellphone, the computer bag and phone records in reference to

22   some phone numbers.

23        Q     Detective Ellis, I'm going to put in front of you

24   if I could have marked as Exhibit 1, 2 and 3, Government

25   Exhibits.  And I'm going to put these three items in front of

Jason Ellis - Direct                          40

1    you.  But if you take a look at Exhibit 1, just identify that

2    for us.

3         A    This is the first search warrant that I applied for

4    on December 28, and it was a search warrant requesting to

5    search the laptop bag, the laptop itself, Samsung cellular

6    telephone, as well as requesting phone records for two phone

7    numbers, from Cellco Partnership, also known as Verizon

8    Wireless.

9         Q    And I take it that Exhibit 1 is the actual warrant

10   which you obtained allowing you to search the computer and

11   cellphone of Mr. Broxmeyer's?

12        A    It is the application for the search warrant and

13   also the actual search warrant attached to it, yes.

14        Q    And that warrant was issued and signed by a judge?

15        A    It was signed by Judge Woodruff Gaul, Town of Union

16   Court.

17                  MR. LOVRIC:  Judge, I would offer Exhibit 1

18   into evidence.

19                  MR. KILKER:  No objection, your Honor.

20                  THE COURT:  Receive Exhibit 1 for purposes of

21   the hearing.

22   By MR. LOVRIC:

23        Q    Now, Investigator Ellis, at some point after you

24   obtained the search warrant, Exhibit 1, did you at that point

25   then take and transfer the items, the laptop and the

Jason Ellis - Direct

1    cellphone to any location for analysis?

2         A    Yes.  When I obtained that warrant I then

3    transported the cellphone, laptop computer, and the bag which

4    had some computer media storage media in it such as CDs, I

5    think there might have been USB flash drive which media can

6    be stored on.  Those items were taken to the computer

7    forensic labs at Broome County Security Division in

8    Binghamton the same day the warrant was signed.

9         Q    Okay.  And did you in taking those items to the, as

10   I call it, if I can call it, the CATS lab, did you then

11   request that they conduct a search and analysis of both the

12   laptop and the cellphone?

13        A    Yes.  I met with Deputy Director Jim Thompson and

14   went over the case summary with him and I at that point

15   requested that his office conduct a forensic analysis of

16   those items.

17        Q    And on approximately -- let me withdraw that.

18   Prior to taking -- prior to applying for the search warrant,

19   did you or to your knowledge any one search or view anything

20   either on that laptop or that cellphone that we have been

21   talking about thus far?

22        A    No.

23        Q    And prior to having the CATS lab personnel analyze

24   that cellphone and laptop, did you or to your knowledge any

25   other investigator search those two items?

Jason Ellis - Direct                    42

1       A    While the evidence was in my custody prior to

2   turning over to the lab, no one searched or looked at either

3   one of those items, the laptop or the cellphone.

4       Q    Now, on January 2 of 2008, approximately several

5   days after taking those two items to the CATS lab, did you

6   actually have occasion to go there and receive a preliminary

7   examination by the CATS forensic people as to what was on

8   that, on those items?

9       A    Yes, I did.

10      Q    And was that the first time that you were at least

11  being shown or seen some of the things that were found on

12  Mr. Broxmeyer's laptop and on his cellphone?

13      A    Yes.

14      Q    If you can look at Government Exhibit number 2

15  briefly, Detective Ellis, Exhibit 2, can you just identify

16  that for us, what that is, just generally speaking?

17      A    Application for search warrant requesting

18  additional records from Cellco Partnership in relationship to

19  some cellular phone numbers.

20      Q    And was that the second search warrant that you

21  applied for in connection with this investigation?

22      A    Yes, it was.

23      Q    And that was signed on or about what date by the

24  judge signing it?

25      A    It was signed on January 4, 2008 by Judge Gaul in

Jason Ellis - Direct

43

 1   the Town of Union.

 2            MR. LOVRIC:  I would offer Government's 2 into

 3   evidence, your Honor.

 4            MR. KILKER:  No objection, your Honor.

 5            THE COURT:  Receive Government's 2 in evidence

 6   for purposes of the hearing.

 7   BY MR. LOVRIC:

 8       Q    Now, I take it the search warrant numbered Exhibit

 9   2 authorized you to search other property and items that your

10   investigation lead you to believe belonged to Mr. Broxmeyer?

11       A    Yes.

12       Q    Now, if you can take a look at Exhibit number 3,

13   marked number 3 for identification and just identify that for

14   us generally speaking?

15       A    Again, this is a search warrant application and the

16   actual search warrant directing Cellco Partnership to provide

17   some records in relation to a Verizon cellular account.

18       Q    And was that the third of those search warrants

19   that you indicated earlier that you applied for?

20       A    Yes.

21       Q    And that search warrant was assigned on or about

22   what date?

23       A    January 18, 2008 by Judge Gaul in the Town of

24   Union.

25       Q    I take it that authorized you to search for

1      additional text messages and photos of another telephone

2      number that you thought may be relevant in this

3      investigation?

4          A     Correct.

5          Q     And just so we're clear, is it correct that the

6      first search warrant, Exhibit number 1, that was signed on

7      December 28, that's the only search warrant that dealt with

8      the authorization to search the cellphone and laptop of

9      Mr. Broxmeyer?

10         A     Correct.

11         Q     At some point the CATS unit, I take it, Detective,

12     at some point they generated a report and provided to you and

13     other investigators all of the various photographs that were

14     found on the laptop and cellphone of Mr. Broxmeyer?

15         A     Yes.

16         Q     I take it that was some time well after that

17     January 2, 2008 date when you went to their lab and they gave

18     you just a preliminary preview?

19         A     Correct.

20         Q     The final questions I have, Detective Ellis, when

21     you removed from Mr. Broxmeyer's person his cellphone, at

22     that point he was under arrest?

23         A     Yes, he was.

24         Q     Prior to removing that cellphone or finding it, I

25     understand from your testimony you had no knowledge that it

Jason Ellis - Direct

1   was actually with him when he came down to your office?

2       A    I did not, no.

3       Q    And at the time when you went to the Sports Plex

4   and met Ed Yetsko, is it a fair statement that he willingly

5   allowed you to come in, look and to actually remove that

6   laptop that you had identified was Mr. Broxmeyer's?

7       A    Yes.

8            MR. LOVRIC:  Those are all the questions I

9   have, Judge.

10           THE COURT:  All right.  Mr. Kilker.

11           MR. KILKER:  Thank you, your Honor.

12  CROSS-EXAMINATION

13  BY MR. KILKER:

14      Q    Morning, Detective.

15      A    Good morning.

16      Q    I'd like to start out with the initial

17  investigation, that being the contact that you initially had

18  with the sheriff's department and Detective Sienko relating

19  to the phone call coming from Jessica Croop.

20      A    Okay.

21      Q    When is it your understanding that a phone call was

22  made from Jessica Croop to the detective division at the

23  sheriff's department and that she arrived at the sheriff's

24  department for purposes of disclosing a possible crime?

25      A    A call was received by Broome County communications

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Jason Ellis - Cross                                    46

1   division I'm assuming over our seven digit line reporting a

2   rape and patrol deputy, which that's what Deputy Sienko is,

3   responded out as anybody would on an initial complaint and

4   interviewed Jessica Croop at her residence.

5          Q    And once that interview has taken place, your

6   involvement became approximately when?

7          A    Around -- the complaint came in on December 21 at

8   11, I believe it was 35 -- it would be noted on the police

9   report -- in the evening.  My first knowledge of this case

10  was on December 22, on or about I'm going to say between 1

11  and 1:30 in the morning.

12         Q    Now, according to Jessica Croop, she had received

13  some information regarding another girl that had apparently

14  had an incident with Mr. Broxmeyer on the 21 day of 2007?

15         A    Yes.

16         Q    In December.  And that allegation was similar in

17  nature to what Jessica Croop was complaining of, is that

18  right?

19         A    That's correct.

20         Q    You subsequently became involved with the

21  investigation and did you, yourself, interview Jessica Croop

22  initially on -- let's go back -- initially on December 22,

23  when you became involved?

24         A    No, I did not.

25         Q    You interviewed her some time later, is that right?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Jason Ellis - Cross

1       A    Yes.

2       Q    And did you have a conversation with Jackie Bendick

3  at Lourdes hospital on December 22, 2007?

4       A    No.

5       Q    Did any police deputy or detective have a

6  conversation with her, either on that day or the 21 of

7  December, 2007?

8       A    Not that I'm aware of.

9       Q    Katelyn Thorp was allegedly a victim on

10  December 21, 2007, is that right?

11      A    Yes.

12      Q    She was at Lourdes Hospital, correct?

13      A    Yes.

14      Q    And you and Detective Sienko arrived to interview

15  her regarding what she had to say about the night before that

16  meeting of the 21 of December?

17      A    Yes.

18      Q    When you arrived you had conversation with

19  Katelyn --

20      A    Yes.

21      Q    -- about the incident that occurred the night

22  before?

23      A    Yes.

24      Q    And she had indicated to you that Mr. Broxmeyer had

25  some forceable sexual intercourse with her --

1       A       Yes.

2       Q       -- on the 21 of December?

3       A       Yes.

4       Q       And she was being inspected at the hospital for any

5  injuries or such, correct?

6       A       Yes.

7       Q       Did she indicate to you that Mr. Broxmeyer had

8  injured her in any way, scratching, bruising, cutting, that

9  type of thing?

10      A       At that time, no.  Later on I had received a call

11  from her and her mother that some bruises had developed and I

12  took photographs of those.

13      Q       Did she indicate to you that she caused any injury

14  to Mr. Broxmeyer or attempted to cause any injury to

15  Mr. Broxmeyer on December 21, 2007?

16      A       She indicated that she -- I believe she bit him in

17  the arm and kneed him in the groin area.

18      Q       When Mr. Broxmeyer was taken ultimately into

19  custody, was he inspected for physical injury?

20      A       Based on her telling me that, yes.

21      Q       Were any physical injuries found on Mr. Broxmeyer?

22      A       There's nothing visible.

23      Q       During the course of the interview with Katelyn

24  Thorp at the hospital, she indicate to you that she had

25  another person, Jackie Bendick, present at the sports complex

Jason Ellis - Cross                                     49

1   when this alleged rape occurred?

2       A    Yes.

3       Q    And did she also indicate to you where in proximity

4   to the incident was Jackie Bendick during the --

5       A    She indicated that Jackie was somewhere down the

6   field from where Todd Broxmeyer and her were located.

7       Q    Was there anyone else present on that evening?

8       A    Not that she indicated, no.

9       Q    And she had said that Katelyn and Jackie had gone

10  to the Sports Plex at the request of Mr. Broxmeyer, is that

11  right?

12      A    They were at the mall and they were going to have

13  to leave the mall, they wanted to spend some extra time there

14  so it was up to them to find a ride home.  They knew

15  Mr. Broxmeyer was at the Sports Plex.  There was some text

16  messaging and Mr. Broxmeyer agreed to pick them up at the

17  mall and then when he did, he indicated that he needed to go

18  back up to the Sports Plex and transported them up there at

19  that time.

20      Q    Do you know what time they arrived at the Sports

21  Plex according to your interview?

22      A    I'm going to say sometime after 7 PM.  I couldn't

23  tell you a specific, specific time.

24      Q    And do you know what time that the girls returned

25  to their homes or when?

Jason Ellis - Cross                         50

1      A      Sometime after 9:00.

2      Q      In the evening?

3      A      Yes.

4      Q      On the 21?

5      A      Yes.

6      Q      The text messages that Katelyn Thorp had shown you

7  on her cellphone, you were able to view those and make a note

8  of them?

9      A      Yes.

10     Q      And those were texts related to a 9:51 PM, 9:52 PM

11 and 9:55 PM correspondence, correct?

12     A      Yes.

13     Q      Now, the notes that were taken from you in relation

14 to what was on the phone, were those verbatim notes?

15     A      Yes.

16     Q      In other words, those were the same words that were

17 on her cellphone at the time?

18     A      Yes.

19     Q      Following your conversation with Katelyn Thorp, I'm

20 sorry, yeah, Katelyn Thorp, you took action to proceed back

21 to Mr. Broxmeyer's residence?

22     A      Yes.

23     Q      Is that right?  And when you arrived at

24 Mr. Broxmeyer's residence, he was there, correct?

25     A      Yes.

Jason Ellis - Cross

1      Q    Now, during your conversation with Katelyn Thorp,

2  did she indicate to you that there were photographs on her

3  phone that were sent by Mr. Broxmeyer?

4      A    She indicated she had received some photographs

5  from Mr. Broxmeyer, whether she indicated they were still on

6  her phone, I don't recall.

7      Q    Did you ask her what the nature of those

8  photographs were?

9      A    Yes.

10      Q    And did she tell you what they were?

11      A    Naked photos of Mr. Broxmeyer.

12      Q    Did she, being Katelyn, indicate to you that she

13  sent any nude photos of herself to Mr. Broxmeyer?

14      A    She stated that he had wanted nude photos of her

15  but she sent a photo of her in her underwear to him.

16      Q    Were there any text messages between the two of

17  them regarding Mr. Broxmeyer's alleged solicitation of these

18  photos?

19      A    Not to my knowledge.  I did not do a forensic

20  analysis of her telephone.

21      Q    So there would be no e-mails or cellphone text

22  messages between the two of them relating to the photos that

23  may or may not have been exchanged?

24      A    I couldn't answer that.  I don't know.

25      Q    You didn't see any though, right?

Jason Ellis - Cross                      52

1      A    No.

2      Q    Now, when you went to Mr. Broxmeyer's residence and

3   you spoke to him, he stepped outside the residence.  He had

4   indicated to you that his girlfriend, Lindsey Wilcox, was in

5   the apartment, correct?

6      A    Indicated his girlfriend was in there.  I don't

7   know whether he said her name or not.

8      Q    And he spoke to you outside and you said you had

9   some questions to him relating to these photos?

10     A    No.  I, first of all, I asked him if he had been

11  with Katelyn and Jackie in the evening and he indicated he

12  had.  And I asked him to accompany us down to the -- to our

13  office so we can conduct an investigation in relation to

14  those two.

15     Q    And I believe that you mentioned that he grabbed a

16  jacket and also some shoes and then put those on?

17     A    We went inside and I think he went in the bedroom

18  and got a shirt, you know, got clothes, got dressed to come

19  with us.

20     Q    And at what time did he leave the residence with

21  you, and this was on the 22, correct, of 2007?

22     A    Yes.  On the 22, sometime between 4 AM and 4:30 AM.

23  Probably be on our radio log.

24     Q    And as you transported him, did you ask him any

25  questions relating to the information you had obtained from

Jason Ellis - Cross

53

1   Miss Thorp or any other witness?

2       A     No.  He said he was nervous and I told him that we

3   would talk to him when we got to our office.  I wasn't going

4   to conduct an interview in the car.

5       Q     How long was it between the time you left the

6   residence and the time you arrived at the station?

7       A     Probably from Lisle to our station, Upper Front

8   station, 20 to 25 minutes maybe.  Maybe a little faster.

9       Q     When you arrived at the station -- well, first of

10  all, Mr. Broxmeyer was not in handcuffs, is that right?

11      A     He was not, no.

12      Q     He was in the rear of the vehicle?

13      A     Yes.

14      Q     And that's a patrol vehicle, marked vehicle?

15      A     Yes.

16      Q     The back doors of that vehicle lock, is that right?

17      A     You can't open them from the inside, yes.

18      Q     He couldn't have got out without your help if he

19  wanted to?

20      A     Correct.

21      Q     And were you in a uniform at that time?

22      A     No, I was not.

23      Q     And was Detective Sienko in uniform?

24      A     Yes.  He's a uniformed deputy.

25      Q     When you arrived back at the station you escorted

Jason Ellis - Cross

1    Mr. Broxmeyer into the interview room, is that right?

2         A    Yes.

3         Q    Prior to putting Mr. Broxmeyer into the interview

4    room and as a policy of your department, do you search the

5    individual, in other words, did you search Mr. Broxmeyer to

6    see if he had any weapons or things of that nature?

7         A    No.

8         Q    So, you simply put him into the -- is it a holding

9    cell first or do you place him directly into the interview

10   room?

11        A    No, we went right to the interview room and I

12   indicated to him I had to get some paperwork.  He -- I don't

13   know how this transpired but his jacket, he removed his

14   jacket and that was outside the interview room and I went and

15   got out the Miranda form and started talking to him.

16        Q    So his jacket did not enter the interview room?

17        A    No.

18        Q    Later your testimony is, inside that jacket is the

19   cellphone that he had used in the vehicle which you later

20   saw?

21        A    That's correct.

22        Q    During the transport from Mr. Broxmeyer's residence

23   down to the station, apparently he made a text to Katelyn

24   Thorp, is that right?

25        A    No.  No.  He made a text to Jackie Bendick.

Jason Ellis - Cross

1    Q    Jackie Bendick.  Sorry.  That was while he was in

2 your custody?

3    A    It's while he was being given a ride down to our

4 office, yes.

5    Q    Did you notice he had his cellphone in the back

6 seat?

7    A    No, I did not.

8    Q    Even though it was 4 AM and it was dark out?

9    A    Correct.  There's a divider between the front seats

10 and back seats and I, to be honest with you, wasn't really

11 paying a lot of attention to him.

12    Q    When you got back to the station, put him into the

13 interview room and he indicated to you that he preferred to

14 speak to an attorney, is that when the interview stopped?

15    A    Placed him in the interview room.  Advised him of

16 his Miranda rights.  Completed a Miranda form which he

17 signed.  He agreed to talk to me.  After talking to him about

18 taking a voice stress analysis test, that's when he indicated

19 he'd like to speak to an attorney.

20    Q    When you had a conversation with him about the

21 girls and what they had said to you, did you relay to him

22 that you were aware of photographs that may be on his

23 computer or his cellphone?

24    A    I relayed to him that I was aware that there had

25 been exchanges of photographs, exchange of text messages and

Jason Ellis - Cross                                    56

1   as a ruse, I advised him we probably had DNA evidence, just

2   trying to get him to talk and make admissions to us as to

3   what occurred.

4        Q    And specifically those admissions were that he had

5   seen the girls at his apartment, he had picked them up and

6   taken them to the apartment on the 21, correct?

7        A    No.  Specifically looking for admissions from him

8   as to the rape of Katelyn Thorp at the Sports Plex on

9   December 21.

10       Q    What did he tell you?

11       A    He indicated to me that -- we talked about that

12  evening.  He indicated he had picked the girls up at the

13  mall.  They'd gone back to the Sports Plex.  He indicated

14  that he had tickled and kind of held Katelyn on the field but

15  denied any type of sexual activity.

16       Q    Did he admit to you sending pictures of himself?

17       A    He stated that -- when I brought up about the

18  photos that, you know, he said it was joking.  They sent

19  some, he sent some, and then I said clothed or naked?  And he

20  stated both.

21       Q    In reference to the three texts that we talked

22  about earlier, did he have an explanation about what those

23  texts meant?

24       A    As I recall, he said they're in relation to some

25  issue that Katelyn was having with either a boyfriend or

Jason Ellis - Cross

1    ex-boyfriend.

2        Q    And not in connection with any matter that

3    allegedly occurred on the 21 of December at the Sports Plex

4    involving this alleged rape?

5        A    That was his story, yes.

6        Q    And again this was videotaped, correct?

7        A    Yes.

8        Q    The interview with Mr. Broxmeyer?

9        A    Yes.

10       Q    Now, following your interview, you placed

11   Mr. Broxmeyer under arrest and charged him with rape in the

12   first degree, among other things, correct?

13       A    Yes.

14       Q    And at that point can you tell us approximately

15   what time that was that he was placed under arrest?

16       A    I'm going to say sometime shortly after 5 AM.

17       Q    Now, Mr. Broxmeyer's jacket was outside of the

18   interview room.  When was his jacket actually searched?

19       A    After being placed under arrest and prior to going

20   to court for arraignment.

21       Q    And who did the searching of the jacket?

22       A    I did.

23       Q    And you reached into the pockets to see what he

24   had?

25       A    I actually think I kind of just squished the jacket

Jason Ellis - Cross                                      58

1    and felt it and if I felt an item inside the pocket, I took

2    it out.

3          Q    And you pulled out the cellphone at that point?

4          A    Yes.

5          Q    Did Mr. Broxmeyer tell you it was his cellphone?

6          A    I don't believe at that point that we had a

7    conversation about it because he asked for an attorney.

8          Q    Did the girls, when you interviewed them, give you

9    a telephone number that they were allegedly sending

10   photographs to Mr. Broxmeyer?

11         A    Yes.

12         Q    What is that telephone number if you can recall?

13         A    (570)574-7772.

14         Q    You then returned to Mr. Broxmeyer's apartment and

15   spoke to Lindsey Wilcox, correct?

16         A    Yes.

17         Q    And what time of day was that?

18         A    I believe, as I said before, some time after

19   8 AM.  Again, that would be -- specific time would be on the

20   radio log.

21         Q    And at that point was it your intention to discuss

22   with her the fact that Mr. Broxmeyer had been placed under

23   arrest and interview her for any potential other evidence in

24   the case?

25         A    Yes.

Jason Ellis - Cross

1    Q    And when you arrived, were you alone or with

2  others?

3    A    I was alone.

4    Q    And she invited you in the house to discuss the

5  case?

6    A    Yes.

7    Q    When you interviewed, for lack of a better word

8  Lindsey Wilcox, you spoke about the computer that Mr.

9  Broxmeyer had and asked him -- did you ask her about any

10  other electronic equipment?

11    A    I talked to her about cameras, computers, and

12  internet, other phones.  And I believe that was it at that

13  point and she had indicated to me there was a laptop but she

14  believed it was at the Sports Plex, that they had no internet

15  access there at the apartment.

16    Q    Was that the reason she gave for having that laptop

17  at the Sports Plex?

18    A    No.  I believe that was just a laptop that Mr.

19  Broxmeyer used and, you know, that's where it happened to be.

20    Q    Is it your understanding that that laptop was used

21  in connection with scheduling and notifying parents and

22  others of when to be at games and that kind of thing?

23    A    Yeah.  I believe he used it for work.  Sure.

24    Q    And that laptop she indicated was in his office or

25  in an office at the Sports Plex?

Jason Ellis - Cross                           60

1        A     I don't believe she told me it was in an office.

2   She stated she believed it was at the Sports Plex.

3        Q     And she gave you a contact name and number to reach

4   out for in order to gain access to the Sports Plex?

5        A     Yes.

6        Q     Did she indicate to you that she had access to the

7   Sports Plex?

8        A     She herself did?

9        Q     Yes, that she had a key.

10       A     No.

11       Q     Did you ask her if she had a key?

12       A     No, I did not.

13       Q     Did you ask her if Todd had a key?

14       A     I don't believe I came out and asked that.  I

15   assumed it.

16       Q     During the course of your conversation with Mr.

17  Broxmeyer, did you know about the location of the computer at

18  that time?

19       A     When I was interviewing him?

20       Q     Yes.

21       A     No.

22       Q     After you had a conversation with Miss Wilcox you

23  then headed to the Sports Plex or, no, you contacted Ed

24  Yetsko or Ed?

25       A     Yetsko.

Jason Ellis - Cross

1    Q    Yetsko.

2    A    Yes.

3    Q    And he had told you that he did have the ability to

4  get you into the Sports Plex?

5    A    I called his residence and talked to, I believe

6  it's his wife.  She indicated that he was actually en route

7  to the Sports Plex.  I waited there for him and again

8  introduced myself and we went in the Sports Plex.

9    Q    When you were talking with Lindsey did she indicate

10  to you that because of this arrest of Todd, that they would

11  have to cancel anything that was going on that day that Todd

12  was in charge of?

13    A    She was concerned about the fact they had a

14  practice at 10:00 AM that day and I believe she may have even

15  tried to reach Ed Yetsko and that was the reason he was

16  coming to the Sports Plex to begin with.

17    Q    To your knowledge, was the purpose of that to

18  advise parents and players that things were cancelled and to

19  go home?

20    A    I don't know.

21    Q    When you arrived at the Sports Plex, this should

22  have been somewhere around 9:00, is that right?

23    A    Shortly after 9 I think.

24    Q    That's on the 22 day of December, 2007?

25    A    Yes.

Jason Ellis - Cross

1      Q      And Mr. Yetsko told you that he did have access to

2  the Sports Plex by way of key, correct?

3      A      I don't believe he told me that.  He showed me by

4  his actions by unlocking the door.

5      Q      As he unlocked the door, you were having a

6  conversation with him about his capacity, what he did there

7  at the Sports Plex?

8      A      Yes.

9      Q      And he basically indicated to you he was a board

10 member?

11     A      Yes.

12     Q      When you entered the Sports Plex, there's a locked

13 door when you first go in, correct?

14     A      Yes.

15     Q      You had testified that the office where the laptop

16 was located is located in an area behind a concession stand?

17     A      That's right.

18     Q      Is that concession stand also locked?

19     A      Not that I recall.

20     Q      Is the door to the office that is behind the

21 concession stand locked?

22     A      It was that day because Mr. Yetsko used a key to

23 open the door.

24     Q      There were at least two locked doors that he had to

25 unopen to the office?

Jason Ellis - Cross                    63

1      A    Yes.

2      Q    And as you spoke to him he indicated that other

3  employees had access to the office?

4      A    He indicated that many people, board members,

5  coaches, had access to the facility and the office, yes.

6      Q    Did you talk about procedures or policies whereby

7  the office is to remain closed at all times or that there was

8  some sign in, sign out sheet in order to identify who entered

9  and exited the office?

10     A    No, he never indicated that in our conversation.

11 He indicated to me when the center was open that office was

12 open for the fact that the automatic defibrillators are

13 stored in there, in case of an emergency someone would have

14 to access those.

15     Q    As Mr. Yetsko entered the office, what did you

16 observe as far as equipment or computers or things of that

17 nature?

18     A    From what I recall, there was some sports equipment

19 in there.  I specifically -- I specifically couldn't tell you

20 what was in that office.

21     Q    Was there anything specifically identifying the

22 area or the computer belonging to Mr. Broxmeyer?

23     A    No.

24     Q    Was the computer labeled Todd Broxmeyer or had

25 anything on the outside that would indicate to everybody that

Jason Ellis - Cross

1   that was his computer?

2       A    No.

3       Q    At the time that you called Karin Intermill and

4   obtained her advice as to what to do about the computer, the

5   computer was still in the locked office other than the fact

6   that he had just opened it, being Ed Yetsko, for purposes of

7   you taking a look around, correct?

8       A    It was still sitting there.  I had not touched it,

9   correct.

10      Q    After speaking with Miss Intermill, at that point

11  you indicated to Mr. Yetsko you were going to seize the

12  computer and take it?

13      A    Yes.

14      Q    And he expressed no objection over that?

15      A    No.

16      Q    Did he tell you that that was Todd Broxmeyer's

17  computer?

18      A    Yes, he did.

19      Q    And that it didn't belong to Mr. Yetsko but

20  Mr. Broxmeyer?

21      A    Yes.

22      Q    And that he also indicated to you that Mr.

23  Broxmeyer was an employee of the Sports Plex, right?

24      A    Yes.

25      Q    And that he regularly used the office for purposes

Jason Ellis - Cross

1    of his employment?

2        A     Yes.

3        Q     And also used his personal computer at the office

4    to do his duties?

5        A     I don't know as he expressed that in those words to

6    me, but he indicated he knew that was his computer.  I don't

7    know as he told me what he used it for.

8        Q     Did he tell you how long Mr. Broxmeyer had been

9    working as an employee of the Sports Plex?

10       A     No, not that I can recall.

11       Q     At the time that you decided to take the computer,

12   Mr. Broxmeyer was already in custody and under arrest, right?

13       A     He was in jail.

14       Q     Do you know how many keys were available to open

15   the office to the Sports Plex, besides the one that

16   Mr. Yetsko had?

17       A     No.

18       Q     Did you ask Mr. Yetsko how many other keys there

19   were?

20       A     Specifically, not the number of keys.  I asked as

21   to who had access to the facility and specifically what is

22   this office used for and what's the access to it.

23       Q     Now, if you were to obtain a warrant, would you ask

24   Mr. Yetsko if he would secure that area so that nobody else

25   could get in there?

Jason Ellis - Cross                    66

1          MR. LOVRIC:  Objection.

2          THE COURT:  I'm not quite sure that's

3    relevant.  That's not how it happened, so I think I'll

4    sustain that objection.

5     Q    Instead of obtaining a warrant, you took the

6    computer because of what you're saying is your concern that

7    other people might have access to the office, is that right?

8     A    Yes.  From conversations during this investigation,

9    up to that point, I had a feeling there were quite a few

10   people that were loyal to Mr. Broxmeyer and I didn't want

11   that evidence disappearing.

12    Q    Now, you took the computer back in your custody and

13   then at the time -- any time during the course that you had

14   the computer, did you view any of the images on it?

15    A    No.  Once I took that into my possession, it was

16   secured until a warrant was obtained.

17          MR. KILKER:  That's all I have, your Honor.

18          THE COURT:  Redirect?

19          MR. LOVRIC:  Just a couple questions if I may,

20   Judge.

21          THE COURT:  Sure.

22   REDIRECT EXAMINATION

23   BY MR. LOVRIC:

24    Q    Detective Ellis, the -- Mr. Kilker just talked to

25   you a little bit about the interview of Mr. Broxmeyer.  Just

Jason Ellis - Redirect

1   so I can clarify it.  At the time when you interviewed Mr.

2   Broxmeyer, after he asked to speak with a lawyer or somehow

3   indicated that he wanted to have a lawyer, did any of this

4   interview proceed after that fact?

5       A    Once he asked for a lawyer, the question in

6   relation to the investigation stopped.  He was asked some

7   questions in relation to completing an arrest history and so

8   on.

9       Q    Okay.  So the things that you described when I

10  asked you on direct about what he had told you with respect

11  to use of his cellphone and pictures, I take it all of that

12  information he provided prior to saying that he wanted to

13  speak with a lawyer?

14      A    Correct.  He provided information between the time

15  he waived his Miranda rights initially and then asked for a

16  lawyer.

17      Q    Now, Mr. Kilker just talked to you a little bit

18  about the Sports Plex as far as the office that we've talked

19  about being accessible to the general public and, just again,

20  Mr. Yetsko informed you that that office was also accessible

21  to the public for what purpose or what reasons?

22      A    I don't know if I used the word public but it was

23  accessible to people utilizing that facility for the purpose

24  of obtaining automatic defibrillators if there's an

25  emergency.  And it appeared to me some equipment was stored

1    in there.

2         Q    Okay.  And Mr. Kilker asked you if you talked to

3    Mr. Yetsko about exact number of keys or exact number of

4    persons who had access and who utilized that office.  I take

5    it he didn't give you an exact number, is that correct?

6         A    No, I believe the words were many people.

7         Q    Okay.  And when he used the words many people, was

8    that in conjunction with you asking him how many people

9    accessed and used that office area in connection with the

10   Sports Plex?

11        A    Yes.

12        Q    And then my last question is:  When after you had

13   spoken to the Assistant DA, did you have a conversation with

14   Mr. Yetsko and indicate that you would like to take that

15   laptop into custody and he indicated he didn't have a problem

16   with that or some way indicate that was fine with him?

17        A    Yes.

18             MR. LOVRIC:  That's all I have.

19             THE COURT:  Mr. Kilker, any recross?

20             MR. KILKER:  Just a couple of questions.

21             THE COURT:  Sure.

22   RECROSS-EXAMINATION

23   BY MR. KILKER:

24        Q    When you were speaking with Mr. Yetsko did he

25   indicate there were defibrillators in other areas of the

Jason Ellis - Recross                          69

1  facility that could be used by the general public?

2      A    No.  I believe his verbiage was that's where we

3  keep the defibrillators.

4      Q    Did he also indicate to you that the office was

5  where all of the money was kept?

6      A    No.

7              MR. KILKER:  I have nothing further.

8              THE COURT:  Anything further?

9              MR. LOVRIC:  No, your Honor.

10             THE COURT:   I have a couple of questions for

11  the witness.

12             Detective Sergeant Ellis, this is not the

13  first time you and I have seen each other, is that correct?

14             THE WITNESS:  That's correct.

15             THE COURT:  Can you tell us, did we have some

16  interaction on a prior occasion in the Town of Vestal, I

17  believe, at a ceremony?

18             THE WITNESS:  Yes.

19             THE COURT:  And can you tell everybody

20  assembled here what kind of ceremony that was?

21             THE WITNESS:  That was my first marriage.

22             THE COURT:  And can you give us the date of

23  that marriage?

24             THE WITNESS:  Oh, boy.

25             THE COURT:  Close as you can come.

Jason Ellis - by the Court                          70

1                    THE WITNESS:  I believe it was July of 1994.

2                    THE COURT:  And at that time did I participate

3        in the ceremony?

4                    THE WITNESS:  Yes.  You performed the marriage

5        ceremony.

6                    THE COURT:  All right.  You knew at that time

7        that I had served on the Broome County Legislature with your

8        father ^ Theron Jack Ellis?

9                    THE WITNESS:  Yes.

10                   THE COURT:  He had asked me to participate in

11       that ceremony?

12                   THE WITNESS:  Yes.

13                   THE COURT:  Now, have you and I had any

14       interaction socially or business wise since that time?

15                   THE WITNESS:  I think maybe once five years

16       ago I ran into you at a clam bake and spoke to you.

17                   THE COURT:  That's most likely.  I think I do

18       remember that.

19                   Does anybody want to question the witness

20       about that relationship?

21                   MR. LOVRIC:  I don't, your Honor.

22                   MR. KILKER:  No, your Honor.

23                   THE COURT:  All right.  Thank you, detective

24       Sergeant Ellis, you may step down, sir.

25                   (Witness excused).

Jason Ellis - by the Court                          71

1              THE COURT:  Let's see.  Now do you have

2    anymore witnesses?

3              MR. LOVRIC:  No, your Honor.  That's all I

4    have for right now.  I don't know if there's going to be any

5    defense or if we need any rebuttal.

6              THE COURT:  That's right.  Are you going to

7    call the defendant?

8              MR. KILKER:  I'm actually going to call

9    Lindsey Wilcox.

10             THE COURT:  Okay.  Can you give me just a

11   little estimate about how long her testimony might be?

12             MR. KILKER:  I would say half an hour.

13             THE COURT:  Okay.  We're going to take five

14   minutes, is that all right with everybody?

15             MR. KILKER:  Sure.

16             (Short break taken).

17             THE COURT:  Okay.  When you're ready,

18   Mr. Kilker.

19             MR. KILKER:  Okay.  We're going to call

20   Lindsey Wilcox.

21             THE COURT:  All right.  Miss Wilcox, would you

22   raise your right hand.

23

24

25

Lindsey Wilcox - Direct                           72

1  L I N D S E Y   W I L C O X, having been called as a witness,

2  being duly sworn, testified as follows:

3                  THE COURT:  You may be seated.  Yes, sir

4  Mr. Kilker.

5  DIRECT EXAMINATION

6  BY MR. KILKER:

7      Q    Lindsey, can you tell us your legal name.

8      A    Lindsey Marie Wilcox.

9      Q    Lindsey, where do you currently reside?

10     A    9071 Main Street, Lisle, New York.

11     Q    Have you lived there for some time?

12     A    Three years.

13     Q    Do you know the defendant, Todd Broxmeyer?

14     A    Yes.

15     Q    How do you know him?

16     A    He's my boyfriend.

17     Q    Was there a time that you lived at the Lisle

18  residence with Mr. Broxmeyer?

19     A    Yes.

20     Q    Approximately when was that?

21     A    For about two years and which ended this past

22  December.

23     Q    And did something significant happen this last

24  December that caused the two of you not to live together?

25     A    Yes.

Lindsey Wilcox - Direct

1    Q    And can you tell us what that was?

2    A    Detective Jason Ellis came to the apartment the

3  morning of the 22 around 4:30 and asked him to step outside

4  and they took him in their police vehicle.

5    Q    This is the December 22, 2007?

6    A    Yes.

7    Q    Approximately what time of the day or night did

8  Detective Ellis come to your residence?

9    A    Around 4:30 in the morning.

10    Q    When he arrived did, you have a conversation with

11  Detective Ellis at that time?

12    A    He just said that he was going to take Todd down to

13  the station for a statement and that he would return him

14  shortly.

15    Q    And did you see Todd take anything with him at that

16  time?

17    A    He took his keys, a sweatshirt.  He just changed

18  his clothes.  His phone.

19    Q    Where was his phone as he exited the residence?

20    A    In the living room.

21    Q    Did he place that anywhere, put it in his pocket,

22  did he carry it out?

23    A    I don't remember.

24    Q    When is the next time that you spoke to anybody in

25  connection with why Detective Ellis asked to speak with Todd

Lindsey Wilcox - Direct

1  Broxmeyer?

2      A    His cousin Tammy called me that morning I believe

3  it was around 9:00 and she had said that he had been charged

4  with rape.

5      Q    And how would your cousin know -- how did she know?

6      A    It's Todd's cousin.  I believe she works at the

7  Broome County Corrections Facility.

8      Q    After you found out that he was -- Todd was charged

9  with rape, what action, if any, did you take?

10     A    I didn't take any action.  I didn't know what to

11 do.  I just started crying so --

12     Q    Did there come a point in time that Detective Ellis

13 returned to the residence?

14     A    Yes.

15     Q    So was that also on the 22 day of December 2007?

16     A    Yes.

17     Q    Do you remember what time he returned to the

18 residence?

19     A    Around 10:00.

20     Q    And when he arrived at the residence, was he alone

21 or was he with others?

22     A    Alone.

23     Q    What was the nature of the conversation that took

24 place between Detective Ellis and yourself at the time he

25 arrived at 10:00 on the 22 day of December, 2007?

Lindsey Wilcox - Direct

1    A    The entire conversation?

2    Q    Yes.

3    A    Okay.

4    Q    What did you talk about and what was -- what were

5    the words that were used during the course of the

6    conversation?

7    A    He arrived at the door and he introduced himself as

8    Detective Ellis, asked if he could come in and ask me a

9    couple of questions, so I let him in the house.  He sat on

10   the couch, I sat on the chair.  He said that Todd had been --

11   he asked if I had known why Todd had been taken to the jail.

12   I had said yes, his cousin had called me that morning, told

13   me he was arrested for rape.  He asked if I knew who it was

14   or had any idea of who it was.  I said yes, I'm assuming that

15   it was Katie because you mentioned her name on the porch.  He

16   said yes.  He told me that -- I can't remember the exact

17   order of the conversation but he had told me that he had saw

18   naked pictures of Katie on his cellphone as well as seeing

19   pictures of Todd's midsection on Katie's cellphone and that

20   she also had a text message on her cellphone saying I didn't

21   mean to hurt you, I was just fooling and if I knew anything

22   about this relationship.  I said no.  He also said that he

23   offered Todd to take a lie detector test and Todd had

24   refused.  He told me that -- he told Todd if he, Todd, took

25   the lie detector test, he would let him come back home.  He

Lindsey Wilcox - Direct

76

1  said that he thought that Todd was guilty because he would

2  look down at his shoes and he was very quiet and he said that

3  if he had been charged with a rape, that he would be freaking

4  out and he said do you think Todd is guilty?  And he told me

5  they also did a rape test on the girl.

6      Q     During the course of your conversation with him you

7  had already realized that Todd was arrested and in custody,

8  is that right?

9      A     Yes, after his --

10     Q     After the second conversation?

11     A     Yes.

12     Q     Besides the conversations that you had regarding

13 Detective Ellis telling you about the images on both cameras,

14 did he indicate to you that he was interested in any other

15 devices or images from Todd's camera or from any other

16 source?

17     A     He asked if there's a video camera in the house.  I

18 said no.  He asked how I knew there wouldn't have been a

19 video camera?  I said I move my apartment around a lot, I

20 clean, I think I would know if there was a video camera in my

21 apartment.  He asked if there was porn in the house.  I said

22 no, I would know if that would be in the house.  He also

23 asked if Todd had a computer.  I said yes.  He asked where

24 his computer was.  I said it wasn't in the apartment so it

25 was probably at the Sports Plex.

Lindsey Wilcox - Direct

1    Q    Now the Sports Plex, that's a facility that I

2  understand Todd Broxmeyer worked at, is that right?

3    A    Correct.

4    Q    And the purpose of this Sports Plex, as I

5  understand it also, it's to promote things such as field

6  hockey, maybe lacrosse and some other things --

7    A    Correct.

8    Q    -- in the community.  And what was Mr. Broxmeyer's

9  involvement in those activities?

10   A    He was a manager of the facility.

11   Q    And as a manager of the facility, did he have

12  access to the building?

13   A    Yes.

14   Q    In what way?

15   A    He had a key to the outside of the building.  He

16  would run the concession stand, and he also had an office in

17  the building.

18   Q    Were you a regular participant of activity at the

19  Sports Plex?

20   A    Yes.

21   Q    And was that as a spectator, as a coach or in both

22  capacities?

23   A    Both.

24   Q    How often would you attend functions at the Sports

25  Plex?

Lindsey Wilcox - Direct

1    A    Usually at least once a week.

2    Q    Are you personally familiar with people that have

3    access in and to the Sports Plex?

4    A    Yes.

5    Q    More specifically, are you familiar with who has

6    the right or access to the office area of the Sports Plex?

7    A    Yes.

8    Q    What is your understanding based upon your personal

9    experience and your being at the Sports Plex, your

10   conversations with people there, with who has permission to

11   be in that office?

12   A    It was Todd's office.  The only other person that

13   had a key would have been Ed Yetsko who oversaw the entire

14   facility who hired Todd as the manager, so that was Todd's

15   office with his equipment.

16   Q    Did anybody else have access to the office when

17   Todd was not there?

18   A    No.  Only if Ed came down and opened it.

19   Q    And what was Ed's day-to-day involvement in the

20   Sports Plex?

21   A    Ed would only come down if he was watching his

22   daughter play a game or if Todd could not open up the

23   facility that day, Ed would come down and open the facility.

24   Q    Now, on December 22 Todd was obviously in custody

25   and incapable of opening the facility.  Did you call Ed

1    Yetsko to make arrangements for him to open the facility?

2        A    I called Ed Yetsko to tell him I was cancelling

3    practice and if there was going to be a practice, he would

4    have to open the building.

5        Q    Do you know if there was going to be a practice

6    after you spoke to Ed Yetsko?

7        A    I cancelled the practice with the parents, so

8    unless the parents contacted Ed, then the facility would not

9    have been opened.

10       Q    To your knowledge, was any other activities

11   scheduled the morning of December 22?

12       A    No.

13       Q    And how do you know that?

14       A    Because it's -- Saturday is field hockey.  Todd has

15   a practice and then there are tournament games for high

16   school students in the later afternoon and evening.

17       Q    And if Ed Yetsko didn't open the building, who else

18   could?

19       A    I don't know.

20       Q    Was that the name that you gave to Detective Ellis

21   to gain access to the Sports Plex?

22       A    Yes.

23       Q    Can you describe how you would get into the office

24   from the outside of the building.

25       A    You have to go through -- the outside entrance

Lindsey Wilcox - Direct

1  would have to be unlocked so the door to the turf field

2  facility itself would have to be unlocked.  You'd have to

3  walk into the building.  Then you would have to open, unlock

4  the concession stand door and then you would have to go

5  through the concession stand and then unlock his office door.

6  So, two other doors would have to be unlocked before you'd

7  get to his office.

8      Q    Are you familiar with a policy regarding leaving

9  the door either locked or unlocked during the time that

10  there's a function going on, like a field hockey game or

11  something like that?

12     A    What do you mean the policy?

13     Q    Is there a policy regarding the office and whether

14  it's allowed to be open or closed when other people are

15  around?

16     A    If Todd unlocks it and leaves it open when he's

17  there, it's up to him.

18     Q    Is the office -- can it be viewed from the fields

19  for example?

20     A    There's a small window you can look into from the

21  field.

22     Q    Would you be able to identify if somebody had gone

23  into the office from the field, from the concession area?

24     A    Would you be able to tell?

25     Q    Yeah.

Lindsey Wilcox - Direct

1    A    You could see them walk through the concession

2 stand, through the office door or you could look through the

3 window and see them in the office.

4    Q    If Ed Yetsko doesn't open the facility and Todd

5 doesn't open the facility, does anybody else have permission

6 to open the facility?

7    A    I don't know.  I don't believe so.

8    Q    But you don't know for sure?

9    A    I don't.  I've never heard of anyone else opening

10 the facility.

11    Q    What was Todd -- we heard he's an employee.  Was he

12 also a manager of the Sports Plex?

13    A    Yes.

14    Q    So what were his duties as far as you understood

15 them to be?

16    A    He would -- there's a phone in his office and

17 printer and his computer.  He would schedule games.  He would

18 schedule the league games, contact coaches, setup sporting

19 events, hire people to work at the concession stand.  And he

20 would manage the money from the leagues and the money to pay

21 the people that worked at the concession stand.

22    Q    Do you know where that money was kept typically?

23    A    In his office.

24    Q    Is that in a lock or unlocked safe?

25    A    It was in a gray box.  That's all I remember or a

1    bag.  One of the two.

2         Q    The computer that Todd left at the Sports Plex,

3    where was that located specifically within the office?

4         A    It would be on his desk or in his laptop bag.

5                   MR. KILKER:  I have nothing further.

6                   THE COURT:  Okay.  Mr. Lovric.

7                   MR. LOVRIC:  Thank you, Judge.

8    CROSS-EXAMINATION

9    BY MR. LOVRIC:

10        Q    Good morning, Miss Wilcox.

11        A    Morning.

12        Q    Miss Wilcox, you used to coach field hockey at

13   Whitney Point School District, is that right?

14        A    Correct.

15        Q    And some time after coaching there, you went to

16   coach at Newark Valley School District, is that right?

17        A    Correct.

18        Q    And is it fair to say that some time after Mr.

19   Broxmeyer was arrested on the state charges, some of which

20   we've talked about here today, you were actually fired by the

21   Newark Valley School District?

22        A    Correct.

23        Q    And is it also fair to say that in firing you from

24   the Newark Valley School District, you were in so many words

25   advised by the district that you were being fired because you

Lindsey Wilcox - Cross                    83

1   had knowledge of Mr. Broxmeyer inappropriately touching

2   children at that school system and failed to report it, is

3   that a fair statement?

4        A    It was one student and they advised me that, yes,

5   that's why I was being fired.

6        Q    And they terminated your employment as a field

7   hockey coach because of at least, from what they were saying,

8   because of their belief that you had knowledge of this

9   inappropriate contact between your boyfriend and this

10  student?

11       A    That was their understanding.

12       Q    And sometime after that, you actually filed a

13  lawsuit against the Newark Valley School District, is that

14  right?

15       A    Correct.

16       Q    You're represented by Mr. Ronald Benjamin in that

17  capacity?

18       A    Correct.

19       Q    And you're suing the Newark Valley school system,

20  if I can put it in a nut shell, for slander and defamation as

21  you claim that they slandered and famed your character by

22  claiming that you had knowledge of Mr. Broxmeyer's sexual

23  inappropriate touching of students that you were involved in

24  coaching, is that a fair statement?

25       A    One student.

Lindsey Wilcox - Cross

84

1    Q    One student?

2    A    One student that they're claiming I knew knowledge

3    of and I'm claiming I know knowledge of absolutely nothing

4    that happened.

5    Q    Now, that one student -- I'll just refer to the

6    person as the one student.  I'm not going to name the person.

7    The student that we're talking about in Newark Valley,

8    allegations of Mr. Broxmeyer sexually touching that student,

9    that was actually a student that was on your field hockey

10   team, is that correct?

11   A    Correct.

12   Q    And, in fact, isn't it also correct that on the

13   date or event that she has reported to law enforcement of

14   this touching by Mr. Broxmeyer, you were actually present on

15   the field on that date, is that fair to say?

16   A    There was no date given to me.  There was no date

17   reported.  It was a time period.

18   Q    Have you learned in relation to your lawsuit, have

19   you learned that an event that this student describes, this

20   student, she actually also says you were actually present on

21   the field when this sexual touching occurred, have you

22   learned that?

23   A    Yes.

24   Q    So this lawsuit that you're suing the Newark Valley

25   School District for, would it be fair a statement that it

Lindsey Wilcox - Cross

1   has, to some degree, a lot to do with what Mr. Broxmeyer is

2   either alleged to have done or not done in connection with

3   the sexual acts?

4       A    It has to do with what he has been alleged to have

5   done.

6       Q    Okay.  And I take it, Miss Wilcox, that this

7   lawsuit is still pending?

8       A    Correct.

9       Q    And this lawsuit, in fact, is pending here in

10  federal court, is that correct?

11      A    I believe that's incorrect.

12      Q    It wasn't filed in federal court?

13      A    I don't believe so.

14      Q    Okay.  That's incorrect.  I stand corrected.  I'm

15  sorry.  I'm relying on a quick review of the paperwork.  And

16  in connection with this lawsuit, has there been any

17  depositions taken yet?

18      A    Yes.

19      Q    And have you actually been deposed?

20      A    Yes.

21      Q    And have you and your attorney deposed certain

22  people from the school district?

23      A    No.

24      Q    Is that something that's going to be occurring?

25      A    I'm hoping it will be occurring.

Lindsey Wilcox - Cross

86

1      Q     Have you discussed with your attorney anything

2  about calling Mr. Broxmeyer in connection with that lawsuit,

3  in the event that all the charges against him were to be

4  either dismissed or he was found not guilty?  Have you

5  discussed that?

6      A     We haven't gotten to that point yet.

7      Q     That wasn't my question.  Have you discussed that

8  with your --

9              MR. KILKER:  Objection, your Honor.

10             THE COURT:  Sustained.

11             MR. KILKER:  Superfluous.

12     Q     Have you discussed with Mr. Broxmeyer -- let me

13 withdraw that.  Now, you've been up to the jail to visit

14 Mr. Broxmeyer, is that correct?

15     A     Correct.

16     Q     How many times do you remember going to the jail to

17 talk with him?

18     A     Between January and, January and February very

19 frequently.  Since March, one time.  I don't recall a number.

20 I'd say between January and February, probably a good 15

21 times.

22     Q     And when you've gone to visit Mr. Broxmeyer at the

23 jail, have you discussed with him matters dealing with his

24 cases, federal and state?

25     A     Minimal.

Lindsey Wilcox - Cross

1      Q      What does that mean?

2      A      Minimal might be -- if I said I heard this on the

3   news or, you know, this parent talked to me today.  But I

4   didn't ask him questions.

5      Q      Okay.  From time to time when you visited him you

6   provided him with information about what you're hearing out

7   and about about things dealing with his cases?

8      A      Not information.  I would just say this parent

9   asked about you.  Or they would like to know how you're

10  doing.  This is what I heard on the news which is public

11  information that I heard.

12     Q      Okay.  Have you at any point in time gone to speak

13  to possible victims and thereby witnesses that may be

14  testifying against Mr. Broxmeyer?  Have you personally talked

15  to any people like that about --

16            THE COURT:  Hold on.  I'd like to see you at

17  side-bar with the stenographer, please.

18            (At the Bench).

19            THE COURT:  I think at this point I have an

20  issue as to whether or not there's a Fifth Amendment issue

21  here because if she goes to talk to witnesses and there's

22  some allegation that she in any way tried to influence any

23  witnesses on what she said, then I think that can be the

24  basis of a criminal charge, so she should have counsel before

25  she answers that question.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Lindsey Wilcox - Cross

1          MR. LOVRIC:  Yeah, Judge.  Because it's not my

2    witness, I have assumed, maybe I shouldn't, that Mr. Benjamin

3    is aware, her attorney, that she is here testifying under

4    oath and that he and she are okay with that.

5          THE COURT:  Off the record.

6          (Discussion held off the record).

7          MR. LOVRIC:  Judge, I don't know but I'd like

8    to think Mr. Benjamin knows that she's here and she's

9    testifying and she's going to be asked questions about a lot

10   of things dealing with this and they're fine with that.  So I

11   mean, I can't represent that I know or don't know because I

12   didn't have any expectation or knowledge that she's going to

13   be here, so I'm just asking questions.  But whether she does

14   or doesn't, whether they've discussed any Fifth Amendment, I

15   don't personally know.

16         THE COURT:  Well, I think it is my job to

17   alert her to those rights and that she should have the

18   opportunity to have counsel, either her counsel of choice or

19   if the financial circumstances are correct, I should bring

20   somebody in myself.  So I'm going to have to make those

21   inquiries.  I wanted to let you know.  Do you have a

22   position?

23         MR. KILKER:  I know I haven't spoken with her

24   attorney on the civil case about any Fifth Amendment, you

25   know, rights or obligations and he represents her currently

Lindsey Wilcox - Cross

1  so without speaking to him, I don't have input one way or the

2  other.

3          THE COURT:  Well, you know, the problem is I'm

4  not sure that the witness would understand that some of her

5  answers might subject her to criminal penalties without

6  having some lawyer tell her about that.  I can explain it to

7  her but --

8          MR. LOVRIC:  I don't disagree, Judge.  I just,

9  from my perspective, I'm asking her things that I think show

10  bias and motive on her part but I do understand the Court's

11  view, and I don't disagree that she may want to be advised of

12  that and she can decide what, if anything, she wants to do as

13  far as that goes.

14          THE COURT:  All right.

15          (In open Court).

16          THE COURT:  Miss Wilcox, Mr. Lovric's asking

17  you some questions about did you have any contact with people

18  who might have been victims in connection with Mr.

19  Broxmeyer's alleged conduct and the Court wants to advise you

20  that answers you give to questions posed, depending upon what

21  they are, may subject you to some criminal responsibility or

22  liability.

23          THE WITNESS:  Okay.

24          THE COURT:  And that did you talk to

25  Mr. Benjamin before you came here?

1              THE WITNESS:  He only knew that I was coming

2    but very minimally because I just found out I was coming

3    Tuesday.

4              THE COURT:  This coming Tuesday, he knew you

5    were going to come at some point?

6              THE WITNESS:  No.  Because I knew that they

7    had filed a motion, we didn't know when the motion would be

8    put in place.  I found out Tuesday that I would have to be

9    here today.

10             THE COURT:  Did he offer to come with you?

11             THE WITNESS:  No.

12             THE COURT:  Did he talk to you about your

13   Fifth Amendment right?

14             THE WITNESS:  No.

15             THE COURT:  To not answer questions if you

16   believe an answer might put you in jeopardy of being

17   prosecuted?

18             THE WITNESS:  No.

19             THE COURT:  Okay.  Well, I'm advising you that

20   you do have that right to not answer questions if you

21   believe, that have a basis to believe that the answer might

22   subject you to some kind of criminal prosecution, either

23   state or federal.

24             THE WITNESS:  Okay.

25             THE COURT:  So if that comes up, I want you to

Lindsey Wilcox - Cross                                    91

1    notify me right away and we'll proceed from there.

2                   Okay.  Do you wish to talk to counsel before

3    you proceed with the answers to these questions?

4                   THE WITNESS:  Can I ask him one question?

5                   THE COURT:  I'm sorry, the lawyer?

6                   THE WITNESS:  Yeah, can I ask Pat one

7    question?

8                   THE COURT:  Sure.  You can ask him a lot of

9    questions.

10                   THE WITNESS:  Can I do that now?

11                   THE COURT:  Yeah, go ahead.

12                   (Witness steps down).

13                   THE COURT:  All right.  Now that you've had a

14   chance to speak with Mr. Kilker privately, do you still wish

15   to go ahead with this?  You have to answer.

16                   THE WITNESS:  Yes.

17                   THE COURT:  Okay.  Mr. Lovric.

18   BY MR. LOVRIC:

19       Q    Miss Wilcox, while we took that break I pulled out

20   my document and I just wanted to correct myself.  That

21   lawsuit that you filed is in Broome County Supreme Court.

22   There's a notice of claim that's been filed there, is that

23   correct?

24       A    If that's what that says, then yes.

25       Q    All right.  The question that I left off with, I

Lindsey Wilcox - Cross                92

1   asked you if you've met with Mr. Broxmeyer at the jail and

2   you indicated you thought it was a couple dozen times, is

3   that just a fair approximation?

4       A    Correct.  Yes.

5       Q    And from time to time has he also called you from

6   the jail on the telephone?

7       A    Yes.

8       Q    And those are collect calls that he places and you

9   accept the call, is that right?

10      A    Correct.

11      Q    And I take it that you and he have discussed some

12  of the substance of the events and charges relating to his

13  two criminal cases, one in federal court, one in state court?

14      A    No.  That's incorrect.

15      Q    You've never discussed with him anything dealing

16  with these cases?

17      A    The substance, no.  If he calls me, all calls are

18  tape recorded so --

19      Q    What about the in-person conversations that you've

20  had with him.

21      A    Just public knowledge.  Things on the news.

22      Q    Have you ever gone and spoken to a person named

23  Alesha Widdall?

24      A    Yes.  I haven't gone to speak to her.  I've seen

25  her at church or she has called me or texted me.

Lindsey Wilcox - Cross

1    Q    Now, Alesha Widdall is someone that you coached in

2  field hockey?

3    A    I never coached her, no.

4    Q    Did you know her at Whitney Point?

5    A    Yes.

6    Q    And is it fair to say that Alesha Widdall was a

7  teenager that Todd Broxmeyer coached in field hockey through

8  a, if I can call it, a travel program or travel team type

9  setting?

10    A    It wasn't a travel team.  If the kids chose to sign

11  up for it or to pay or to travel, they would sign up.  But it

12  wasn't one specific team.  If she chose to go, then Alesha

13  would go and play.

14    Q    Okay.  But you knew that she was one of the

15  teenagers that played on these -- at these events or these

16  teams that he put together?

17    A    Yes.

18    Q    And you've actually gone -- you've actually spoken

19  to Alesha Widdall and asked her about sexual contact that

20  she's had with Todd Broxmeyer, is that correct?

21    A    No.  I -- she -- I asked her -- I said to her, you

22  know, to -- anything ever happen, if it happened it's okay.

23  You know to -- this was in the very first week, it's okay to

24  tell somebody or she would call me and cry on the phone and

25  say I can't believe that this happened.  I can't believe -- I

Lindsey Wilcox - Cross

94

1  don't believe that it happened.  And, you know, I would say I

2  don't believe it happened either.  So those were kind of the

3  context of our conversations.

4      Q    You've learned that Todd Broxmeyer had sexual

5  relationships with Alesha Widdall while she was a minor under

6  the age of 18?

7              MR. KILKER:  I'm going to object, your Honor.

8  This doesn't go to anything that deals with her bias at all,

9  including even if he were to assume that the witness had some

10 personal knowledge about something that certainly doesn't

11 have any -- it doesn't have any weight.  It doesn't carry any

12 weight towards her credibility.  What he's asking her to do

13 is to verify an allegation that's collateral to these

14 matters.

15             THE COURT:  Well I think, first of all, this

16 testimony is, as far as I know right now, is not material at

17 the trial in this form anyway, but it might be material as to

18 what she knew about the defendant's activities as charged or

19 not charged but of a nature where he had contact with

20 somebody under the age of 18 in a sexual manner and that

21 might affect the way she thinks about things and, therefore,

22 her testimony.  So for that purpose only, the Court will

23 admit that.

24      A    No.  She never told me that.

25             THE COURT:  Okay.

Lindsey Wilcox - Cross

95

1    Q    Did you ever learn that that was the case, not

2 whether she told you that, did you ever come to learn and

3 conclude in your mind that Alesha Widdall had a sexual

4 relationship with Todd Broxmeyer when she was a minor under

5 the age of 18?

6    A    I heard of rumor through the public or parents that

7 when Alesha turned 18 she went down to view pictures and

8 Jason tried to convince her that pictures -- some of the

9 pictures were her.  And that he made her sign a form stating

10 that she had never had sexual contact with Todd.  That's what

11 Alesha told me and I heard a rumor that she -- the form that

12 she signed was not a form stating she didn't have sexual

13 contact.  It was a form that it was consensual.  Those were

14 the two things, one I heard from Alesha and one I heard

15 around town.

16   Q    Did you reach out or speak to Alesha Widdall?

17   A    No.  I didn't ask her about that.

18   Q    Did you ever ask her or talk to her in any capacity

19 about photographs that she and Todd Broxmeyer took of each

20 other during sexual acts?

21   A    No.  I never heard about that.

22   Q    Did you ever discuss that with Mr. Broxmeyer during

23 any conversations with him?

24   A    No.  If I didn't hear about it, how could I have

25 asked?

Lindsey Wilcox - Cross

96

1    Q    Now, the girls that Mr. Broxmeyer coached through

2    this Sports Plex and also through his New Jersey and PA web

3    site, are you familiar with those web sites that I'm

4    referring to?

5    A    Coached through them, I'm only familiar with the

6    web site where he sold equipment.

7    Q    Okay.  Were you aware that he also had girls from

8    New Jersey and PA who accessed his web site and then hired

9    him to coach them and teach them and train them in field

10   hockey?

11   A    The parents would hire him and pay him and come to

12   his academy but he wasn't hired through a web site.  He was

13   contacted by phone.

14   Q    Okay.  So you were aware of those contacts by

15   parents who then had their teenage girls come up from either

16   PA or even New Jersey to be with his coaching group?

17   A    He had academy in New Jersey.

18   Q    Okay.  That's what I was asking.  I guess we went

19   kind of -- he had girls from out of state that came up here

20   actually and he coached them in this area when he was living

21   with you?

22   A    If they chose to drive up to New York instead of

23   going to New Jersey.

24   Q    Okay.  So you met some of those girls, is that

25   right?

Lindsey Wilcox - Cross

97

1    A    A few of them.

2    Q    And some of those girls Mr. Broxmeyer coached and

3 took to practices at the Sports Plex, is that right?

4    A    What do you mean some of those girls?  Are you

5 talking about girls from New Jersey he coached and then took

6 to the Sports Plex?

7    Q    Right.  From out of state.

8    A    He would bring up -- I don't remember if girls came

9 up from New Jersey, their parents brought them up from New

10 Jersey or if they came up from PA, the girls came up.  The

11 parents brought them up from PA.

12    Q    I think that was my question.  Were there girls

13 that came from PA and New Jersey that came up, whether they

14 drove or parents drove, and came up here to be coached by

15 Mr. Broxmeyer, you were aware of that?

16    A    Yes.

17    Q    And some of those girls you actually met?

18    A    Yes.

19    Q    And is it also fair to say that from time to time

20 Mr. Broxmeyer had some of the girls that he was coaching in

21 your apartment in Lisle, New York?

22    A    Yes.

23    Q    And you knew that at the time when these things

24 happened?

25    A    I knew that when the girls came over I was present.

Lindsey Wilcox - Cross

98

1          THE COURT:  You know, I think this is getting

2    a little bit far afield from the issue here.  We're doing a

3    probable cause analysis.  We're doing a search and seizure

4    analysis and I think we've heard what the officer believed at

5    the time he went in and grabbed the computer, at the time

6    when he took the cellphone at the arrest area and this

7    witness has also shed some light on some of those matters but

8    I think to go any further into other relationships that she

9    might be aware of really don't bear on whether or not the

10   officer had the right to take the computer without a warrant,

11   even though he got a warrant before it was searched and

12   whether or not he had a right to take the cellphone, even

13   though he took the cellphone before a warrant was issued for

14   search of the cellphone and the records.  I think to get into

15   collateral matters is not going to help me make those

16   decisions.

17          MR. LOVRIC:  I'll move onto the next topic,

18   Judge.

19          THE COURT:  Okay.

20   Q    Miss Wilcox, did Todd Broxmeyer, using his

21   cellphone, ever take naked pictures of you?

22   A    No.

23   Q    He didn't?

24   A    Using his cellphone, take a picture of me naked?

25   Q    Correct.

Lindsey Wilcox - Cross                                    99

1      A     No.

2      Q     Did you ever see him using any kind of equipment to

3  take naked pictures of you?

4      A     No.

5      Q     Never?

6      A     No.

7      Q     No camera, cellphone, digital camera, any kind of

8  electronic equipment?

9      A     No.

10              THE WITNESS:  Can I speak to Pat for a second,

11  please?

12              THE COURT:  Are you going to continue on in

13  this area?

14              MR. LOVRIC:  Yes, Judge.

15              THE WITNESS:  Go ahead then.

16              THE COURT:  I don't think that this -- this

17  line of questioning exposes you, except maybe to a charge of

18  perjury, to any kind of criminal liability because as far as

19  I know, and I don't know much about this topic but adults are

20  allowed to take photographs of one another without clothes

21  on.  I don't think there's any crime.

22              THE WITNESS:  Well, I agree with that if

23  photos were taken it was because I was taking them.  So you

24  asked me the question if he took them and the answer would be

25  no.  If I took them, the answer would be yes.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Lindsey Wilcox - Cross                          100

1              THE COURT:  I see.

2   BY MR. LOVRIC:

3       Q    Well, Miss Wilcox, I think you kind of know what

4   I'm asking.  I get the feeling we're kind of beating around

5   the bush here.  Okay.  Photos of you naked were taken at your

6   apartment, right?

7       A    At his apartment.

8       Q    At his apartment, not at your apartment?

9       A    No.

10      Q    And you're saying that all of those photos were

11  taken by you?

12      A    I believe so.  I -- it would have been three years

13  ago.  I remember it was my idea.  I remember I got the

14  camera.  I remember --

15      Q    Did you ever look at those photos?

16      A    Yes.

17      Q    How did you look at them?

18      A    On my laptop or his laptop, or in the camera.

19      Q    The laptop that was at the Sports Plex?

20      A    Did I look at the photos at the Sports Plex?

21      Q    No.  Did you look at the photos on that laptop

22  that -- you just said you looked at the photos, is that the

23  laptop we're talking about?

24      A    I don't remember if it was my laptop or his laptop.

25      Q    When you looked at those photos at any point in

Lindsey Wilcox - Cross                                    101

1   time did you see other photos of young looking teenage girls

2   in naked positions?

3        A    No.

4        Q    You never saw any of that on his laptop?

5        A    No.

6        Q    Did you ever look at his cellphone that he had?

7        A    Periodically I used his cellphone to make phone

8   calls.

9        Q    Did you ever look at the photos that he had on that

10  cellphone?

11       A    No.

12       Q    You never bothered to look at them?

13       A    Why would I?  I have my own phone.

14       Q    Did you know, prior to Mr. Broxmeyer being

15  arrested, did you know that teenage girls under the age of 18

16  were text messaging Mr. Broxmeyer, all the time back and

17  forth, text messages between him and them, were you aware of

18  that?

19       A    He received text messages when I was at the

20  apartment.  He'd receive text messages.

21       Q    Did you know what the substance of those messages

22  was?

23       A    No.  I mean, periodically, it would be, I can't

24  come to practice or, you know, he might open it up and I'd

25  say who is that.  He'd say it was this person.  What's going

Lindsey Wilcox - Cross

1  on.  They can't come to practice or, you know, things like

2  that, usually related to field hockey.

3        Q     Okay.  During the time that you worked at Newark

4  Valley coaching, were there ever times when you came home and

5  Mr. Broxmeyer was there with one or more teenage girls under

6  the age of 18?

7        A     Just one time.  No.  No.

8              THE COURT:  You're going to have to explain

9  how all this is relevant.  I understand the witness'

10 credibility is always an issue.  The Court knows that, but,

11 you know, I don't think --

12             MR. LOVRIC:  I'll move on to another topic,

13 Judge.

14             THE COURT:  All right.

15       Q     Miss Wilcox, Mr. Kilker asked you a question and I

16 wrote down generally what the question was he asked you,

17 whether anyone else had permission to open the facility and

18 this was what he was asking you about.  Ed coming down to

19 open it and your answer was I don't know.  Isn't it a fair

20 statement that you only know that Mr. Broxmeyer had access to

21 that facility but you don't know how many other persons,

22 coaches or personnel in addition to Mr. Broxmeyer, had access

23 and used that facility?

24       A     The only knowledge I have is that Todd had a key

25 and Ed Yetsko had a key.  Those were the only two people that

1  I had ever seen or heard of had a key or access to the

2  building.

3      Q    And you don't know if other coaches other than Mr.

4  Broxmeyer were given keys by Ed Yetsko in order to use the

5  facility, for example, when you and Mr. Broxmeyer were not

6  there?

7      A    I just said the only people I were aware of having

8  a key were Todd and Ed Yetsko.

9      Q    And you don't know if there were other people, do

10 you?

11     A    I said the only people I were aware of were Todd

12 Broxmeyer and Ed Yetsko.

13     Q    Now, you refer to the office area as Mr.

14 Broxmeyer's office?

15     A    Correct.

16     Q    That's not his office, is it?

17     A    Yes.

18     Q    Well he puts things in there but it's not an office

19 that belongs exclusively to him, is it?

20     A    Yes.  It's the manager's office, he's the manager

21 of the Sports Plex.

22     Q    And other people also kept equipment and things in

23 that office, isn't that correct?

24     A    If he allowed them to keep their equipment in that

25 office or if he found their equipment, he would store it in

Lindsey Wilcox - Cross

104

1  their office and lock it up.

2      Q    And if Ed Yetsko decided he wanted people to have

3  access and store things in there, he allowed people to have

4  access and store things in there?

5      A    If Ed Yetsko runs the entire building, Ed Yetsko

6  can unlock any door he wants to unlock for anyone.  So if Ed

7  wanted to unlock his employee's door, he can unlock Todd's

8  office.

9      Q    So the answer to that is yes?

10     A    That would be correct.

11              MR. LOVRIC:  That's all I have, Judge.

12              THE COURT:  Mr. Kilker, anything further from

13  this witness?

14              MR. KILKER:  No, your Honor.

15              THE COURT:  Okay.  Thank you, Miss Wilcox.

16  You may step down, ma'am.

17              (Witness excused).

18              THE COURT:  Anything further?

19              MR. KILKER:  Mr. Broxmeyer would like to

20  testify at this hearing.

21              THE COURT:  Okay.

22              THE CLERK:  Will the witness please state his

23  name for the record.

24              THE WITNESS:  Todd James Broxmeyer.

25

Todd Broxmeyer - Direct

1   T O D D    B R O X M E Y E R, having been called as a

2   witness, being duly sworn, testified as follows:

3   DIRECT EXAMINATION

4   BY MR. KILKER:

5       Q    Mr. Broxmeyer, can you please give us your full

6   legal name.

7       A    Todd James Broxmeyer.

8       Q    And, Mr. Broxmeyer, where are you located right

9   now?

10       A    Broome County Correctional Facility.

11       Q    And prior to being at the Broome County

12   Correctional Facility, did you have a regular residence?

13       A    Yes, sir.

14       Q    And what was that location?

15       A    It was in Lisle, the exact -- we don't have an

16   exact mailbox, so we just had a PO Box, so I think it's 9017

17   Main Street.  That could be wrong.

18       Q    Were you residing back in Lisle on December 21 of

19   2007?

20       A    Yes, sir.

21       Q    Is that the last day that you had been living at

22   the Lisle residence?

23       A    Yes, sir.

24       Q    And did you live alone at the Lisle residence or

25   did you live with somebody else?

Todd Broxmeyer - Direct

1    A    I lived with my girlfriend, it was actually her

2  apartment and then I moved in from New Jersey.

3    Q    What was her name?

4    A    Lindsey Wilcox.

5    Q    And did something happen on December 21, early

6  hours of the 22, that you no longer lived there?

7    A    Yes.  Detective Ellis showed up and at whatever,

8  3:30 in the morning.

9    Q    3:30 in the morning Detective Ellis appeared at

10  your Lisle residence, is that right?

11    A    Yes, sir.

12    Q    You had a conversation with him?

13    A    Yes, sir.

14    Q    What was the nature of that conversation?

15    A    He -- they knocked on the door and I went and

16  answered it and they asked who I was and I gave them my name.

17  They said they wanted to talk to me, so Lindsey was sleeping

18  so I said okay.  Let me step outside because my girlfriend's

19  sleeping and then he started asking me some questions.

20    Q    What questions were you being asked at that time?

21    A    He asked me about, if I had been with Jackie

22  Bendick, Katie Thorp earlier in the evening and I said yes.

23    Q    And what other questions did he ask regarding the

24  girls?

25    A    I don't remember specifically.  It's -- I mean, I

Todd Broxmeyer - Direct

1  asked -- he said if I'd been with them and then I was -- I

2  don't remember.  I can't tell you his exact words.  I can

3  only, you know, give you a synopsis of the situation.

4      Q    Did there come a time that you would be escorted

5  down to the station for some further questioning?

6      A    Yes.  At that point I asked him what it was about.

7      Q    And what was your understanding of what it was

8  about?

9      A    He said we just have some questions to talk to you

10 about.

11     Q    And what did you do, did you grab your coat, your

12 keys?

13     A    That was out on the porch and then we went back

14 inside and by this point Lindsey had woken up and was in the

15 bedroom and I went in to get dressed and she asked what's

16 going on?  I said I don't know.  These officers are here and

17 they're asking about Jackie and Katie.  And Lindsey -- at

18 this point I had been dressed and we were moving into the

19 living room and he said -- I'm sorry, Lindsey said you

20 weren't alone, right?  I was like, no, we weren't alone,

21 together at all times.  And then I said, you know -- I

22 grabbed my keys and my cellphone and my jacket by the door

23 and I put my jacket on and I had my keys as well and I said

24 I'll just follow you guys down.  They said no, that's okay,

25 you can ride down with us, we'll have you back in like an

Todd Broxmeyer - Direct

1  hour.

2      Q    And then you entered a marked patrol car, correct?

3      A    Yes, sir.

4      Q    You were in the rear of the vehicle?

5      A    Yes, sir.

6      Q    And Detective Ellis indicated he was in the front

7  right seat.

8      A    Yes, sir.

9      Q    And Detective or Deputy Sienko was in the driver's

10  seat?

11     A    Yes, sir.

12     Q    And as you drove down to the station, there's an

13  allegation you made a text message, is that correct?

14     A    Yes.

15     Q    To whom was that text message and what were the

16  contents?

17     A    I texted Jackie because they didn't give me an

18  answer as to why I was in the car and I said something that's

19  not normal in my life, I said why am I in the back of police

20  car?  I did that for the reason they had mentioned her name.

21     Q    When you arrived at the station, can you tell us

22  what the layout was and where you exactly went when you got

23  there?

24     A    I was getting out of the back of the car, you

25  walk -- they park in front so you got out, went to I think

Todd Broxmeyer - Direct

1    it's a glass door, go through a glass door, you go to the

2    right or down a hall and to the right and there was some

3    rooms, I guess interview rooms.

4         Q    Now, did you go into the interview room with your

5    keys, your coat, your cellphone?

6         A    I -- I started to go in but they -- Detective Ellis

7    said that I couldn't have my jacket on and, you know, to make

8    sure I didn't have anything, you know, that would be -- could

9    be used against them I guess.  He didn't say specifically

10   why, he just made me take off my jacket and he took my

11   jacket.

12        Q    Do you recall if he searched the jacket at that

13   point?

14        A    As they were walking out the door they were feeling

15   the outsides of the jacket.  I can't say they went into a

16   pocket at that point.

17        Q    And then the door was closed and you couldn't see

18   after that, is that fair to say?

19        A    Yes, sir.  I sat down in the chair and the chair is

20   at the opposite end from the door.

21        Q    You were then interviewed for a brief period of

22   time?

23        A    Yes, sir.

24        Q    And they asked you some questions?

25        A    Yes, sir.

Todd Broxmeyer - Direct

1    Q    Do you recall the questions that were being put to

2   you at that time?

3    A    That -- just things that he had stated in reference

4   to, if I had given them a ride home, if they went to the

5   Sports Plex.  I think that was -- and then --

6    Q    Was there any discussion of any potential images

7   that might have been on your cellphone?

8    A    There was.  There was a question of images.

9    Q    And do you recall whether you indicated whether

10  those images were sexual in nature or not?

11   A    Did not.  Not that I can recall.

12   Q    Ultimately they charged you with rape in the first

13  degree --

14   A    Yes, sir.

15   Q    -- and among some other things, is that right?

16   A    Yes is.

17   Q    You've been in the Broome County Jail since?

18   A    Yes, sir.

19   Q    Now, we heard some testimony that you were a

20  manager of a Sports Plex, is that right?

21   A    Yes, sir.

22   Q    And that's located on Robinson Hill Avenue?

23   A    Robinson Hill Road.

24   Q    What township?

25   A    It's in Union.

Todd Broxmeyer - Direct

1      Q     And how long have you been a manager at that

2  facility?

3      A     There was an agreement made when I moved up here

4  approximately, I guess it would have been two years ago or

5  whatever the specific date I'm not sure.  I could find it but

6  I don't off the top of my head -- with Ed Yetsko because his

7  daughter had been coming to training sessions and when

8  Lindsey and I met and had dated and decided that it wasn't a

9  long distance relationship, I decided that, you know, it

10  would be okay to move up here because Ed had made a

11  suggestion, well, the Sports Plex needs a full-time manager

12  but we don't have the money to pay you.  I said okay.  So for

13  the time being we'll work it out where I can run sessions

14  and, you know, when you can give me some money we'll work it

15  out that way.  But then before the summer of this year, I

16  believe or I am, I'm sorry, before the summer of 2007, they

17  had worked out the budget to I would become a paid employee

18  as opposed to gratis employee.

19      Q     As the manager there, were you responsible for

20  opening and closing the facility?

21      A     Yes.

22      Q     And you did that by means of a key I take it?

23      A     Yes.

24      Q     And who else besides yourself had authority to

25  enter and exit the building with a key?

Todd Broxmeyer - Direct

1    A    That I know of, there was myself and Ed and then

2  there was a lacrosse guy that ran the lacrosse leagues that

3  we would call periodically if I couldn't be there.  Now, I

4  was there arguably 15 hours a day on a lot of days,

5  especially in the wintertime because we had been having snow

6  and I was also in charge of doing the snowplowing and the

7  garbage and the mopping and everything that -- and the

8  vacuuming of turf which takes hours upon hours so Ed had been

9  doing this previously, you know, whenever he could, you know,

10  before last summer and then he, his wife and him had just had

11  enough because he was spending so much time there.  So that's

12  why the budget came about and that I became a paid employee.

13    Q    Besides the two of you and you mentioned the

14  lacrosse, someone, lacrosse coach or something?

15    A    Yes.  I can't recollect his name.

16    Q    On the 22 day of December, I understand you had a

17  practice that was scheduled at 10:00 at the facility, is that

18  right?

19    A    If it was 10:00 I'm shocked.  I don't remember.

20  The only reason it would have been 10:00 -- oh, you know, it

21  was, it was 10:00 because that afternoon I had started a gift

22  program and we were going to deliver three families a lot of

23  money in gifts that was donated.  So 10:00 would be right.

24    Q    Now, when you were arrested were you able to make

25  any calls to let people know that you were going to be

Todd Broxmeyer - Direct                              113

1    unavailable?

2         A    No.

3         Q    Was there any other teams or any other programs

4    scheduled for the 22 of December at the Sports Plex?

5         A    No.

6         Q    Your team wasn't there, there would be no teams

7    there?

8         A    That's correct.

9         Q    If you didn't open the Sports Plex, who would or

10   could?

11        A    Would have, nobody.  There would have been nobody

12   there, nobody there for that week.

13        Q    And the only other one that you're aware of that

14   has a key is Ed Yetsko?

15        A    And the gentleman with the lacrosse leagues but

16   there was nothing going on.

17        Q    He had no reason to be there?

18        A    No.  Not at all.

19                  MR. KILKER:  That's all I have.

20                  THE COURT:  Mr. Lovric.

21                  MR. LOVRIC:  Thank you, Judge.

22                  THE COURT:  Briefly.

23                  MR. LOVRIC:  I'm sorry.

24                  THE COURT:  Briefly.

25

1    CROSS-EXAMINATION

2    By MR. LOVRIC:

3        Q    Okay.  Good afternoon, Mr. Broxmeyer.

4        A    Good afternoon.

5        Q    Mr. Broxmeyer, let me start with the last topic

6    that you just discussed with Mr. Kilker.  You knew that in

7    addition to you, Ed and this we'll call him lacrosse coach,

8    had full access and keys to the plex and that office, is that

9    a fair statement?

10       A    You can say they had access but the lacrosse coach

11   wouldn't enter my office unless he asked or unless he was

12   given permission by me because it was cold in there and I

13   would sometimes say by all means go ahead, you can use my

14   office because I had a heater in there.

15       Q    That wasn't my question.

16       A    I don't know.

17       Q    Did you understand my question?

18       A    And I answered it in the beginning but I need to

19   clarify something with it as well.

20       Q    Well I'd ask you if you can answer my question?

21       A    I did.

22       Q    And Mr. Kilker wants to clarify something, he can

23   do that.  My question again is:  When you were the manager of

24   the Sports Plex you knew that in addition to you having a key

25   and access, Ed and this lacrosse coach had equal access and a

Todd Broxmeyer - Cross

1  key to the plex and that office, is that a fair statement?

2      A    You can say that, yes.

3      Q    I did say that.

4      A    And I said yes.

5      Q    Okay.  So in addition to you, Ed Yetsko could come

6  and go any time he chose into that office and that Sports

7  Plex as well as the lacrosse coach, is that a fair statement?

8      A    Sure.

9      Q    Okay.  And the office that was utilized in that

10 Sports Plex, that was an office that other people besides you

11 utilized, is that a fair statement?

12     A    No, that's not.  It's not a fair statement because

13 there was no reason for anybody else to use that office

14 unless they were given permission.

15     Q    And if Ed Yetsko gave anybody permission to go into

16 that office, he had the ability to do that, is that right?

17     A    Why would he?  That's my question.  I don't

18 understand.  He wouldn't do it.

19     Q    How about if we stick to I'll ask the questions and

20 if you can answer them for me, would that be okay?

21     A    It wouldn't be likely that Ed Yetsko would do that.

22 Could it have happened, sure.

23     Q    And it did happen?

24     A    No.  When?

25     Q    Ed Yetsko gave Detective Ellis access to that

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Todd Broxmeyer - Cross

1   office, brought him in, opened it, and told him to look

2   around and then told him he could take that laptop?

3       A    At the behest of Mr. Ellis.  He asked -- Mr. Ellis

4   went in and asked about that.

5       Q    Detective Ellis asked Mr. Yetsko if he wouldn't

6   mind opening up the place, Mr. Yetsko opened it up for him

7   and Mr. Yetsko allowed him to take that laptop from that

8   office, do we agree on that?

9       A    You can say yes, that's the scenario of the events

10  that I've been told.

11      Q    Okay.  So, Mr. Broxmeyer, when you left -- just so

12  there's no mistake -- the laptop that was seized that

13  Detective Ellis took from that office, that is your laptop,

14  right?

15      A    I -- I haven't seen it but I would assume it is the

16  one I left, my laptop on the desk.

17      Q    So the laptop, if there was one that was taken out

18  of that office from the Sports Plex, that's the last place

19  you left your laptop in a black case, is that right?

20      A    In my office, yes.

21      Q    And, okay, can we also agree that all of the

22  materials on that laptop belong to you?

23      A    What?  I mean as far as what material?  People had

24  access to my computer at times.

25      Q    Oh, okay.  Let's talk about that.  You gave other

Todd Broxmeyer - Cross

117

1   people access to your laptop?

2        A     Okay.  Can I tell you how it works?

3        Q     Sure.  Sure.

4        A     Virginia Beach, we were at a tournament, people

5   needed to send e-mails, I let them.  I let them send e-mails

6   because there was wireless at the hotel.  So on occasion

7   people have had access to my computer.

8        Q     Did you ever let anybody have access to your

9   computer in that office at the Sports Plex?

10        A     Would people go down -- I can't say that it didn't

11   happen when I was there.  When I was at the Sports Plex, if

12   somebody needed to send an e-mail, sure.

13        Q     Okay.  Did you ever allow people to use your laptop

14   when you weren't standing right there over them?

15        A     Yeah.  Yes.

16        Q     Okay.  Again, ask you, the materials on that

17   laptop, do they belong to you or don't they belong to you?

18        A     The laptop is mine.  I mean, anything that I wrote

19   would be mine.  I mean --

20        Q     Okay.  I'll move on, Mr. Broxmeyer.  At the time

21   that you were manager at the Sports Plex, you knew that other

22   people had access and could come if they chose to into that

23   office when you were not there?

24        A     I knew Ed and the lacrosse coach, yes.

25        Q     Okay.  Now, did you know or did you learn that

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

 1  Lindsey Wilcox called Ed after Detective Ellis had left

 2  interviewing her at the Lisle apartment and said Detective

 3  Ellis was on his way over to the Sports Plex?

 4        A    I learned that today.

 5        Q    That's the first time you learned it?

 6        A    Yes.

 7        Q    You've never discussed that with Lindsey Wilcox?

 8        A    No.

 9        Q    You've never said that to her --

10        A    No.

11        Q    -- in your conversations with her?

12        A    No.  You can ask it 13 different ways, no.

13        Q    And when -- let me withdraw that.  Let me go on to

14  another area.  Mr. Broxmeyer, when Detective Ellis came to

15  the apartment in Lisle, New York --

16        A    Yes.

17        Q    -- this would be about 4-ish in the morning of the

18  22?

19        A    Sure.

20        Q    You know the event we're talking about?

21        A    Yes.

22        Q    He indicated in so many words that he wanted to

23  speak with you about something dealing with Katelyn Thorp and

24  Jackie Bendick?

25        A    Yes.

Todd Broxmeyer - Cross                                    119

1     Q     And in so many words, he indicated to you that he

2 would like to speak to you about that at his office, is that

3 a fair statement?

4     A     Yes.

5     Q     And at some point you agreed to accompany him to

6 his office?

7     A     Yes.

8     Q     And you did that voluntarily, is that a fair

9 statement?

10    A     Yes.

11    Q     He didn't say you're under arrest or --

12    A     No.

13    Q     -- I'm directing you to come with me or anything of

14 that sort?

15    A     No.

16    Q     You went voluntarily?

17    A     Yeah.  I even offered to drive myself.

18    Q     Okay.  And at the time when you went voluntarily,

19 you weren't under any legal pressure to go, is that a fair

20 statement?

21    A     I've never had a police officer at my house.  I've

22 always assumed if somebody wants you to go with them, you go

23 with them.  I wouldn't know not to.

24    Q     So you did accompany them and accompany them into

25 their vehicle and down to their office?

Todd Broxmeyer - Cross

1      A     Yes.

2      Q     And you actually were the one that grabbed your

3   jacket which also had your cellphone in it?

4      A     No.  My jacket was hanging up, my cellphone and

5   keys were on the living room table, and then I put my jacket

6   and keys in my -- or my keys and cellphone in my jacket.

7      Q     Okay.  Maybe I wasn't clear.  You picked up the

8   jacket, keys and cellphone.  Detective Ellis didn't pick

9   those items up at your apartment, did he?

10     A     No.

11     Q     So you brought those with you at your choosing, is

12  that a fair statement?

13     A     Yes.

14     Q     And you brought those with you down to the

15  sheriff's department and then an interview occurred at that

16  location?

17     A     Yes.

18     Q     And you do recall Detective Ellis advising you of

19  your -- they call it Miranda rights -- that you have a right

20  to a lawyer?

21     A     Yes.

22     Q     He did do that, didn't he?

23     A     Yes.

24     Q     And, in fact, he presented you with a form that you

25  signed, is that a fair statement?

Todd Broxmeyer - Cross

1    A    Yes.

2    Q    And you signed it?

3    A    Initialed and signed --

4    Q    I'm sorry?

5    A    Initialed where it was asked and I signed it where

6    it was asked.

7    Q    And you agreed to speak to -- speak with Detective

8    Ellis voluntarily and without having a lawyer present?

9    A    Yes.

10    Q    Is it a fair statement during your conversation

11    with Detective Ellis you were not under arrest?

12    A    No.  Not -- not until he arrested me at the end of

13    the conversation.

14    Q    Right.  But you, at that point in time, you were

15    free if you wanted to get up and say I'd like to leave now?

16    A    No, because --

17    Q    You weren't?

18    A    No.  Let me -- let me -- the overlying feeling was

19    I didn't have a car, how was I going to get home?  I didn't

20    know.  I was under the assumption that I had to sit there.

21    There was no -- nobody said that I could get up and leave

22    whenever I wanted.

23    Q    Nobody said that but what lead you to that

24    assumption?

25    A    I'm in a police station and somebody just gave me a

Todd Broxmeyer - Cross

1    ride down there, why would I think I could get up and leave?

2    That's silly.

3         Q    You just said you voluntarily came and nobody

4    forced you or coerced you or in any way pressured you to go.

5    Why would you believe that you couldn't leave?

6         A    I never -- do you watch -- I'm sorry, I watch too

7    much television I guess, because I just assumed you couldn't

8    get up and go.

9         Q    Let me ask you a more, I guess, pointed question on

10   the topic.  Was there anything that Detective Ellis or any

11   other officer said to you that lead you to reasonably believe

12   you could not leave?  Did they say anything to you?

13        A    There weren't any specific statements that I could

14   recollect, no.

15        Q    And during that conversation you did tell Detective

16   Ellis about utilizing your cellphone to send pictures to some

17   of these young girls and that they sent you some pictures

18   from their cellphone to your cellphone?

19        A    I don't remember the exact wording used but he

20   was -- asked if there was pictures in exchange and there had

21   been pictures.

22        Q    And you told him that there were?

23        A    That there had been pictures exchanged?

24        Q    Correct.

25        A    Sure.

Todd Broxmeyer - Cross

1    Q    From your cellphone and the cellphone of these

2    young girls?

3    A    No.  I told him Katie had sent a picture of her

4    face the day before.  He said there was pictures, I said yes.

5    Q    Did you in so many words tell Detective Ellis that

6    some of the pictures that either you sent to them using your

7    cellphone or they sent to you using their cellphone, that

8    some of those were naked in nature?

9    A    Not that I can recollect.

10   Q    Did you or didn't you?  You don't remember?

11   A    I can't remember what this conversation was.  I'd

12   have to, if it's on videotape, I'd like to see it and I can

13   tell you then.

14   Q    Did you review that videotape that I provided to

15   Mr. Kilker?

16   A    No, sir.

17   Q    You didn't watch that videotape?

18   A    No, sir.

19   Q    Okay.  Well, the earliest opportunity maybe you can

20   do that.  When the interview ended, that was when Detective

21   Ellis was asking you if you would take some kind of a stress

22   analyzer.  At that point you told him in so many words that

23   you'd like to talk to a lawyer, is that a fair statement?

24   A    Towards the end -- yeah, when he asked that, that's

25   when I stopped the interview and asked for a lawyer.

Todd Broxmeyer - Cross

124

1    Q    And he stopped questioning you --

2    A    Yes.

3    Q    -- other than maybe when, after he arrested you,

4  your name, your date of birth and your, as we call it,

5  pedigree information?

6    A    That's right.

7    Q    But he stopped asking you questions dealing with

8  anything about this matter or the allegations, is that a fair

9  statement?

10   A    Yes.

11   Q    Okay.  And after you were arrested at the sheriff's

12 department then, were you processed and lodged at the jail?

13   A    Yes.

14   Q    Now, on the way down to the sheriff's department,

15 you did, in fact, text Jackie Bendick and say to her in sum

16 and substance why am I in a police car?

17   A    Yes.

18   Q    Okay.  You're grinning, why is that?

19   A    Because my cellphone is well lit and when you open

20 a cellphone in the dark you can -- I would sometimes use my

21 cellphone to get to where the lights are in the Sports Plex,

22 it's almost like a flashlight, so for Mr. Ellis to sit there

23 and say he didn't see the light is a lie.

24   Q    You're calling him a liar?

25   A    I'm questioning it.  I'm not calling anybody a

Todd Broxmeyer - Cross

1  liar.  I just --

2      Q    Maybe he's looking at something in front, maybe he

3  was looking at some report or reading.

4      A    When he turned and looked at me, he was talking to

5  me.

6      Q    You weren't on the phone with Jackie Bendick the

7  entire time to the station?

8      A    Not the entire time but I was on the phone, the

9  phone was open.

10     Q    But you had one text to her, that was the only

11 text, why am I in a police car?

12     A    Right.

13     Q    Did -- she didn't respond to you, did she?

14     A    No.

15     Q    Okay.  So you texted her that and am I correct you

16 texted her that because you knew they were going to question

17 you about events that happened with her and Katelyn Thorp the

18 night before?

19     A    I wanted to know why I was in the back of police

20 car.  I had no idea.

21     Q    You had no idea why you were in the back of a

22 police car?

23     A    When I asked Detective Ellis, he asked me to come

24 down to the station, I said I agreed.

25     Q    Now, when you were using the Sports Plex facility,

Todd Broxmeyer - Cross                          126

1    you were also from time to time down in New Jersey using a

2    facility there?

3          A    Yes.

4          Q    And in fact --

5          A    Not a facility, per se.  I would -- outdoor field.

6    Once in a while I would rent an astro turf but the weather

7    was fairly conducive to being outside a lot of time and in

8    the winter sometimes I would sometimes rent space on a hard

9    court because it's a different style of game.

10         Q    Did you ever use an indoor facility in New Jersey

11   or PA from -- during the entire time that you lived with

12   Lindsey Wilcox?

13         A    I'm sorry.  I don't understand.  Did I use one

14   specific one?

15         Q    No.  Did you ever, other than the Sports Plex, did

16   you ever use any other indoor facility?

17         A    I rented time at Ed's, at different things

18   depending on the weather.

19         Q    Different facilities?

20         A    Sure.  At either a school or -- there's an astro

21   turf that's down there once in a while.

22         Q    So my follow-up question is:  During the time that

23   you were utilizing the Sports Plex facility, indoor facility,

24   there were other facilities that from time to time you

25   utilized to run training sessions or practices, indoor

Todd Broxmeyer - Cross

127

1    facilities?

2        A    Yes.

3        Q    Okay.

4        A    Okay.

5        Q    So the Sports Plex is not the only indoor facility

6    that you utilized to run or train teenagers in field hockey?

7        A    It's the only one I was employed at but it's not

8    the only I would have access to.  It's only one I used in

9    this area.

10       Q    The cellphone?

11       A    Yes.

12       Q    That you brought with you?

13       A    Yes.

14       Q    To the station, that's your cellphone?

15       A    Yes.

16       Q    It begins with area code 570?

17       A    Yes.

18       Q    That's your personal cellphone?

19       A    Yes.  I use it more for business but it was

20   everything.

21       Q    And the items, materials on that cellphone, do they

22   belong to you?

23       A    It's my cellphone, I mean, I guess you could say

24   that, yes.

25       Q    I did say that.  I'm asking you.

Todd Broxmeyer - Cross

128

1    A    I said yes.

2    Q    With that cellphone you also had what's called a

3  PIX account?

4    A    Yes.

5    Q    And if I can just summarize it, it's an account at

6  Verizon Wireless where you can store images and videos?

7    A    Yes.

8    Q    And that was password protected, is that correct?

9    A    Yes.

10    Q    You needed a password to get in?

11    A    Yes.

12    Q    And you did, in fact, store videos and images on

13  that account?

14    A    Yes.

15              MR. LOVRIC:  That's all I have, Judge.

16              THE COURT:  Okay.  Mr. Kilker, anything

17  further?

18              MR. KILKER:  Just a follow up on those last.

19              THE COURT:  Okay.

20  REDIRECT EXAMINATION

21  BY MR. KILKER:

22    Q    In connection with your cellphone, if you were to

23  open your cellphone, can you access images from the cellphone

24  immediately?

25    A    Immediately?

Todd Broxmeyer - Redirect

1    Q     Without typing in some sort of password or pass

2  code?

3    A     On my specific phones, most phone now a days have a

4  photo log I guess and you can use, you can store photos there

5  but have you to go through -- the password protected one is

6  no, you'd have to go through some hoops.

7    Q     There's a difference between password protected and

8  images that are simply found on the phone?

9    A     Right.

10    Q     But there are images that can be stored on the

11  phone without a password?

12    A     Yes.

13    Q     All that has to happen is your phone is on and

14  accessible?

15    A     Yes.

16    Q     Was your phone on and accessible at the sheriff's

17  department on the 21?

18    A     Yes.

19              MR. KILKER:  That's all I have.

20              THE COURT:  Mr. Lovric, anything further?

21              MR. LOVRIC:  No other questions.

22              THE COURT:  Okay.  Thank you, Mr. Broxmeyer.

23  You may step down, sir.

24              (Witness excused)

25              THE COURT:  Mr. Kilker, any other witnesses?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Todd Broxmeyer - Redirect

1              MR. KILKER:  No other witnesses, your Honor.

2              THE COURT:  Mr. Lovric, any rebuttal

3   witnesses?

4              MR. LOVRIC:  No, your Honor.

5              THE COURT:  So the evidence is closed?

6              MR. LOVRIC:  Yes.

7              MR. KILKER:  Yes.

8              THE COURT:  All right.  Okay.  Did you want to

9   summarize why I should suppress the item requested?

10             MR. KILKER:  Yes, your Honor.  When it comes

11  down to the cellphone, Lindsey Wilcox testified she had a

12  conversation with Investigator Ellis back at the Broxmeyer/

13  Wilcox residence just after Mr. Broxmeyer was arrested

14  wherein she indicated that Mr. Ellis had advised her that he

15  was aware of the images that were on Mr. Broxmeyer's phone

16  because he had looked at them.  Now, Mr. Broxmeyer had taken

17  his cellphone down to the station when he went, Detective

18  Ellis had asked for the cellphone and if you credit the

19  testimony of Miss Wilcox and that of Mr. Broxmeyer with his

20  cellphone, it's very possible that he did, in fact, look at

21  those images prior to getting the warrant.  If that is the

22  case, while he may have been able to seize the cellphone

23  itself at some point incident to arrest, the images that he's

24  referring to, our position is that he looked at before he

25  arrested Mr. Broxmeyer and then ultimately applied for a

USA vs Todd Broxmeyer

1   search warrant and then searched through the remainder of the

2   accounts that were the PIX accounts and so on.  If that's the

3   case, then Mr. Broxmeyer's Fourth Amendment rights were

4   violated and those images should be suppressed.

5            With regard to the computer itself, the issue

6   is access to that office and whether it's under exclusive

7   control of Mr. Broxmeyer.  We know that it's under at least a

8   limited control of Mr. Broxmeyer since he was the manager of

9   the facility and that he and at least Mr. Yetsko had access

10  to that facility.  More importantly, though, Mr. Broxmeyer

11  was arrested and taken into custody, he is not a threat to

12  remove that particular laptop.  The concern that Detective

13  Ellis had was that perhaps others had access to the facility;

14  that the laptop might be removed before he was able to obtain

15  a warrant and, therefore, those are exigent circumstances

16  that exist.

17           The fact that Ed Yetsko had a key and that he

18  was summoned down there for the purposes of getting into the

19  facility by the detective demonstrates that no other person

20  had actively opened the facility.  They had to go through the

21  front door, unlock the front door, go around the concession

22  stand and through another locked door in order to access the

23  computer that was in Mr. Broxmeyer's office.  The testimony

24  is that Mr. Broxmeyer had majority control over that area in

25  which that computer was located.  That being the case, were

USA vs Todd Broxmeyer

132

1   there other people that had access or the ability to enter

2   there and the testimony is yes, but with permission.  You

3   know that Ed Yetsko had permission because he had a key but

4   he was specifically requested and directed to go down and

5   open the facility when Mr. Broxmeyer was arrested because Mr.

6   Broxmeyer couldn't open the facility obviously because his

7   keys were with him and he was in custody.  The testimony from

8   Lindsey is that she's aware of no other person having a key

9   other than Yetsko and Mr. Broxmeyer and that he is the

10  manager of the facility and, therefore, that is his office;

11  that Mr. Yetsko spends a limited amount of time there and if

12  Mr. Broxmeyer doesn't open and give permission for people to

13  access that office, then the only other person who could is

14  Mr. Yetsko.  Mr. Yetsko opened the facility at -- very well

15  the officer could have gotten a warrant without the concern

16  about exigent circumstances that the computer would have been

17  lost somehow.  The limited access that were -- Yetsko had to

18  the facility coupled with the fact that practice was

19  cancelled as a result of Mr. Broxmeyer's inability to open

20  the facility yields a result that that computer was seized

21  illegally because there were no exigent circumstances at that

22  time.  A warrant could have been obtained and then ultimately

23  seized and, therefore, anything else that happened after that

24  point should be suppressed as well.  And that's our position

25  on those two issues.

1          THE COURT:  Let me ask you this:  Assuming

2    without deciding that the computer -- I'll go in reverse

3    order -- was not seized pursuant to exigent circumstances or

4    probable cause before the computer was searched as I

5    understand it at the CATS facility -- a warrant was signed by

6    Judge Gaul permitting that examination.  So, would you say

7    that if I suppressed the computer itself, that there's no

8    basis that the Court has to suppress the information that was

9    retrieved from the computer because it was retrieved pursuant

10   to a lawful warrant?

11          MR. KILKER:  The lawful warrant has to

12   obviously be based on probable cause that computer contained

13   images of a sexually explicit nature, pornographic nature.

14   The testimony doesn't reveal that was the case because the

15   girls had indicated that they were using cellphones and Mr.

16   Broxmeyer's cellphone --

17          THE COURT:  Wait a minute.  Nobody raised the

18   issue of the warrant being defective.

19          MR. KILKER:  That's correct, Judge.

20          THE COURT:  The issue is was the computer

21   lawfully seized.  I'm saying, supposing I agree with you that

22   it wasn't, where do you go from there because obviously the

23   evidence that was retrieved from the computer comes in

24   because it came in pursuant to a warrant that was issued by a

25   judge with the authority to issue it, right?

USA vs Todd Broxmeyer

134

1            MR. KILKER:  That is correct.

2            THE COURT:  Okay.  I just want to know what

3    your position is.

4            Mr. Lovric, did you want to be heard on these

5    issues?

6            MR. LOVRIC:  Yes.  I didn't know if Mr. Kilker

7    was finished.

8            THE COURT:  I'm sorry.

9            MR. KILKER:  I'm done.

10            THE COURT:  Do you have more, Pat?

11            MR. KILKER:  No.

12            MR. LOVRIC:  Judge, yes, if I may and I'll try

13    to be as pointed as I personally can be.  It's not always

14    successful.  Judge, in my view there's two very narrow

15    issues.  The issue is not raised by the defense and motion's

16    not made.  They have not attacked the search warrants or

17    probable cause determinations of the warrants.  The first

18    issue, and I'll take it in the order of events.  The defense

19    has raised the issue that the cellphone was impermissibly

20    seized, taken into custody and then the defense has made the

21    allegation that subsequent to that event, the police viewed

22    materials on the cellphone prior to obtaining the search

23    warrant which is in evidence as Government's Exhibit 1.

24            First of all, addressing the cellphone.  It is

25    crystal clear, and even the defendant has admitted that he

USA vs Todd Broxmeyer

1   voluntarily went with the police and that he chose to bring

2   that cellphone and that the police did not in some way

3   orchestrate that cellphone coming with him.  Once he had that

4   item with him and after he voluntarily went to the sheriff's

5   department, and after he was interviewed, he was arrested and

6   the arrest was based on probable cause.  At least one minor

7   had already directly provided police information that Mr.

8   Broxmeyer had raped her the previous night.  Once he was

9   arrested, there are two provisions of law that permit the

10  police to take that cellphone that he had brought with him.

11  The first is, it is permissible for police to search a person

12  and his clothing for anything that he has on him after a

13  lawful arrest.  Now, the defense has not even contested

14  whether the arrest was lawful or not.  They've conceded that

15  the police had probable cause to arrest Mr. Broxmeyer at the

16  conclusion of that interview.  Once they did that, the police

17  have the right to search him and remove any property on him

18  or on or in his clothing.  There are numerous Second Circuit

19  cases and I believe there's even a US Supreme Court case that

20  simply says that pursuant to a lawful arrest.  Secondarily,

21  the police were also entitled to remove all of his personal

22  property from him for inventory purposes.  They were entitled

23  to take his personal property even if it has no evidentiary

24  value and secure it so that there's not an allegation it was

25  lost or stolen or mishandled or something to that effect.  In

USA vs Todd Broxmeyer

136

1   this particular case, the police had the right under both

2   legal principals to take that phone into their custody.  The

3   evidentiary side of it is crystal clear in our view because

4   Detective Ellis had direct knowledge from one of the victims

5   that Mr. Broxmeyer had, using his phone, sent her images,

6   naked images of himself, and that she had sent to his phone

7   an image of her in her underwear after he had asked her to

8   send him an image of her in the nude.  Secondarily, Mr.

9   Broxmeyer himself admitted prior to being placed under arrest

10  he had utilized his cellphone to receive images from these

11  girls and that he also sent them and that in the testimony of

12  Detective Ellis, that some of these images were naked in

13  nature.  So when Detective Ellis found that phone in Mr.

14  Broxmeyer's coat, after Mr. Broxmeyer was under arrest, he

15  had authority to seize it as evidence knowing what he knew

16  but he also had authority to seize it for the purpose of

17  inventorying that property.

18            I simply address Miss Wilcox's allegation as,

19  at very best and I put this very mildly, she is confused but

20  at the worst, she has a very clear and distinct motive to

21  marshal events and conversations based upon her predicament

22  in terms of where she is in relation to a civil action

23  directly related to Mr. Broxmeyer's conduct.  Giving her

24  whatever benefit of doubt anyone might choose to do, she may

25  have heard Detective Ellis telling her about Katelyn Thorp,

USA vs Todd Broxmeyer

1    advising him that photos and images were transmitted between

2    Mr. Broxmeyer's phone and Thorp's phone and that Thorp had

3    seen naked images of Jackie Bendick on Mr. Broxmeyer's phone.

4    But in my assessment, your Honor, I think Miss Wilcox has

5    gone beyond that and played very loose with the facts and

6    orchestrated them in a way to benefit Mr. Broxmeyer and

7    herself here.

8              The fact of the matter is, that that phone

9    after it was seized was not searched until a search warrant

10   was obtained and common sense dictates that that's what any

11   law enforcement personnel would do in this day and age when

12   machinery and equipment can very easily lose materials and

13   that's why we have forensic units that analyze these

14   materials because these materials cannot be simply perused

15   through novices and then risked at being lost or destroyed or

16   altered.  Once the cellphone was lawfully into custody of the

17   police, once they obtained the search warrant they had an

18   absolute right to search.  In fact, they had a court order

19   and that's when it was taken over to the CATS unit and search

20   conducted.

21             The secondary question and issue is the

22   seizure, taking the laptop, and I submit, your Honor, that

23   Mr. Broxmeyer's testimony alone justifies the way that that

24   laptop was obtained.  I think the defense misses the point

25   when they talk about exigent circumstances.  This is not a

USA vs Todd Broxmeyer

1  case of exigent circumstances.  This is a case of third-party

2  consent.  Mr. Broxmeyer admits that Mr. Yetsko and this other

3  lacrosse manager, that he's aware of, that Mr. Broxmeyer's

4  aware of, had equal and complete access to the office and the

5  Sports Plex.  Now, that's what he admitted and that's what

6  Mr. Broxmeyer says he was aware of that Yetsko --

7           THE COURT:  Are you talking about consent to a

8  third party or are you talking about expectation of privacy?

9           MR. LOVRIC:  Both.  Both, your Honor.  Mr.

10 Broxmeyer --

11          THE COURT:  Differentiate those.

12          MR. LOVRIC:  Mr. Broxmeyer, and again I'm

13 utilizing for the moment just his testimony alone.  Mr.

14 Broxmeyer admitted under oath that he knew at the time that

15 Yetsko and this lacrosse coach both had access to that

16 office, access to the Sports Plex, equal or greater to his,

17 so they could come and go as they pleased and they could do

18 whatever they wished in that office.  He knew that at the

19 time.  He said that on the stand.

20          Secondarily is the analysis of expectation of

21 privacy.  That being the case, his expectation, reasonable

22 expectation of privacy is, if nonexistent, it's greatly

23 diminished because he now knows and he admitted that, that he

24 knows that other persons have complete access to that space

25 equal or greater to his.  That lacrosse coach could come in

USA vs Todd Broxmeyer
139

1  and steal his laptop if he chose to.  Yetsko could come in,

2  I'm not suggesting they would, but he could come in and steal

3  his laptop, take it.  He reasonably should have known that

4  but he minimally knew that other people had access, equal or

5  greater to his, to that very space where he chose to leave

6  his laptop.  Once that --

7             THE COURT:  Is there any testimony that

8  Mr. Yetsko or the lacrosse coach or anybody else who may have

9  had access to the facility and the office, if you credit

10  Detective Sergeant Ellis' testimony with the other members of

11  board of directors and perhaps others, is there any evidence

12  that would allow the Court to believe that someone could have

13  opened that laptop up, turned it on and used it without a

14  password?

15             MR. LOVRIC:  Mr. Broxmeyer's testimony, he

16  said that in order to turn it on and use it, you need a

17  password.  I believe he said he allowed people to use it.

18             THE COURT:  Wait a minute.  You're going way

19  too far here.  He did say he allowed other people to use the

20  laptop both in New Jersey and at the facility here on

21  Robinson Hill Road, but he never said that he gave anybody

22  his password.  He may have turned the thing on, opened up the

23  computer using his password, and said here, go ahead, I'll

24  put you into my e-mail.

25             MR. LOVRIC:  Let me back up, Judge.  With all

USA vs Todd Broxmeyer

1  due respect, it's irrelevant because the police did not

2  search or turn on the laptop.

3              THE COURT:  I understand that.

4              MR. LOVRIC:  They merely and solely took

5  custody of it.

6              THE COURT:  Right.

7              MR. LOVRIC:  The only issue is whether they

8  received that laptop into their possession lawfully and for

9  that, because after that the search warrant allowed the

10  forensic unit to go in, whether they cracked the password or

11  not -- to be honest with you, I don't know.  Whether they did

12  or not is irrelevant because at that point they have a court

13  order.  But for purposes of Mr. Broxmeyer's attack, it's how

14  the police got the laptop into their possession and I submit

15  two concepts and only two are relevant:  One is was there

16  third-party consent.  A party that had equal or greater

17  access to the area and consent for the police to take that

18  laptop and what, if any, expectation of privacy or lack

19  thereof did Mr. Broxmeyer have under the totality of the

20  circumstances.  And I submit Mr. Yetsko, Detective Ellis

21  testified Mr. Yetsko brought him into the facility, allowed

22  him to look, allowed, if you want to call it, to search the

23  facility, allowed him to look and even if you want to call it

24  search the office, and then allowed him to and gave him

25  consent to take that laptop with him.  That is third-party

USA vs Todd Broxmeyer

1    consent from a person who has equal and in this case even

2    greater access and use of that facility than Mr. Broxmeyer.

3                 THE COURT:  Even though Mr. Yetsko may have

4    had the ability and the right to access that office, what is

5    it about that that gives him the right to consent to have

6    someone take the defendant's personal computer?

7                 MR. LOVRIC:  What is it, it's the law, Judge.

8    The law, the US Supreme Court in United States Matlock, 415

9    US 164.  A third party who maintains common authority such as

10   joint access over the place to be searched may consent to the

11   search.

12                THE COURT:  And seizure?

13                MR. LOVRIC:  Yes.

14                THE COURT:  That says that in that case?

15                MR. LOVRIC:  Well that's what that case and

16   line of cases say.  That's the whole point, they can search

17   and seize.

18                THE COURT:  There's no question that he had

19   permission to search by a third party and a person who had

20   authority to give him permission to search.  My question has

21   to do with Mr. Yetsko or anybody else's ability to allow a

22   police officer to take from those premises a personal

23   computer owned by the defendant?

24                MR. LOVRIC:  I believe the case law supports

25   that.

USA vs Todd Broxmeyer                    142

1              THE COURT:  Okay.  That's what I'm saying.

2              MR. LOVRIC:  I believe the case law says once

3    the officer is in a place where he lawfully has been given

4    consent to be.

5              THE COURT:  He can seize?

6              MR. LOVRIC:  I'm sorry.

7              THE COURT:  He can seize the object?

8              MR. LOVRIC:  He can seize if the third party

9    consents to that item being removed from that location.  Most

10   of the cases that are in this line are the husband/wife,

11   landlord/tenant.

12             THE COURT:  I just got reversed by the Second

13   Circuit.

14             MR. LOVRIC:  I read that, Judge, but they

15   agreed with the analysis and the analysis actually applies

16   here.

17             THE COURT:  That's why I was asking you.

18             MR. LOVRIC:  There you had a wife who clipped

19   a pad lock of her husband's.

20             THE COURT:  It was a girlfriend.

21             MR. LOVRIC:  Girlfriend.

22             THE COURT:  Well, there's a difference between

23   wife and girlfriend, if you haven't noticed.

24             MR. LOVRIC:  Actually that case, I think the

25   Circuit does a good analysis of this area of the law because

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

1    they analyze the third party or other party consent.

2                    THE COURT:  They did.

3                    MR. LOVRIC:  And, in fact, that case I think

4    supports the analysis here --

5                    THE COURT:  It may.

6                    MR. LOVRIC:  -- which is if the third party

7    has equal or greater access and usage, so it can't just be

8    sole access, it has to be usage.  Mr. Yetsko and even the

9    lacrosse coach had access and usage of that facility.

10                   THE COURT:  Okay.  I get the point.

11                   MR. LOVRIC:  So, the point is:  The defendant

12   left a laptop in a place whereby his own admission he knew

13   other people had access to it if they cared to do anything

14   with it.  That is relevant as to his reasonable expectation

15   of privacy.  It says, I'm not going to compare exactly, but

16   if he had left his laptop in a bus terminal and then somebody

17   took it or the police came in and seized it, he can't say I

18   was so surprised they took it.  In this particular case he

19   cannot say that he is either surprised or that he did not

20   reasonably or should have known that Mr. Yetsko or this other

21   person removed the laptop or allowed somebody else to remove

22   it.  He'd like not to have that happen but that's different

23   than his expectation of privacy.  Once the police had the

24   laptop, the December 28 search warrant gave them the right to

25   search it.  Prior to that they did not search it and that was

USA vs Todd Broxmeyer

144

1   authority for the CATS unit then to search it.

2            It's our position that the law clearly

3   supports both items in the way they were taken into custody

4   by the police and then searched after a valid search warrant

5   was obtained.

6            THE COURT:  All right.  With respect to the

7   cellphone, the Court is convinced based upon the evidence in

8   the presentation that there was probable cause to make the

9   arrest because there was direct evidence from the victim of a

10  crime, corroborated by another person that was spoken to by

11  Detective Sergeant Ellis, and that the arrest itself was

12  lawfully made.  There's no question about -- nobody asked to

13  suppress any statements that the defendant made because he

14  was Mirandized.  He said he was -- they stopped questioning

15  him after he said he wanted a lawyer, so when the cellphone

16  was taken from his pocket he brought the coat down with him,

17  it was a personal item that was traveling with him because he

18  chose to bring it and it was in his pocket and the officer

19  had a right, first of all, to examine the clothing which he

20  did according to Mr. Broxmeyer.  He felt through the outside

21  of the clothing before they went into the interview room.  He

22  certainly was permitted to do that and, more importantly, he

23  was permitted to seize the phone because it was incident to

24  an lawful arrest, number one; and, number two, also on your

25  second theory, to take the phone because all items of

USA vs Todd Broxmeyer

145

 1  personal property have to be taken for inventory purposes so

 2  there's no claim later on that something was damaged or

 3  stolen from the defendant while he was in custody and that

 4  becomes necessary once a decision was made, which it was in

 5  this case, to take him into custody.

 6          Now, the only controversy here is whether or

 7  not Detective Sergeant Ellis looked at the pictures or the

 8  text and the cellphone before he got the warrant and I did

 9  hear testimony from Miss Wilcox that she might have believed

10  that he said that he had looked or had seen those pictures

11  but I think the weight of the evidence is clear, the

12  preponderance of the evidence and the totality of the

13  circumstances that what happened was, is the information as

14  to what was in those pictures was transmitted to Detective

15  Sergeant Ellis by other people who were aware of and knew

16  what were those pictures and what had been transmitted and

17  not by means of Detective Sergeant Ellis viewing the images

18  himself.

19          So, in that regard the motion to suppress the

20  cellphone or the contents of the cellphone is denied.

21          I'm going to issue a short writing on the

22  other issue, the computer seizure issue, and we'll have that

23  out in a couple of days.

24          Is there anything further?

25          MR. LOVRIC:  No, your Honor.

USA vs Todd Broxmeyer

1              THE COURT:  Mr. Kilker?

2              MR. KILKER:  No, your Honor.

3              THE COURT:  Okay.  Thank you all for an

4    interesting morning and early afternoon.

5                   (Court stands adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T I O N

2

3

4

5              I, VICKY A. THELEMAN, RPR, CRR, United

6    States Court Reporter in and for the United States

7    District Court, Northern District of New York, do

8    hereby certify that I attended at the time and place

9    set forth in the heading hereof; that I did make a

10   stenographic record of the proceedings had in this

11   matter and cause the same to be transcribed; that

12   the foregoing is a true and correct copy of the same

13   and the whole thereof.

14

15

16                         _____

17                         VICKY A. THELEMAN, RPR, CRR

18                         United States Court Reporter

19                         US District Court - NDNY

20

21

22   Dated:  September 2, 2008.

23

24

25