UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
UNITED STATES OF AMERICA,

vs.                         08-CR-21

TODD J. BROXMEYER,

                        Defendant.
-------------------------------------------x

VOLUME I


TRANSCRIPT OF JURY TRIAL

held in and for the United States District Court,

Northern District of New York, at the Federal Building,

15 Henry Street, Binghamton, New York, on Monday,

September 15, 2008, before the HONORABLE THOMAS J. McAVOY,

Senior United States District Court Judge, PRESIDING.


A P P E A R A N C E S

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
                    Northern District of New York
                    15 Henry Street
                    Binghamton, New York 13901
                      BY:  MIROSLAV LOVRIC, AUSA

FOR DEFENDANT:      PATRICK J. KILKER
                    Attorney at Law
                    231-241 Main Street
                    Vestal, New York 13850




VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs Todd Broxmeyer                    2

1        (Whereupon, a jury was duly selected and

2        sworn.)

3        THE COURT:  Thank you very much, folks.

4   Ladies and gentlemen, first of all, I'm going to give you

5   some very brief general instructions about your duties as

6   jurors, then I'm going to actually give you some specific

7   instructions about the law that you're going to be

8   considering at the end of the case.

9        Now, what I tell you about the law now as

10  opposed to what you're going to hear at the end of the case

11  is not my final instructions on the law and shouldn't be

12  considered by you as that.  So you might say to me, well, why

13  bother to tell us.  Well, because if I do tell you what the

14  elements of the charges are, as the witnesses testify, you

15  can match up and see if the evidence supports or detracts

16  from any of those elements.  It will give you a better feel

17  for what the evidence is all about.  So, after that, each

18  lawyer, the prosecutor and the defense lawyer, will make an

19  opening statement.

20       Now, I'm going to tell you that what the

21  lawyers state is not the evidence.  The evidence comes from

22  right here on the witness stand and the documents that are

23  received in evidence and are for you to peruse during your

24  deliberations.  While what the lawyers say is not evidence,

25  it may well be helpful to you.  What they're going to do is

USA vs Todd Broxmeyer                            3

1   paint a picture for you.  I like to think of it as a puzzle

2   box with puzzle pieces inside and a picture on the outside.

3   If you dump the box over on the table to assemble the pieces

4   and you turn the picture face down and you don't know what

5   the puzzle's going to look like at the end, it makes it a lot

6   tougher than if you flip the thing over, if you can see the

7   picture of what you're doing, what it's going to look like,

8   makes it easier to fit the pieces together.

9           So what the lawyers tell you in their opening

10  statements is kind of like painting that picture on the box

11  for you.  However, it's still not evidence.  It's going to be

12  your duty to find from the evidence what the facts are.  You

13  and you alone will be the judges of those facts.  You'll have

14  to apply to those facts the law as the Court states it for

15  you and you must follow that law, whether or not you agree

16  with it.

17          Nothing that I do or say during the course of

18  trial is intended to indicate or should be taken by you as

19  indicating what your verdict should be.

20          Now, the evidence which you'll find from the

21  facts will consist of testimony of witnesses, documents and

22  other things received into the record as exhibits, any fact

23  the lawyers agree or stipulate to, or any fact the Court may

24  instruct you to find.

25          Certain things are not evidence and must not

USA vs Todd Broxmeyer

4

1  be considered by you, and I want to list those for you now.

2  The statements, the arguments and the questions by the

3  attorneys are not evidence.  Objections to questions are not

4  evidence.  The attorneys have an obligation to their client

5  to make an objection when they believe that certain items

6  being offered in evidence is improper under the Rules of

7  Evidence.  You shouldn't be influenced by the objection or by

8  the Court's ruling on it.  If an objection is sustained, just

9  ignore the question.  If it's overruled, treat the answer

10  like any other.

11          If you're instructed that some item of

12  evidence is received for a limited purpose only, you must

13  follow that instruction.  Testimony that the Court has

14  excluded or told you to disregard is not evidence and must

15  not be considered.  Anything you may have heard or seen

16  outside the courtroom about this case is not evidence and

17  must be disregarded.  You're to decide the case solely on the

18  evidence produced in the courtroom.

19          Now, there are two kinds of evidence that you

20  may properly consider; direct and circumstantial evidence.

21  Direct evidence is direct proof of a fact such as the

22  testimony by an eyewitness.  Circumstantial evidence is proof

23  of facts from which you may infer or conclude that another

24  fact exists.  I'll give you further instructions on these as

25  well as other matters at the end of the case, but keep in

USA vs Todd Broxmeyer                    5

1    mind that you may consider both the direct and circumstantial

2    evidence.

3              Now, it's going to be up to you to decide

4    which witnesses to believe, which witnesses not to believe,

5    and how much of any witness' testimony to accept or reject.

6    I'll give you some guidelines to determine the credibility of

7    witnesses at the close of the case.

8              Now, as we said earlier, this is a criminal

9    case, and there are three basic rules about a criminal case

10   that you should keep in mind.  First, the defendant is

11   presumed innocent until proven guilty.  The indictment

12   against the defendant brought by the government is only an

13   accusation, nothing more.  It is not proof of guilt or

14   anything else.  The defendant, therefore, starts out the

15   trial with a clean slate.

16             Second, the burden proof is on the government

17   until the very end of the case.  The defendant has no burden

18   to prove his innocence or to present any evidence or to

19   testify.  Since the defendant has the right to remain silent,

20   the law prohibits you in arriving at your verdict from

21   considering that the defendant may have chosen not to

22   testify.

23             Third, the government must prove the

24   defendant's guilt beyond a reasonable doubt.  I'll give you

25   instructions on this point later, but bear in mind that in

USA vs Todd Broxmeyer                                          6

1   this respect a criminal case is different from grand jury or

2   a civil case.

3            I instruct you during the trial you're not to

4   discuss the case with anybody.  That doesn't mean when you go

5   home tonight you can't say you got selected for jury service

6   in a criminal case, but the Judge told you not to talk about

7   it, but you can talk about it after the case is over.  So, at

8   least that may help stem their curiosity.  I don't know.

9   Until you retire to the jury room at the end of the case to

10  deliberate on the case, don't talk with anyone on it.

11           Next, don't read or listen to anything or

12  Google anything touching on the case in any way.  If anyone

13  should try to talk to you about it, bring it to the Court's

14  attention promptly.  Don't try to do any research on your

15  own; no computer research or any other kind.  The lawyers

16  will present what they think is proper for you to hear of the

17  evidence in the case.

18           Please keep an open mind as you hear the

19  proof.  Don't form any final opinions or conclusions until

20  you've heard all the witnesses and all the proof in the case.

21  Now, if you want to, you can take notes and the clerk will

22  provide you with the wherewithal to do that.  Some people

23  seem to learn and retain things better if they write it down

24  as opposed to an oral presentation.  But you don't have to

25  take notes if you don't want to.  They're personal to you, by

USA vs Todd Broxmeyer                    7

1    the way, if you do take notes, you can't be passing them

2    around to your follow jurors saying look what I have here.

3    Each one of you read your own notes to refresh your

4    recollections when you're in the jury room.  You can say,

5    hey, I looked over my notes and I think this is what happened

6    with witness number three or witness number two.  Okay.

7              Now, as I stated a minute ago, I'm going to

8    give you a preliminary charge on the law that you'll be

9    dealing with at the end of the case.  This is not a complete

10   charge and your deliberations and verdict must be based on

11   the charge I give you at the end of the case and not on this

12   preliminary charge.  This is simply an overview so you'll

13   recognize and appreciate the significance of the evidence or

14   lack of evidence presented in the case.

15             I'll now give you a brief description of this

16   case, after which I will instruct you on the substantive law

17   you are to apply to the facts as you find them.  Remember,

18   the government bears the burden of proving each and every

19   element of each crime charged beyond a reasonable doubt.  The

20   prosecution charges the defendant with having committed

21   certain crimes, including producing child pornography, the

22   attempted production of child pornography, transporting a

23   minor in interstate commerce to engage in sexual activity,

24   and possessing child pornography.

25             I'll now give you a brief overview of the law

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs Todd Broxmeyer

8

1  that applies to these charges.  Counts One and Two charge the

2  production of child pornography.  To convict the defendant of

3  using a minor to produce child pornography, the government

4  must prove each of the following elements beyond a reasonable

5  doubt:

6                First, that the victim was a minor under the

7  age of 18.

8                Second, that defendant used, employed,

9  persuaded, induced, enticed or coerced the victim to take

10 part in sexually explicit conduct for the purpose of

11 producing a visual depiction of that conduct, and the visual

12 depiction was produced using materials that had been mailed,

13 shipped, or transported in interstate or foreign commerce.

14                The first element which the government must

15 prove beyond a reasonable doubt is that the victim was less

16 than 18 years old at the time of the acts alleged in the

17 indictment.  The government does not have to prove that the

18 defendant knew that the victim was less than 18 years old.

19                The second element that the government must

20 prove beyond a reasonable doubt is that the defendant used,

21 employed, persuaded, induced, enticed or coerced the victim

22 to take part in sexually explicit conduct for the purpose of

23 producing a visual depiction of that conduct.  A visual

24 depiction includes any photograph, film, video or picture,

25 including undeveloped film, and videotape and data stored on

USA vs Todd Broxmeyer

9

1  computer disk, or by electronic means which is capable of

2  conversion into a visual image.

3           In deciding whether the government has proven

4  that the defendant acted for the purpose of producing a

5  visual depiction of the sexually explicit conduct, you may

6  consider all of the evidence concerning the defendant's

7  conduct.  While the government must prove that the defendant

8  acted with the purpose of producing a visual depiction of the

9  child engaging in sexually explicit conduct, it is not

10  required that the government prove that the visual depiction

11  of that conduct was actually produced.

12           The phrase sexually explicit conduct as used

13  in this element means actual or simulated sexual intercourse,

14  including genital-to-genital, oral-genital, anal-genital, or

15  oral-anal, whether between persons of the same or opposite

16  sex; masturbation; sadistic or masochistic abuse; or

17  lascivious exhibition of the genitals or pubic area of any

18  person.

19           The term lascivious exhibition means a

20  depiction which displays or brings to view to attract notice

21  to the genitals or pubic area of children in order to excite

22  lustfulness or sexual stimulation in the viewer.  Not every

23  exposure of the genitals or pubic area constitutes a

24  lascivious exhibition.  In deciding whether the government

25  has proven that a particular visual depiction constitutes a

USA vs Todd Broxmeyer                          10

1    lascivious exhibition, you should consider the following

2    questions:

3                 Whether the focal point of visual depiction is

4    on the child's genitals or pubic area or whether there is

5    some other focal area.

6                 Whether the setting of the visual depiction

7    makes it appear to be sexually suggestive.  For example, in a

8    place or pose generally associated with sexual activity.

9                 Whether the child is displayed in an unnatural

10   pose or in inappropriate attire, considering the age of the

11   child.

12                Whether the child is fully or partially

13   clothed, or nude, although nudity is not in and of itself

14   lascivious.

15                Whether the visual depiction suggests sexual

16   coyness or willingness to engage in sexual activity.

17                And whether the visual depiction is intended

18   or designed to elicit a sexual response in the viewer.

19                It is not required that a particular visual

20   depiction involve all of these factors to be a lascivious

21   exhibition.  The importance which you give to any one factor

22   is up to you to decide.

23                The third element which the government must

24   prove beyond a reasonable doubt is that the visual depiction

25   was produced using materials that had been mailed or

USA vs Todd Broxmeyer

1    transported in interstate or foreign commerce.

2              Simply stated, the phrase transported in

3    interstate or foreign commerce means that the materials used

4    to produce the visual depiction had previously moved from one

5    state to another or between the United States and another

6    country.  Here, the government alleges that the camera used

7    to take the photographs in question was manufactured in

8    another state or country.  I instruct you that if you find

9    that the camera was manufactured outside New York, that is

10   sufficient to satisfy this element.  The government does not

11   have to prove that the defendant personally transported the

12   camera across the state line, or that the defendant -- or

13   that the defendant knew that the camera had previously

14   crossed the state line.

15             The third count charges the attempted

16   production of child pornography.  This count is similar to

17   Counts One and Two that I previously described to you.  The

18   difference between Count Three and Counts One and Two is that

19   Count Three charges that the defendant attempted to commit

20   the subject crime.  In analyzing this count, you should use

21   the definitions and explanations I previously gave to you

22   with respect to Counts One and Two, in addition to the

23   following explanation:

24             To prove the charge of attempt to commit the

25   crime of child pornography, the government must prove the

USA vs Todd Broxmeyer

1    following two elements beyond a reasonable doubt;

2                    First, that the defendant Broxmeyer intended

3    to commit the crime of production of child pornography as

4    defined for you in the previous section.

5                    Second, that the defendant Broxmeyer did some

6    act that was a substantial step in an effort to bring about

7    or accomplish this crime.

8                    Mere intention to commit a specific crime does

9    not amount to an attempt.  In order to convict the defendant

10   of an attempt, you must find beyond a reasonable doubt that

11   defendant intended to commit the crime charged, and that he

12   took some action which was a substantial step toward the

13   commission of the crime.

14                   In determining whether the defendant's actions

15   amounted to a substantial step toward the commission of the

16   crime, it is necessary to distinguish between mere

17   preparation on the one hand and the actual doing of the

18   criminal deed on the other.  Mere preparation, which may

19   consist of planning the offense, or of devising, obtaining or

20   arranging a means for its commission, is not an attempt,

21   although some preparations may amount to an attempt.  The

22   acts of a person who intends to commit a crime will

23   constitute an attempt when the acts themselves clearly

24   indicate an intent to commit the crime, and the acts are a

25   substantial step in a course of conduct planned to culminate

USA vs Todd Broxmeyer

13

1    in the commission of the crime.

2                    The fourth count charges the defendant with

3    transporting a minor in interstate commerce with the intent

4    to engage in sexual activity.

5                    To convict defendant Broxmeyer on this count,

6    the government must prove the following elements beyond a

7    reasonable doubt:

8                    First, that the defendant transported an

9    individual or individuals across a state line or border.

10                    Second, that the defendant did so with the

11    intent that the individual engage in sexual activity.

12                    And third, at the time, that the individual or

13    individuals at issue were under the age of 18.

14                    The second element requires the government to

15    prove that one of the motives or purposes for the travel was

16    to engage in illicit sexual conduct with another person.

17                    The government must show that one of the

18    defendant's motivating purposes for traveling across state

19    lines was for engaging in sexual activity with a minor.

20    Whether while the government need not show that the illegal

21    sexual conduct was the sole, or only, purpose for the trip,

22    it is not enough if you find that the illegal sexual conduct

23    was merely incidental to travel.

24                    The phrase sexual act means contact between

25    the penis and the vulva or the penis and the anus.  Contact

USA vs Todd Broxmeyer

14

1   involving the penis occurs upon penetration, however slight.

2   The phrase sexual act also means contact between the mouth

3   and the penis, the mouth and the vulva, or the mouth and the

4   anus.  The penetration, however slight, of the anal or

5   genital opening of another by a hand or finger or by any

6   object, with an intent to abuse, humiliate, harass, degrade

7   or arouse or gratify the sexual desire of any person; or the

8   intentional touching, not through the clothing, of the

9   genitalia of another person who has not attained the age of

10  16 years with an intent to abuse, humiliate, harass, degrade

11  or arouse or gratify the sexual desire of any person.

12               Count Five of the indictment reads as follows:

13               Between in and about January of 2007 through

14  December of 2007, in the Northern District of New York and

15  elsewhere, the defendant Todd Broxmeyer did knowingly and

16  willfully possess material which contains images of child

17  pornography which were produced using materials which had

18  been mailed, shipped, and transported in interstate and

19  foreign commerce by any means, in that, defendant knowingly

20  possessed computers, computer hard drives, cameras and other

21  materials containing graphic images of child pornography,

22  knowing that the images contained a visual depiction and

23  material containing a visual depiction, the production of

24  which involved the use of a minor engaged in sexual explicit

25  conduct as defined in Title 18, United States Code, Section

1   2256.  In violation of Title 18, United States Code, Section

2   2252A(a)(5)(B) and Section 2.

3                   Now that's gobbely gook.  You don't know what

4   those sections are but you'll get acquainted with them.

5                   Count Five charges the defendant with

6   violating 2252A(a)(5)(B) of Title 18, United States Code,

7   which provides, in relevant part, that:

8                   Any person who knowingly possesses any book,

9   magazine, periodical, film, videotape, computer disk, or any

10  other material that contains an image of child pornography

11  that was produced using materials that had been mailed or

12  shipped or transported in interstate or foreign commerce by

13  any means, shall be guilty of a crime.

14                  To convict the defendant on this count, the

15  government must prove each of the following elements beyond a

16  reasonable doubt:

17                  First, that the defendant knowingly possessed

18  a visual depiction, as I will explain that term to you.

19                  Second, that the visual depiction was produced

20  using materials that had been transported in the interstate

21  or foreign commerce.

22                  Third, that the visual depiction was child

23  pornography, as I will define that term.

24                  And fourth, that the defendant knew of the

25  sexually explicit nature of the material and that the visual

USA vs Todd Broxmeyer

16

1  depictions were of actual minors engaged in that sexually

2  explicit conduct.

3          The first element which the government must

4  prove beyond a reasonable doubt is that the defendant

5  knowingly possessed a visual depiction.  A visual depiction

6  includes any photograph, film, video, or picture, including

7  undeveloped film and videotape, and data stored on computer

8  disk or by electronic means which is capable of conversion

9  into a visual image.

10         To possess something means to have it within a

11  person's control.  This does not necessarily mean that the

12  person must hold it physically.  That is to have actual

13  possession of it.  As long as the visual depiction is within

14  the defendant's control, he possesses it.  If you find that

15  the defendant either had actual possession of the depiction

16  or that he had the power and intention to exercise control

17  over it, even though it was not in his physical possession,

18  you may find that the government has proven possession.

19         The law also recognizes that possession may be

20  sole or joint.  If one person alone possesses it, that is

21  sole possession.  However, it is possible that more than one

22  person may have the power and intention to exercise control

23  over the visual depiction.  This is called joint possession.

24  If you find that the defendant had such power and intention,

25  then he or she possessed the depiction even if he possessed

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs Todd Broxmeyer                    17

1    it jointly with another person.

2              The government must prove that the defendant

3    possessed the depiction knowingly.  An act is done knowingly

4    when it is done voluntarily and intentionally and not because

5    of accident, mistake or some other innocent reason.

6              The second element which the government must

7    prove beyond a reasonable doubt is that the child pornography

8    was produced using materials that had been transported in

9    interstate or foreign commerce.

10             I have previously explained this phrase to you

11   and you may apply that same definition here.  Essentially, it

12   must be shown that the materials used to produce the child

13   pornography had previously moved from one state to another or

14   between the United States and another country.

15             The third element which the government must

16   prove beyond a reasonable doubt is that the visual depiction

17   was child pornography.

18             Child pornography means any visual depiction,

19   the production of which involved the use of a minor engaging

20   in sexual explicit conduct and which portrays that minor

21   engaged in that conduct.  The visual depiction must be of a

22   real person under the age of 18 engaging in sexually explicit

23   conduct.  The government does not have to prove the identity

24   of the minor or the exact age of the minor.  You may consider

25   all of the evidence in determining whether the depiction

USA vs Todd Broxmeyer                    18

1    portrayed an actual person under the age of 18 engaging in

2    sexually explicit conduct.

3              I have previously defined the term sexually

4    explicit conduct for you and you should apply that same

5    definition in this count.

6              The fourth element which the government must

7    prove beyond a reasonable doubt is that the defendant knew

8    that the material possessed was child pornography.

9              An act is done knowingly when it is done

10   voluntarily and intentionally and not because of accident,

11   mistake or some other innocent reason.

12             In this case, the term knowingly refers to an

13   awareness of the sexual explicit nature of the material and

14   to the knowledge that the visual depictions were in fact of

15   actual minors engaged in sexually explicit conduct.

16             The government must show that the defendant

17   had knowledge of the general nature of the contents of the

18   material.  The defendant need not have specific knowledge as

19   to the identity or actual age of the underage performer.  The

20   defendant must have knowledge or an awareness that the

21   material contained a visual depiction of a minor engaging in

22   sexually explicit conduct.  Such knowledge may be shown by

23   direct or circumstantial evidence, or both.  Eyewitness

24   testimony of the defendant's viewing of the material is not

25   necessary to prove his or her awareness of its contents.  The

USA vs Todd Broxmeyer

1  circumstances may warrant an inference that the defendant was

2  aware of what the material depicts.  Furthermore, the

3  defendant's belief as to the legality or illegality of the

4  material is irrelevant.

5           This has been a brief overview of the charges

6  in the indictment.  As I told you, at the end of trial I'll

7  give you a more thorough charge on the applicable law.  All

8  right.

9           Mr. Lovric, are you prepared to address the

10  jury with your opening statement?

11          MR. LOVRIC:  Yes, Judge.

12          THE COURT:  You may do that.

13          MR. LOVRIC:  Afternoon everyone.  This is part

14  of the trial that the Judge mentioned we as attorneys, I

15  think I do, and Mr. Kilker will, we try to give you an idea

16  what it is we're doing in these opening remarks and the best

17  way I can put it is the way Judge McAvoy described it for

18  you.  The opening statement, in some cases it can be

19  extremely helpful to juries, and as you can imagine, for

20  example, if you were going to be sitting and listening to a

21  trial that might take two months, it would be very helpful to

22  have kind of an outline to kind of know what's going to be

23  happening throughout that time period, so that as you see it

24  and hear it, you can kind of put it in the right place in

25  your mind and kind of put everything together the way the

USA vs Todd Broxmeyer                    20

1  Judge talked about this puzzle box.  And it's very much like

2  that in terms of what I try to do with you over the next very

3  short period of time that I will speak to you.

4              Now, this trial, the trial is not going to be

5  extremely long.  I estimate and I think we all estimated

6  you'll probably be here for the next several days at the very

7  most.  So it's not going to be overly long.  I don't believe

8  that you'll find it's going to be overly complicated.  I

9  think you'll be able to follow and recall things fairly well.

10              But, nevertheless, I still think what I'm

11  going to talk with you a little bit here will help you as you

12  hear and see the evidence developing.  I'm going to be

13  presenting evidence in this case against Mr. Broxmeyer.  As I

14  told you before, I'm the prosecutor, assigned to this case.

15  Mr. Broxmeyer has been indicted on federal charges.  And the

16  Judge read to you those five counts.  Counts being another

17  way of saying charges.  And I will be presenting evidence

18  that will show you that Mr. Broxmeyer, in fact, was guilty of

19  committing those five separate violations of federal law.

20              The evidence in this case is going to come

21  from a number of different sources.  One, you're going to

22  hear witnesses testify.  You're going to hear some of

23  Mr. Broxmeyer's teenage players that played for him testify.

24  You're also going to hear from Detective, Sergeant Detective

25  Jason Ellis.  He was one of the lead investigators.  He will

USA vs Todd Broxmeyer

1 talk with you about search warrants that he put together,

2 court authorized warrants allowing him to retrieve evidence,

3 and he will talk with you and tell you about what it is that

4 he found and where he found it.

5          You're also going to hear, as I've alluded to,

6 in the questioning from a computer forensic expert, Jim

7 Thompson.  Works over here at the Broome Security Division,

8 CATS Unit.  And he'll talk with you about analysis that he

9 did on two computers that belonged to Mr. Broxmeyer; a

10 Gateway laptop and a Compaq laptop.

11          Now, where did those computers come from?

12 Well, Detective Ellis will tell you one of them he based on a

13 search warrant, he found and took from the Sportsplex up here

14 on Robinson Hill Road where Mr. Broxmeyer was coaching and

15 had an office area.  His laptop was in there.  Detective

16 Sergeant Ellis took that laptop based on the search warrant.

17          Mr. Thompson will also describe for you not

18 only what was found on these two laptops, but also an iPod.

19 Now I didn't mention iPod during my questions with you but

20 you'll learn what it is and what it does.  And what you'll

21 find basically is, a lot of young folks, folks today, maybe

22 your kids, my kids have this thing called an iPod where they

23 can put their music on it.  They can put videos on it.  They

24 can put pictures on it.  And it's an electronic, I call it an

25 electronic album.  You can carry your entire collection of

1    music and photographs if you'd like.

2              Jim Thompson and Detective Ellis will describe

3    for you what was found on Mr. Broxmeyer's iPod.  Detective

4    Ellis found that iPod in Mr. Broxmeyer's car, and pursuant to

5    a search warrant it was removed and then the forensic

6    analysis done by Jim Thompson over at the CATS Unit.

7              Now, if I could, and I'm giving you just kind

8    of an overview of some of the things you're going to see and

9    hear, and relating back to the charges I submit to you what

10   the evidence will show you in this case and what you will

11   find from the evidence is the following:  You will learn that

12   Todd Broxmeyer was a field hockey coach, coaching teenage

13   girls for a number of years.  You're going to learn from the

14   evidence that he coached teenage girls anywhere from the ages

15   of 14 through 17 years of age.  And he's done that for a

16   number of years.

17             You'll also learn that he was a coach of girls

18   who would travel to, as I put it to you, hockey tournaments.

19   They called them festivals.  They would go out and travel to

20   various locations, sometimes across the country, and play in

21   these field hockey tournaments.  Todd Broxmeyer coached girls

22   from New Jersey, from Pennsylvania, and also here in the

23   Southern Tier of New York.  Several of the girls that you

24   will hear testify were actually from the Whitney Point area.

25   Some of them played in the Whitney Point school system and

USA vs Todd Broxmeyer

1   also then practiced at the Sportsplex dome where Todd

2   Broxmeyer had practices for these -- as I call it, as I put

3   it to you, for these travel teams.

4              You're going to learn that Todd Broxmeyer

5   engaged in a number of activities that formed the basis of

6   these federal charges.  First and foremost, you're going to

7   learn that he had a sexual relationship with a 17-year-old

8   teenage field hockey player of his.  Alesha Widdall will

9   testify and describe for you how when she was under the age

10  of 18 years -- which as you'll hear the Judge describe for

11  you that's a minor.  Under federal law you'll learn that

12  anyone under the age of 18 years of age is a minor.  You will

13  learn that Alesha Widdall had a sexual relationship with Todd

14  Broxmeyer starting sometime in the spring of 2007.

15             You're going to learn at times when they were

16  engaged in sexual acts -- and at that time you'll learn that

17  Todd Broxmeyer was about 37 years old.  He is currently 38

18  years of age.  When he engaged in these sexual acts with Miss

19  Widdall she was 17, he was 37.  At times when these

20  activities happened, photographs were taken of sexual acts or

21  sexual conduct being committed.  And she will very candidly

22  tell you that many times she was the one taking pictures.

23  There may have been occasion where he took a photograph, and

24  I submit to you, you will find that there is no reasonable

25  doubt as to that act alone that Mr. Broxmeyer caused the

1  taking of photographs during his sexual acts with Alesha

2  Widdall.

3              Now, during this trial you're going to see and

4  hear testimony about where was the camera made, or where was

5  the computer made or where was the iPod made.  In fact, I'll

6  introduce into evidence Mr. Broxmeyer's cellular telephone.

7  And I'll also introduce into evidence pictures of Alesha

8  Widdall's cellphone where it said made in.  It probably won't

9  surprise you that nothing is made in America anymore,

10 unfortunately, but the importance of that as it relates to

11 these federal charges is that the Judge talked to you briefly

12 about those materials that either were shipped, mailed or

13 moved in interstate or foreign commerce.

14             Well, if I can put it very simply, we're going

15 to prove that materials that were either used to take

16 pictures, or to store pictures, or to save pictures, or to

17 send pictures, that these materials, cameras, iPod,

18 computers, were all made outside of New York State.  And,

19 therefore, they do qualify for that materials made outside of

20 the state which traveled in interstate or foreign commerce.

21             So, for example, the camera that was used

22 while Mr. Broxmeyer and Alesha Widdall were engaged in sexual

23 acts, you'll find that camera was made in China.

24 Mr. Broxmeyer's camera you'll learn was made in China.  The

25 relevance of that is you will find that on his camera he was

USA vs Todd Broxmeyer

1    receiving these images, these child pornography images, and

2    it was being sent to his phone and then he was storing it at

3    another location.  So, when I introduce this evidence about

4    where these things were made, that's the purpose of it.  It's

5    to see that these materials that either saved the child porn

6    or were used to send it or receive it did in fact travel in

7    interstate commerce.  Because before it got to New York

8    State, that camera was made in China, was shipped to the US

9    somehow.  Or the computer was shipped to the US at some

10   point.  And as you'll learn, that's all that's required for

11   that part of that charge.

12              Now, when Mr. Broxmeyer was coaching these

13   teenage girls, you'll learn that most of the girls that were

14   being coached by him were somewhere between the ages of 14

15   and 17.  That's the vast majority of the girls that he

16   coached either from New Jersey, from Pennsylvania or from New

17   York State.  You will see the photographs that we're talking

18   about.

19              Alesha Widdall will tell you that there were a

20   number of photographs that were taken, sometimes Mr.

21   Broxmeyer's present with her, sometimes he wasn't.  Sometimes

22   she was alone at home and she would in the shower take very

23   explicit, very close-up photographs of her vagina.  In one

24   photograph you'll see she has her fingers in her vagina and

25   she will tell you she sent these photographs to Mr. Broxmeyer

USA vs Todd Broxmeyer

26

1   via text message and sending a photo along with that text

2   message.

3            And you'll see a couple of photographs that

4   were recovered of Alesha Widdall which I submit to you

5   constitute child pornography.  She was under the age of 18.

6   It is, and you'll be able to tell for yourself, it is clearly

7   a picture designed to focus one's attention to her genitalia.

8   And in one photo it is clearly a picture where she is

9   inserting her fingers into her vagina.

10           You will also learn that Mr. Broxmeyer was

11  talking with other players, other minors on that travel club,

12  travel team that he coached.  A girl by the name of Monica

13  Gombita will testify.  And Monica Gombita was also coached by

14  Mr. Broxmeyer.  And she will describe for you where

15  Mr. Broxmeyer, when she was in high school, was hitting on

16  her as he was coaching her.  And not only hitting on her, but

17  asking and requesting and repeatedly asking her to send him a

18  picture of herself.  A sexually oriented picture of herself.

19           And you will see a photograph that was

20  recovered that shows her in her underwear, and she will

21  describe for you how it was that she finally sent him this

22  photograph of herself, to the most part that she will put

23  just to get him to stop hassling, harassing about sending him

24  a picture of herself.

25           Now the pictures I'm talking about so far were

1   sent to Mr. Broxmeyer on his cellular telephone.  And on that

2   cellular telephone you'll learn from a couple of witnesses

3   that we're going to call, including a person from Verizon

4   Wireless, that Mr. Broxmeyer had this account called a

5   Verizon Pix account.  And what that was, and you'll learn

6   from actually a couple of the witnesses, including a Verizon

7   Wireless representative, is that this Pix account is an

8   account, like a lot of things you can get when you get a

9   cellphone.  You can get voice mail.  You can get how many

10  minutes you use.  One of the features they offer is what they

11  call a Pix account, P-I-X.  Pictures account, where you can

12  store your photographs, so that if and when somebody sends

13  you a photograph, or let's say you take a photograph on your

14  cellphone, since most cellphones today come with a little

15  camera attached, you can take a picture and let's say you

16  like the picture, you can find that, you can store it in your

17  Pix account.  What can you do with it?  You can keep sending

18  it to somebody.

19             Let's say it's a picture of a house you like,

20  you want to tell your family how much you want to buy it.

21  You can keep sending this picture.  Mr. Broxmeyer used this

22  Pix account to store images of players, which constitutes

23  child pornography.  Those two pictures of Alesha Widdall were

24  found in Mr. Broxmeyer's Pix account.  The picture of Monica

25  Gombita was found in Mr. Broxmeyer's Pix account.  There's a

USA vs Todd Broxmeyer

1    picture of a girl named Brittany Branco, who's another player

2    Mr. Broxmeyer, that he coached, and you will see her picture

3    where she is standing straight up and she has shaving cream

4    on her breasts and vagina.  He stores that picture in his Pix

5    account.

6            You will see a picture of Katie Thorp.  And

7    Katie Thorp will testify and tell you how Mr. Broxmeyer

8    harassed and hassled her to give him a picture, a sexually

9    explicit picture of herself, and you will see her picture

10   where she sent it to him finally in her underwear.  You will

11   see other pictures from his Pix account.  Other pictures of a

12   close-up of a vagina where it takes up the whole picture.  A

13   picture of a girl's vagina with her fingers inserted.  You

14   will see pictures, a girl with her breasts exposed and

15   highlighted so that the breasts take up the entire picture.

16   You will see a picture that is a little fuzzy but you can

17   make it out, and you see will see a photograph that came out

18   of his Pix account where there are several teenage girls

19   forming a pyramid and they're all barely dressed in

20   underwear, if you call it that.  And you will see a number of

21   photographs like that that he stored in his Pix account.

22           The other thing you're also going to see is

23   with some of the girls that you will learn, Mr. Broxmeyer

24   sent back a picture of his erect penis while he's trying to

25   get them to send him pictures of themselves.  And you will

USA vs Todd Broxmeyer

29

1  see a picture of his erect penis on his Pix account.  You

2  will also see, in addition to the Pix account that I've been

3  telling you about, there were also two photographs recovered

4  from his actual cellphone, the one that Detective Ellis took

5  off of him when he arrested him.  And on that cellphone were

6  two photographs.  One is that photo of Brittany Branco with

7  the shaving cream or whip cream, whatever it is, in the right

8  or wrong places.  And another one is a picture of

9  Mr. Broxmeyer's erect penis.

10            I submit to you the photographs alone of what

11  was found on his Pix account, which by the way you're going

12  to learn he saved into his account -- and it's a password

13  protected account, and it was saved from his cellphone to his

14  Pix account, so it's not as though somebody could have sent

15  him this to that Pix account without him knowing it.  He

16  saved it right from his cellphone into that account.

17            In addition, those pictures alone that you

18  will see that were found on his Pix account wireless are

19  sufficient to find him guilty of production, production of

20  the Widdall pictures.  The two photographs that you'll see,

21  photographs one and two.  The attempted production, you'll

22  see the photograph of Monica Gombita and Katie Thorp in their

23  skinny underwear that were sent to him.  And then you'll see

24  the other photographs of other teenage girls in barely

25  dressed poses.  And then you'll see pictures, explicit

USA vs Todd Broxmeyer

30

1  pictures of genitalia, breasts, vaginas.  That alone is

2  sufficient to find him guilty of everything that he's been

3  charged with, Counts One through Four.  Excuse me, One

4  through Three.  I submit to you.

5              But you're going to find more.  And what

6  you're going to also find is that Gateway laptop, the one

7  that he had at the Sportsplex, the one that's referred to.

8  Jim Thompson will describe for you when he went through and

9  forensically searched the entire computer, on there was found

10 a couple hundred photos of teenage girls, everything from

11 sexual course, anal intercourse, oral sex, sexually explicit

12 poses, and it's going to be all in a book for you.  You can

13 look at it all.

14             When I'm presenting this evidence, I'll show

15 you some of the things but I'm not going to sit here in court

16 and show you all 280 or 90 photographs.  You'll be able to

17 look at that when you're in the jury room and look at all of

18 the images.  On his Compaq computer -- and that computer was

19 recovered at a relative's house, a place where Mr. Broxmeyer

20 had lived.  And Jason Ellis learned that there was another

21 computer of Mr. Broxmeyer's, he got a search warrant and

22 recovered that computer, and on there also were found some

23 images of teenagers engaged in various sexual acts.

24             On his iPod, the iPod that was taken from his

25 car, Detective Ellis will testify that there were four video

USA vs Todd Broxmeyer                              31

1   clips that were found on there and one of them, Detective

2   Ellis will testify for you because he's watched those four

3   video clips, on one of them actually Mr. Broxmeyer is

4   performing oral sex on a girl.  He has his head between her

5   vagina and he's performing oral sex on her.

6                  You will also learn that on his Pix account,

7   there were two videos found on that Pix account.  And

8   Detective Ellis has watched both of those videos and he'll

9   describe for you how in both of those video clips there is a

10  male and a female engaging in sexual intercourse, and all you

11  can pretty much see is the penis inside the vagina.

12                 The physical evidence in this case alone is

13  compelling, and I submit to you when you look at the physical

14  evidence, pictures that Mr. Broxmeyer saved to his Pix

15  account, pictures that he had on his laptops, videos that he

16  had on his iPod, that in and of itself is compelling evidence

17  as far as Counts One, Two and Three, those photos alone.

18                 But you're also going to hear from several of

19  the players, several of the players that were coached by

20  Mr. Broxmeyer, and some of whom Mr. Broxmeyer, as I will put

21  it, inappropriately used minimally in order to have these

22  images produced.  And to have these images made.  The issue

23  of these images being made on materials being transported in

24  interstate commerce, there's really no question as to that.

25  Everything was made either in China, Thailand or Singapore,

USA vs Todd Broxmeyer

1    all these materials, whether it is the cameras or the

2    laptops.

3               You're also going to hear from Kayla Mueller.

4    Kayla Mueller you'll learn at the time this event occurred

5    was 15 years old, and Kayla Mueller was also someone that

6    Mr. Broxmeyer coached, and Kayla Mueller and her father will

7    testify, Lance Mueller.  Lance will tell you how it is that

8    he and his family found Mr. Broxmeyer as a field hockey coach

9    that they wanted to coach their daughter.  Their daughter,

10   who is Kayla, was very, very much into field hockey.  Very

11   much looking to become a better hockey player and hopefully

12   go on to college to become a field hockey player.  And Lance

13   Mueller will describe for you how they lived throughout that

14   entire time in Pennsylvania, approximately about two, two and

15   a half hours away.  And he'll describe for you how he drove

16   Kayla Mueller up to New York State to the Sportsplex, and

17   also sometimes you'll learn they practiced over at the

18   Binghamton High School.  They have that turf, astro turf up

19   top, I think the lacrosse players practice there sometimes.

20              He will tell you on how all of the occasions

21   that she had practiced, he would drive her up, except for the

22   one time, and he'll tell you as to why it was that he and no

23   one else in the family was able to get her up here for the

24   practice session and get her back home.  And what happened on

25   that one time, on that one time that they were unable to

1    bring her up and take her home -- excuse me, or take her

2    home, you will learn that Todd Broxmeyer on that occasion

3    sexually assaulted Kayla Mueller.  The arrangement was that

4    the family would bring her up on December 8 of 2007 and she

5    would stay and practice with Mr. Broxmeyer and the team.  And

6    that she would then stay over night at another player's

7    house.  And the arrangement was Todd Broxmeyer was then the

8    next day going to drive her back home to Pennsylvania,

9    December 9, 2007.

10              And you're going to learn that Kayla at that

11    time, she's going to get up on the stand here, a girl,

12    15-year-old kid, will tell you how when he picks her up, when

13    Broxmeyer picks her up the next morning to drive her from New

14    York State to Pennsylvania, the first thing that he does is

15    he takes her over to the Sportsplex with nobody else there

16    and he forces her to perform oral sex on him before he drives

17    her down to Pennsylvania.  That is Count Four.

18              In the course of having a minor transported up

19    and back down, he does the transporting back on December 9,

20    in the course of doing that, he causes her to have oral sex

21    with him and then drives her home and drops her off.

22              Count Five, the possession.  Everything I told

23    you so far about is all the images he possessed in his Pix

24    account.  He's the one that's storing them in there.  It's

25    kind of like a safety deposit box, if you want to call it.

USA vs Todd Broxmeyer

34

1    Except here his valuables were these images of teenage girls.

2    He possesses those.  He has access to them.  He possesses

3    them as they come on his cellphone as the girls sent it to

4    him.  He possesses what's on his laptops and he possesses

5    what's on his iPod.  And the materials that are referenced in

6    Count Five, they're the same materials I talked about

7    earlier; the camera, the laptop, the iPod.  Katie Thorp's

8    phone, the one that she uses to take a picture of herself in

9    her underwear that she sends to him that's made in, to be

10   honest I can't remember if it's Thailand or China.

11              On December 21, 2007, Detective Ellis begins

12   an investigation of Mr. Broxmeyer.  On December 22, early

13   morning hours, Detective Ellis goes to Mr. Broxmeyer's

14   residence in Whitney Point and asks him to accompany

15   Detective Ellis to the sheriff's department, that they need

16   to talk, and Mr. Broxmeyer comes along with him.  And

17   Mr. Broxmeyer brings that cellphone of his with him.  And

18   you'll learn that during the course of Detective Ellis having

19   a conversation with Mr. Broxmeyer, Mr. Broxmeyer admits to

20   him that he sent inappropriate pictures to some of the

21   players and they sent inappropriate pictures to him.  And

22   it's soon after that conversation that Detective Ellis places

23   Mr. Broxmeyer under arrest.  And you're then going to learn

24   afterwards that Detective Ellis then begins to get search

25   warrants.  Search warrant for all those items that I

USA vs Todd Broxmeyer

35

1   described for you earlier.

2           And in addition to the photographs that you're

3   going to see -- and a number of these players have been

4   identified and you'll also see photographs of players that

5   have not been identified.  Okay.  I think you'll find from

6   the evidence why it's very difficult to identify some of them

7   when a very small portion of their body is in the picture.

8   But in addition to the evidence of the photographs, the

9   materials that were seized, the admission by Mr. Broxmeyer to

10  Detective Ellis, you're also going to see, and I will

11  introduce into evidence, text messages between Mr. Broxmeyer

12  and Katie Thorp.  And in there you will see where he,

13  Mr. Broxmeyer, tells Katie Thorp that he's storing these

14  pictures in his Pix account.  And you'll also see how

15  Mr. Broxmeyer is asking for her to send him a picture,

16  pictures of herself.

17          And I submit to you, ladies and gentlemen when

18  you're done looking at all this evidence, when you have seen

19  all of these materials, when you've listened to the several

20  players that are going to testify, and when you've looked at

21  everything, I submit to you, you will find there's no

22  reasonable doubt that Mr. Broxmeyer is guilty of the charges

23  as the Judge will describe the law for you.

24          And the next time that I'm going to stand up

25  in front of you, I'm going to stand up and talk to you about

USA vs Todd Broxmeyer

36

1   how I believe the evidence shows what the charges charge.

2   I'm going to ask you to convict him on all five counts

3   because what it says he did in here is in fact what the

4   evidence shows, not what I say, but what the evidence shows.

5   Thanks for your attention.

6                    THE COURT:  Thank you Mr. Lovric.  Mr. Kilker.

7                    MR. KILKER:  Thank you, your Honor.  May it

8   please the Court, counsel.  What Mr. Lovric just told you is

9   what he plans to introduce in this particular case.  I'm

10  going to ask that you keep an open mind and don't be tricked

11  by some of the images or some of the things that you're going

12  to see, because some of that stuff is not child pornography.

13  It's legal.  It's legal to possess.  It's legal to view.  And

14  some of that stuff is simply being presented to you to try to

15  show that Mr. Broxmeyer has some sort of propensity.  Don't

16  be fooled by that.

17                   The burden proof is always going to stay right

18  here on the prosecution and they've got to prove each and

19  every element of those five charges, and the Judge has given

20  you a brief overview of what those elements are.

21                   In connection with the first count of the

22  indictment, an indictment is simply a piece of paper, it's

23  nothing more than that, and it can't be considered as

24  evidence, just as the prosecution's comments and my comments

25  can't be considered as evidence.  But what it does, it

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs Todd Broxmeyer

37

 1  charges Mr. Broxmeyer with five counts.  And the first count

 2  is production of child pornography.  Production of child

 3  pornography.  And there's another number of elements that

 4  have to be met.

 5              And specifically Mr. Broxmeyer is accused of

 6  having images on his phone where he knowingly and willfully

 7  employed, used, persuaded, induced, enticed and coerced a

 8  minor.  And in this case the prosecution has indicated to you

 9  that the minor here is Alesha Widdall.  And they intend to

10  introduce two photographs purporting to be sexual in nature

11  or pornography, but you'll have to be the judge of that.  You

12  decide if you believe that these are lewd and lascivious

13  pictures.  You decide whether or not it constitutes

14  pornography.  And you decide whether he willfully employed,

15  used, persuaded, induced or enticed Alesha Widdall to send

16  these pictures.

17              Because the evidence is going to show he never

18  did.  She sent them voluntarily.  She did it because she

19  thought it was funny.  You're going to hear there was a

20  relationship between the two of them.  She's a 17-year-old

21  player of his, you're going to see photographs.  We don't

22  deny that.  We do deny that he induced her to send those

23  photographs.  That he willfully coerced her to send those

24  photographs.

25              Those are the first two counts of the

USA vs Todd Broxmeyer

38

1  indictment, Counts One and Two.  That he took affirmative

2  steps in getting her to send naked pictures of herself.

3  There won't be any proof.  There won't be any proof of that.

4  She'll even tell you she sent them voluntarily.  That the

5  relationship was consensual.  But the fact that they're on

6  his camera, the prosecution would like you to believe that

7  Mr. Broxmeyer did something affirmative to get them on there.

8  That he's out there preying on young girls.

9           Obviously, we all feel the same way about

10  child pornography and anybody who feels otherwise is

11  obviously very sick.  But that's not what we have in this

12  case.  These child pornography statutes are intended to avoid

13  the exploitation of children.  Here is a different case.

14  Here you have young girls who for their own fun are sending

15  pictures to a guy they've got a crush on.  The fact that he

16  coached them, as the prosecution calls it, he's basically not

17  a coach but more of a consultant and sells hockey equipment

18  is irrelevant.  Totally irrelevant.  Just like many of these

19  photographs are going to be irrelevant.  Just like many of

20  the videos are going to be irrelevant.  They don't have

21  anything to do with these charges.

22           So, when you're looking at Count One and Two,

23  you're looking at photo one of Alesha Widdall and photo two

24  of Alesha Widdall, that's it.  So, Counts One and Two, when

25  she takes the stand, pay very close attention to whether she

USA vs Todd Broxmeyer

1  says, because she won't, that Todd Broxmeyer encouraged her

2  to send those photographs.

3              Now, four out of five of these counts

4  basically involve production or attempted production of child

5  pornography and/or possession.  Third count being the

6  attempted production of child pornography.  And the

7  prosecution has told you that they have two photographs.  One

8  of Katie Thorp and one of Monica Gombita in their underwear,

9  and that somehow Mr. Broxmeyer became dangerously close or

10  took substantial steps to try to influence these girls to

11  send these photographs.  But you won't see any text messages

12  to that effect.  You won't see any audio or hear any audio,

13  or see any videos or anything to substantiate that

14  allegation.

15              And again, did he attempt to employ, use,

16  persuade, induce or entice a minor, that being under 18, to

17  send these naked pictures of themselves or did they do it on

18  their own?  Like I say, like I said, these girls all had

19  crushes on Mr. Broxmeyer and they sent these photographs of

20  their own free will.  He wasn't holding a gun to their head.

21  There wasn't anybody there making these girls take pictures

22  of themselves.  He wasn't in the back room with video camera

23  and duct tape holding them down and photographing them.

24  Nothing like that.  These are 17-year-old girls and they're

25  sending pictures of themselves to a guy they've got a crush

USA vs Todd Broxmeyer

40

1   on.

2              Transporting a minor in interstate commerce to

3   engage in sexual activity.  When we're talking about

4   transporting a minor across state lines, the purpose has to

5   be for the sex.  It's incidental if sexual activity occurs

6   either in one state or another state unless the purpose is to

7   transport the minor for purposes of sexual activity, even if

8   you believe that sexual activity occurred.  Not that we're

9   saying that it did.  But even if you believe that, the

10  purpose would still have to be crossing state lines for sex.

11             That is, I'm going to go down, I'm going to

12  pick up this young girl, I'm going to take her back, have sex

13  with her.  That didn't happen.  And you're not going to hear

14  any evidence like that.  What you did hear is that the young

15  lady came, Kayla Mueller, was brought up for a hockey event

16  by her father, and that Mr. Broxmeyer offered to take her

17  home.  That's not Mr. Broxmeyer who went down to Pennsylvania

18  for purposes of bringing her back to have sex.  That's not

19  the case.  That's what interstate transporting a minor means.

20             Note the fact that even if you believe there

21  was sex, that she was from another state.  So this is why I

22  want you to keep an open mind.  You see a lot of those things

23  that will come in here or may be introduced to you have

24  nothing to do with what's in the indictment, what's in the

25  charges.  And should not be focused on.  What you need to

USA vs Todd Broxmeyer                                41

1  focus on are those images that are part of this case and

2  determine based on those photographs whether you believe the

3  people have met their burden of proof beyond a reasonable

4  doubt.

5              Now, Mr. Broxmeyer may not testify, and as you

6  heard from the Judge, you cannot consider that as evidence of

7  anything.  It's not consciousness of guilt, it is not

8  evidence of anything.  There are many reasons why he may not

9  testify but mostly you can't even consider those reasons.

10 You can't even consider anything about why he wouldn't

11 testify, if he chooses not to.  And that you cannot hold

12 against him.  Everything has to come through this stand,

13 through the evidence, as far as photographs, it has to be

14 proven by the prosecution, not by the defense.

15             That's why Mr. Broxmeyer sits right there an

16 innocent man and he stays that way throughout this trial,

17 unless you're convinced that every element of these charges

18 as the Judge instructed you on the law and will instruct you

19 on the law has been met and proven beyond a reasonable doubt.

20 Every element.  If one's missing, that charge is out.  If you

21 don't believe that he enticed or coerced Alesha Widdall into

22 sending those photographs, Counts One and Two, gone.  You

23 must acquit.  Same thing with the attempted production.  If

24 you don't believe that he was enticing or coercing or trying

25 to get Kayla -- or, actually it's Katie Thorp or Monica

USA vs Todd Broxmeyer

1  Gombita to send their photographs to him, that he did some

2  act that was a substantial step to getting those photographs,

3  then you must acquit.  If you don't find that a minor was

4  transported across state lines for purposes of sexual

5  intercourse or sexual contact, you must acquit.

6         So, in each one of these charges, on each one

7  these charges, that's simply what they are, is allegations,

8  there's something that you can find in order to find

9  Mr. Broxmeyer not guilty because in each and every one of

10  those there's a lacking element.  And I'm going to ask that

11  you keep an open mind throughout the case, that you not make

12  any presumptions about guilt or innocence until you've heard

13  all of the evidence, and then at the end of this case

14  collectively go back into the jury room, recall the evidence

15  collectively, and then come back and reach a verdict, and I'm

16  sure that verdict will be not guilty.  Thank you.

17         THE COURT:  Thank you, Mr. Kilker.  All right,

18  ladies and gentlemen.  We're going to take a break now and

19  then we're going to start the evidence.

20         (Jury excuse).

21         (Jury present).

22         THE COURT:  All right.  Mr. Lovric, do you

23  have a witness for us?

24         MR. LOVRIC:  Yes, Judge.  First witness we

25  call is Detective Sergeant Jason Ellis.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

USA vs Todd Broxmeyer

43

1          THE COURT:  Okay.

2          THE CLERK:  Please state your full name for

3   the record.

4          THE WITNESS:  Jason T. Ellis.

5   JASON T. ELLIS, having been called as a witness, being duly

6   sworn, testified as follows:

7          THE COURT:  Okay, Mr. Lovric.

8          MR. LOVRIC:  Thank you, Judge.

9   DIRECT EXAMINATION

10  BY MR. LOVRIC:

11     Q    Good afternoon, Detective Ellis.

12     A    Good afternoon.

13     Q    Detective Ellis, for the members of the jury, could

14  you please state for them again your full name, your title,

15  and where you work?

16     A    My name is Jason Ellis.  I'm a detective sergeant

17  with the Broome County Sheriff's Office.

18     Q    Detective Ellis, about how long have you been with

19  the sheriff's department?

20     A    I've been there for 15 years.  It will be 16 years

21  in February of '09.

22     Q    And what are your current duties with the sheriff's

23  department?

24     A    Currently I supervise the criminal investigations

25  division, juvenile division and also the warrant deputies.

Jason Ellis - Direct

1    Q    And about how long have you had that type of

2  supervisory responsibilities?

3    A    Over a year and a half.

4    Q    And during your years with the sheriff's

5  department, what type of different duties have you performed?

6    A    Originally, I was hired part time back in the late

7  '80s as a correctional officer, and then I was hired as a

8  full-time law enforcement deputy in 1993.  During that time I

9  worked road patrol.  And there's a six-year term where I was

10 the director of the Regional Police Academy before I went

11 back to detective.

12   Q    And Detective Ellis, in your current position with

13 the Broome Sheriff's Department, do you from time to time

14 investigate crimes dealing with everything from child

15 pornography or child sexual assault type matters?

16   A    Yes.  On a regular basis.

17   Q    Detective Ellis, I'd like to direct your attention,

18 if I may, to December 21 of 2007, this past December.  Did

19 you become involved on that date in an investigation dealing

20 with the matters that we're going to talk about today?

21   A    Yes, I did.

22   Q    And on that date, who was the individual that was

23 primarily the person you were investigating?

24   A    Todd Broxmeyer.

25   Q    And just for the record, can you tell us if you see

Jason Ellis - Direct

1   Mr. Broxmeyer in court, and if you do, where?

2       A    Yes, I do.  He's sitting at the defense table

3   wearing a blue shirt, blue tie and blue sport coat.

4                MR. LOVRIC:  For the record, your Honor,

5   identifying the defendant.

6                THE COURT:  Record will so reflect.

7       Q    Excuse me, Detective Ellis, on that date,

8   December 21, 2007, did you shortly after you commenced your

9   investigation, did you have the opportunity to actually speak

10  with and interview Mr. Broxmeyer?

11      A    Yes, I did.

12      Q    And can you describe for the members of the jury

13  where you first encountered Mr. Broxmeyer and where it was

14  that you had a chance to interview him?

15      A    I, myself, and a patrol deputy went to his

16  residence in the early morning hours of December 22, and I

17  knocked on the door of his residence, identified myself, and

18  he identified himself as Todd Broxmeyer, and I asked him to

19  come with me down to our department to speak with me about a

20  matter I was investigating.

21      Q    And did he accompany you to the sheriff's

22  department?

23      A    Yes, he did.

24      Q    And at some point after you and he arrived at the

25  sheriff's department, did you have a conversation with him?

Jason Ellis - Direct

1    A    Yes, I did.  I interviewed him in one of our

2    interview rooms.

3    Q    And prior to interviewing him, did you advise him

4    of his constitutional Miranda rights, as far as remaining

5    silent and those admonishments?

6    A    Yes.  We have a standard Miranda rights form that

7    we go through.  I read that to him out loud and then gave it

8    to him to review and sign.

9    Q    And then after that, did you speak with him?

10   A    Yes, I did.

11   Q    And during the course of your discussions with

12   Mr. Broxmeyer, did there come a point in time when you asked

13   him and spoke to him about whether or not he had ever sent

14   via his cellphone any inappropriate type images to any minor

15   girls?

16   A    Yes.  I spoke to him about text messaging and

17   sending photos.  He had made a statement that he thought they

18   were just joking and that they had sent some photos to him

19   and he had sent some to them, and I asked clothed or naked

20   photos, and he said both.

21   Q    And during the time that Mr. Broxmeyer was

22   interviewed, at some point did you obtain any pedigree

23   information, such as his date of birth and age, things of

24   that sort?

25   A    Yes, I did.

Jason Ellis - Direct

1     Q     Can you tell the members of the jury what

2  Mr. Broxmeyer's date of birth is, if you recall?

3     A     August 3, 1970.

4     Q     And so today being September 15 of 2008 would make

5  him how old?

6     A     Thirty-eight.

7     Q     And in 2007, prior to August of '07, he would have

8  been, I take it, 37 years old?

9     A     Yes.

10    Q     Now, after your interview of Mr. Broxmeyer, was he

11 placed under arrest?

12    A     Yes, he was.

13    Q     And after he was arrested, did you recover or find

14 any item or items that he had with him?

15    A     Yes.  One in particular that I recovered and

16 secured as evidence was a cellphone.

17    Q     Okay.  And just generally speaking, where did he

18 have that cellphone?

19    A     It was in the pocket of a jacket that he had wore

20 down to our station.

21    Q     Okay.  If I could, Detective Ellis, I'd like to

22 show you what's been marked as Government Exhibit 5 for

23 identification.  If you could take a look at that exhibit.

24 Tell us if you recognize it.

25    A     Yes.  This would be the cellphone that I secured

Jason Ellis - Direct

1   from his jacket on the morning I placed him under arrest.

2       Q    And after securing his cellphone, was that then

3   maintained in either your custody or law enforcement pending

4   resolution of this case?

5       A    Yes.

6            MR. LOVRIC:  Your Honor, I would offer

7   Government's Exhibit Number 5 into evidence.

8            MR. KILKER:  No objection, your Honor.

9            THE COURT:  Receive Government's 5 in

10  evidence.

11      Q    Now, Detective Ellis, Exhibit 5, Mr. Broxmeyer's

12  cellphone, can you take the back cover and pop that battery

13  out and tell us where that was manufactured?

14      A    There's a bar coded tag on the back and above it it

15  says made in China.

16      Q    And did you, after commencing your investigation,

17  at some point after recovering that cellphone of

18  Mr. Broxmeyer's, did you determine what his cellular

19  telephone number is?

20      A    Yes, I did.

21      Q    And can you give that number to the members of the

22  jury, please?

23      A    (507)574-7772.

24      Q    Did you also determine in the course of your

25  investigation who the provider or carrier was that provided

Jason Ellis - Direct

1   service for that cellular telephone of Mr. Broxmeyer's?

2       A    Yes.  We determined it to be Cellco Partnership,

3   which is a subsidiary of Verizon Wireless.

4       Q    And at some point after you recovered or took into

5   custody that cellular telephone of Mr. Broxmeyer's, did you

6   at some point then apply for and obtain a search warrant from

7   a court to allow the search of that telephone?

8       A    Yes.  I applied for a search warrant in the Town of

9   Union Court, and that was on December 28.  The search warrant

10  was signed by Judge Gaul.

11      Q    And then at some point was that telephone searched

12  to look for any images, among other things, that may be on

13  that cellphone?

14      A    Yes.  It was taken down to the Broome County

15  Security CATS Lab.  They process forensic evidence in

16  relation to digital media computers and so on, and the

17  evidence was turned over to them for analysis.

18      Q    At some point did you actually go there to look at

19  what items were recovered on that cellular telephone?

20      A    Yes, I did.

21      Q    And in addition to materials found on that

22  cellphone, were there a number of photographs that were

23  recovered, saved on that cellular telephone?

24      A    Yes, there were.

25      Q    I'd like to at this point mark and show you what's

Jason Ellis - Direct

1    been marked as Government Exhibit Number 2 for

2    identification.  And if you could take a look at the Exhibit

3    2.  There are, in that folder there are two images in Exhibit

4    2.  I believe they've been marked One and Two in the bottom

5    right-hand corner.  Can you tell us if you recognize Exhibit

6    2, the two images found in that exhibit?

7        A    Yep.  They're two images that were located by the

8    CATS Unit on the cellphone belonging to Todd Broxmeyer.

9                MR. LOVRIC:  Your Honor, I would offer Exhibit

10   2 into evidence.

11               MR. KILKER:  No objection, your Honor.

12               THE COURT:  Receive Government's 2 in

13   evidence.

14       Q    Detective Ellis, I'm going to put on the monitor

15   Exhibit 2, page 1 of Exhibit 2.  Do you see that?

16       A    Yes, I do.

17       Q    That's one of two photos found on Mr. Broxmeyer's

18   cellphone?

19       A    Yes, it is.

20       Q    And in the course of your investigation, were you

21   and law enforcement able to identify the girl that is

22   pictured in that Exhibit 2, page 1?

23       A    Yes.

24       Q    Who is that a picture of?

25       A    That's a picture of Brittany Branco.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Jason Ellis - Direct                        51

1      Q    And in the course of your investigation, were you

2    able to determine who Brittany Branco is?

3      A    Yes.  She is a field hockey player that played

4    under Todd Broxmeyer on one or more teams and currently

5    resides in the State of New Jersey.

6      Q    And in the course of this investigation, without

7    telling us what she said, was Miss Branco interviewed by law

8    enforcement?

9      A    Yes, she was.

10     Q    And in the course of the interview of Miss Branco,

11   was she shown a copy of this photograph?

12     A    Yes, she was.

13     Q    I'm going to now flip to page 2 of Exhibit 2.  Is

14   that the other photograph that was found on Mr. Broxmeyer's

15   cellular telephone?

16     A    Yes, it is.

17     Q    Now, Detective Ellis, on Mr. Broxmeyer's telephone,

18   were there contacts, by that I mean people's names and

19   telephone numbers, contained on his cell telephone?

20     A    Yes.

21     Q    And did you have the opportunity to look at a

22   printout directory of the materials found on Mr. Broxmeyer's

23   cellphone?

24     A    Yes, I did.

25     Q    And in your reviewing that contact directory, did

Jason Ellis - Direct                    52

1  you see or observe the name of an Alesha Widdall in his

2  contacts?

3       A    Yes, I did.

4       Q    And in the course of this investigation, was Alesha

5  Widdall identified as a real person?

6       A    Yes.  She was identified, located and interviewed,

7  and it was determined also she was a field hockey player

8  under Todd Broxmeyer.

9       Q    And just generally speaking, from what state and

10 what general area was Alesha Widdall a field hockey player

11 that he coached?

12      A    Whitney Point, Broome County, New York.

13      Q    And did you also examine the directory in

14 Mr. Broxmeyer's phone for a person by the name of Jackie

15 Bendick?

16      A    Yes, I did.

17      Q    And was that name and a contact telephone contained

18 in his directory?

19      A    Yes, it was.

20      Q    And did you -- at some point in the investigation

21 were you able to determine who Jackie Bendick is?

22      A    Yes.  She was a field hockey player that played

23 underneath Todd Broxmeyer on the travel teams and she

24 currently had attended school at the Whitney Point School

25 District in Broome County, New York.

Jason Ellis - Direct

53

1    Q    Was she also interviewed by yourself?

2    A    Yes, she was.

3    Q    And a few moments ago we talked about that

4  photograph of Brittany Branco.  Did you also find in his

5  contacts list the name of Brittany Branco and the telephone

6  number?

7    A    Yes, I did.

8    Q    You already indicated to us her identification.

9  Did you also at some point look in that directory to see

10  whether a person by the name of Katie Thorp was located in

11  that directory?

12    A    Yes, I did.

13    Q    And what did you find as far as her name and

14  telephone number?

15    A    Her name and telephone number was in the directory,

16  were able to locate her, again a field hockey player from the

17  Whitney Point, Broome County, New York area.  She was

18  interviewed.

19    Q    At some point were you able to determine -- let me

20  ask you, the telephone number contained in Mr. Broxmeyer's

21  directory for Katie Thorp, were you able to get that

22  telephone number information?

23    A    Yes.

24    Q    Do you recall that number or do you have anything

25  as to what that number was?

Jason Ellis - Direct                    54

1      A    As I recall (607)725-91, I believe, 85.

2      Q    Let me ask you if -- let me ask you if I can show

3    you -- at some point we'll talk about it in a little bit.  At

4    some point did you apply for and obtain a search warrant to

5    get text messages from her phone?

6      A    Yes, I did.

7      Q    And have you had a chance to look at those

8    materials that were obtained through that search warrant?

9      A    Yes, I have.

10     Q    Okay.  Let me show you, if I can real quickly,

11   Government Exhibit Number 13 for identification.  And if you

12   can just take a look at the bottom of that.  Just tell us if

13   you recognize the phone number listed at the bottom?

14     A    Yes.  I was incorrect on the number.  The number

15   that appears here (607)725-9185 is, in fact, Katie Thorp's

16   phone number and the number that appeared in the directory.

17     Q    Now, when you looked at Mr. Broxmeyer's cellphone

18   directory, did you also find any information for a Kayla

19   Mueller?

20     A    The information that we found in the directory was

21   just the first name of Kayla.  We were able to, after a

22   complaint was filed, we were able to track her down and match

23   that phone number up to Kayla Mueller.

24     Q    Okay.  And was Kayla Mueller at some point actually

25   interviewed by you and other officers?

1      A    Yes.  She was located and interviewed in the state

2    of Pennsylvania.

3      Q    And the telephone number listed for her in

4    Mr. Broxmeyer's cellphone, was that an accurate phone number

5    where she could be reached on her cellphone?

6      A    Yes.  It was the same number that she provided to

7    me when we interviewed her.

8      Q    Now, in Mr. Broxmeyer's directory did you also find

9    a contact information for Lance Mueller?

10     A    Yes, I did.

11     Q    Who was Lance Mueller?

12     A    Lance Mueller is Kayla Mueller's father, and while

13   we were in the State of Pennsylvania, we also interviewed

14   him.

15     Q    And in reviewing Mr. Broxmeyer's phone directory,

16   were you able to find a listing for a Lindsey Wilcox?

17     A    Yes, I was.

18     Q    Who is Lindsey Wilcox?

19     A    She was the live-in girlfriend of Todd Broxmeyer

20   and field hockey coach in both the Whitney Point and Newark

21   Valley School Districts.

22     Q    And on the morning of December 22 of 2007, when you

23   went to Mr. Broxmeyer's residence as you described for us, do

24   you know if Miss Wilcox was present in that apartment?

25     A    Yes, she was.

1    Q    And in the directory for Mr -- in reviewing

2    Mr. Broxmeyer's directory on his cellphone, did you find a

3    contact information for Monica Gombita?

4    A    Yes, I did.

5    Q    And was there also a phone listing for her?

6    A    Yes, there was.

7    Q    And were you able to identify Monica Gombita?

8    A    Yes.  Actually by calling her and contacting her,

9    locating where she was currently, and went down and conducted

10   an interview with her.

11   Q    Who was she in relation to Mr. Broxmeyer?

12   A    A player that had played under him while she

13   attended high school here at the Vestal School District.

14   Q    Now, at some point in your investigation, Detective

15   Ellis, did you obtain and apply for and obtain a search

16   warrant to search the Verizon Wireless Pix account of

17   Mr. Broxmeyer?

18   A    Yes, I did.

19   Q    And about when was that, approximately?

20   A    December 28, 2007.

21   Q    And just very briefly, can you tell us based on

22   your investigation in applying for this search warrant,

23   what's your basic understanding of what a Pix account is with

24   Verizon Wireless?

25   A    Pix account, as I relate, it is basically a storage

Jason Ellis - Direct                              57

1    room.  Obviously, phones don't have a lot of memory that you

2    can store data on, so it gives you a place to move that data,

3    to be no different than burning something to a CD or like a

4    floppy disk or external hard drive on your computer.  It's

5    just some extra storage space.

6         Q    And in the course of your investigation, did you

7    determine and thereby apply for a warrant that there were

8    materials stored in Mr. Broxmeyer's Verizon Pix account?

9         A    Yes.  When we obtained the warrant, we served the

10   warrant on Cellco Partnership, also Verizon, and they

11   provided information to us pursuant to that search warrant.

12        Q    I'd like to show you what's marked as Government's

13   Exhibit 1 for identification.  If you can take a look at that

14   Exhibit 1, and if you can take a look at the items therein.

15   Just tell us if you recognize what they are.

16        A    These all appear to be the pictures provided us

17   from Cellco Partnership from Todd Broxmeyer's Pix Place

18   account.

19        Q    And when we're saying Cellco Partnership, is that

20   the holding company of what's called Verizon Wireless?

21        A    Yes.

22        Q    And Exhibit 1, does that contain the copies of the

23   actual photo images that they provided to your department and

24   agency based on that search warrant on December 28?

25        A    Yes, they are.

Jason Ellis - Direct                                    58

1      Q     And in addition to the photo, is there with each

2   photo a secondary page that they provided that indicates when

3   approximately that photo was saved into that Pix account of

4   Mr. Broxmeyer's?

5      A     Yes, there is.

6      Q     And are those materials that they actually gave

7   pursuant to that court-ordered search warrant?

8      A     Yes.  They are.

9                MR. LOVRIC:  I would offer Exhibit 1 into

10  evidence.

11               MR. KILKER:  No objection, your Honor.

12               THE COURT:  Receive Government's 1 in

13  evidence.

14     Q     Detective Ellis, I'm going to put on the document

15  camera the first page of Exhibit 1.  Is that the document

16  Verizon Wireless sent describing the account holder's name,

17  address, cellphone number, things of that nature?

18     A     Yes.  It says, part of search warrant we ask for

19  subscriber information, and that's what that page is.

20     Q     And I'm going to point to a top left place it says

21  name and it says Todd J. Broxmeyer.  Do you see that?

22     A     Yes, I do.

23     Q     And over to the right a little bit there is an

24  address of 80 Columbine Drive.  Are you familiar with that

25  address as it relates to Mr. Broxmeyer?

Jason Ellis - Direct                                             59

1      A     Yes.  It's an address where we executed a search

2   warrant.  It's a cousin's house that he used to reside at.

3      Q     When you say he, you're referring to who?

4      A     Todd Broxmeyer.

5      Q     And then towards the bottom right I'm now pointing

6   to a listed home number.  Do you see that number?

7      A     Yes, I do.

8      Q     And is that the same cellphone number you recited

9   for us was the number for that cellular phone, Exhibit Number

10  5?

11     A     Yes.

12     Q     Then page 2 just has name and telephone number, is

13  that correct?

14     A     Yes.

15     Q     Looking at image 1.  It's numbered image 1.  Do you

16  see that?

17     A     Yes, I do.

18     Q     That image is an image that Verizon Wireless

19  provided based on the search warrant?

20     A     Yes, it is.

21     Q     And at some point in the investigation were you

22  able to identify who the girl is in that image?

23     A     Yes, we were.

24     Q     Who is that girl?

25     A     That is Alesha Widdall.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Jason Ellis - Direct

60

1    Q    For right now, Detective Ellis, I'm just going to

2  go through the image.  Image 2, do you see that picture?

3    A    Yes, I do.

4    Q    At some point were you able to identify who the

5  person is that's depicted in that close-up picture?

6    A    Yes.

7    Q    Who is that?

8    A    That is also Alesha Widdall.

9    Q    The next image that I put on there.  Do you see

10  that?

11   A    Yes, I do.

12   Q    Were you able to identify who's pictured in that

13  image?

14   A    Yes.  This was identified as Monica Gombita.

15   Q    The next image I've flipped on the presenter.  Do

16  you see that?

17   A    Yes, I do.

18   Q    Were you able to identify who the girl is in that

19  photograph?

20   A    Yes.  She's identified as Katie Thorp.

21   Q    Now, the next image that I've put on the screen is

22  a picture of the girl we talked about a little bit earlier

23  that you indicated was identified as Brittany Branco.  Do you

24  recall that?

25   A    Yes, I do.

Jason Ellis - Direct

1    Q    So a few minutes ago I had shown you Exhibit 2,

2  which were the two photographs contained on Mr. Broxmeyer's

3  actual cellphone, is that correct?

4    A    Yes, you did.

5    Q    And now we're looking -- and does that appear to be

6  the same image that's contained in Exhibit 2 that's also

7  contained in Exhibit 1 on his Pix account?

8    A    Yes, it is.

9    Q    Do you see a picture of this girl in the next

10  picture?

11    A    Yes.

12    Q    Were you able to locate that girl?

13    A    I was able to identify who she was from a year book

14  photo.

15    Q    Okay.  Who is she?

16    A    Chelsea Wheeler.  She was a student at the Whitney

17  Point High School.

18    Q    Were you able to determine where that picture was

19  taken by the surroundings?

20    A    Yes.  I went to the school and I was able to

21  determine that photograph was taken in the girls' bathroom

22  opposite the art room in the main hallway of the high school.

23    Q    The next photograph a picture that was found on

24  Mr. Broxmeyer's Pix account?

25    A    Yes, it is.

Jason Ellis - Direct                    62

1      Q     The next picture, a little fuzzy, appears to be a

2   picture of a number of girls in a pyramid type stance in what

3   appears to be their underwear?

4      A     Yes.

5      Q     Were you able to identify who these girls are?

6      A     No, we're not.

7      Q     The next photograph, photo of young girls or

8   teenage person's breasts.  Were you able to identify who?

9               MR. KILKER:  I'd object, your Honor, to the

10  term teenage.  It hasn't been identified that she is a

11  teenager.

12              THE COURT:  Sustained.

13              MR. LOVRIC:  Withdraw.

14     Q     The girl's photograph here with breasts, were you

15  able to identify who she is?

16     A     No, we're not.

17     Q     The next girl, close-up of the breasts, were you

18  able to identify her?

19     A     No, we're not.

20     Q     The next girl with the photograph of breasts, were

21  you able to identify her?

22     A     No, we're not.

23     Q     The next girl, the close-up of her vagina, were you

24  able to identify her?

25     A     No, we're not.

Jason Ellis - Direct                           63

1      Q      This photograph appears to be a hand or finger

2  being inserted into a vagina.  Were you able to identify the

3  person or persons depicted there?

4      A      No, we're not.

5      Q      This photograph, girl's breasts and torso, were you

6  able to identify her?

7      A      No, we were not.

8      Q      The next picture of girl's breasts, were you able

9  to identify her?

10     A      No, we were not.

11     Q      The next girl with a close-up shot of the vagina,

12 were you able to identify her?

13     A      No, we were not.

14     Q      The next girl, picture of breasts, were you able to

15 identify her?

16     A      No, we were not.

17     Q      The next girl, underwear and bottom torso, were you

18 able to identify who that is?

19     A      No, we were not.

20     Q      The picture of two girls kissing naked from the

21 waste up, were you able to identify who those two girls are?

22     A      No, we were not.

23     Q      Picture of the next two girls kissing?

24     A      We were not able to identify them.

25     Q      Close-up of girl's vaginal area in underwear, were

Jason Ellis - Direct

1    you able to identify that girl?

2         A    No, we were not.

3         Q    Picture of girl's breasts, were you able to

4    identify her?

5         A    No, we were not.

6         Q    Close-up picture of vagina, were you able to

7    identify that person?

8         A    No, we were not.

9         Q    Next picture of girl's breasts, able to identify

10   her?

11        A    No, we were not.

12        Q    Close-up picture of vagina being spread apart by

13   two fingers, able to identify who the person is?

14        A    No, we were not.

15        Q    Next picture of girl's breasts, were you able to

16   identify her?

17        A    No, we were not.

18        Q    Now, all the pictures that we've just seen in

19   Exhibit 2 -- excuse me, Exhibit 1, pictures that we just

20   looked at in Exhibit 1, were all those photographs provided

21   by Verizon Wireless as being in Mr. Broxmeyer's Pix account?

22        A    Yes, they were.

23        Q    In addition to the photographs that we saw just in

24   Exhibit 1, did you also receive from Verizon Wireless

25   pursuant to that search warrant two video clips that were

Jason Ellis - Direct                          65

1   contained in Mr. Broxmeyer's Pix account?

2        A    Yes, we did.

3        Q    Did you have an opportunity to view those video

4   clips?

5        A    Yes, I viewed both of them.

6        Q    Can you just generally describe what you saw when

7   you viewed them?

8        A    Both video clips depicted a male and female

9   engaging in sexual intercourse and it was basically a

10  close-up of the penis going into the vagina.

11       Q    So based on the video, were you able to identify

12  either male or the female engaging in that sexual

13  intercourse?

14       A    No, we were not.

15       Q    Now, in the course of your investigation, were you

16  able also to identify and where possible take a photograph of

17  a cellular phone, the manufacturing information in relation

18  to certain cellphones?

19       A    Yes.

20       Q    At some point were you able to look at the cellular

21  telephone of Alesha Widdall to determine where that was

22  manufactured?

23       A    Yes.

24       Q    And likewise, were you able to look and to

25  determine the cellular telephone manufacturing for Katie

Jason Ellis - Direct                                    66

1    Thorp's cellular telephone?

2        A    Yes.

3        Q    Okay.  I'd like to show you Exhibit 6.  And I'll

4    put 7 there also.  But first looking at Exhibit 6, do you

5    recognize that photo of Exhibit 6?

6        A    Yes.  This is the back of Alesha Widdall's

7    cellphone with the battery removed similar to what I did

8    earlier during my testimony.

9        Q    And then Exhibit 7, is that a photograph of Katie

10   Thorp's cellphone?

11       A    Yes, it is.

12       Q    And do both those pictures simply show where those

13   phones were manufactured?

14       A    Yes, they do.

15            MR. LOVRIC:  I would offer Government's

16   Exhibit Number 6 and 7 into evidence.

17            MR. KILKER:  No.  Okay, your Honor.

18            THE COURT:  Receive Government's Number 6 and

19   7 in evidence.

20       Q    Can you just tell the members of the jury, Exhibit

21   6, Alesha Widdall's telephone, is manufactured where?

22       A    It's made in Korea.

23       Q    And Katie Thorp's?

24       A    Made in China.

25       Q    Now, during the course of the investigation, were

1   you able to also determine Alesha Widdall's cellular

2   telephone number?

3          A     Yes.

4          Q     Do you recall what that number is?

5          A     I believe (607)237-5185.

6          Q     And is that the actual then cellphone which you

7   photographed that's depicted there in Exhibit 6?

8          A     Yes.

9          Q     Now, Detective Ellis, at some point after you

10  interviewed Mr. Broxmeyer on December 22, of 2007, did you at

11  some point go to a location called the Sportsplex on Robinson

12  Hill Road in the Town of Union here in Broome County?

13         A     Yes, I did.

14         Q     And can you just for the members of the jury tell

15  us what is the Sportsplex, for those of us that are not

16  familiar with that facility?

17         A     It's an indoor basically field where they practice

18  lacrosse, field hockey and soccer.  You know, anything that

19  they can practice on a field, they play there.

20         Q     In going to the Sportsplex on Robinson Hill Road,

21  when you went there, did you, at that point in time did you

22  have any information in connection with how, if at all,

23  Mr. Broxmeyer was affiliated with that Sportsplex?

24         A     Yes.  I had information that he was the manager of

25  the Sportsplex, responsible for scheduling, and also that he

Jason Ellis - Direct

1    held practices, and I guess sometimes some like pick-up games

2    of field hockey there.

3        Q    And did you go there on December 22, among other

4    reasons, to try to locate a laptop, if there was one that was

5    located there?

6        A    Yes, I did.

7        Q    And did you, in fact, locate a laptop at the

8    Sportsplex?

9        A    Yes.  I located a laptop in an office area and

10   determined it to be the laptop belonging to Todd Broxmeyer.

11       Q    Did you then secure or take custody of that laptop?

12       A    Yes, I did.

13       Q    And at some point did you then obtain a search

14   warrant to allow the search of the actual contents of the

15   laptop?

16       A    Yes, I did.

17       Q    And when was that, approximately?

18       A    It was contained in a search warrant of December

19   28, 2007.

20       Q    And in connection with that Gateway laptop that you

21   secured, where did you take that to be analyzed?

22       A    I took it again to the Broome County Security CATS

23   Lab.

24       Q    At some point after that laptop was taken to the

25   CATS Unit, did you have the opportunity to look through

Jason Ellis - Direct

1  materials that had been found on Mr. Broxmeyer's Gateway

2  laptop?

3       A    Yes, I did.

4       Q    And just very generally, what were some of the

5  materials that you viewed or saw that were on his laptop?

6       A    There were things on there about field hockey,

7  along with numerous pictures depicting younger females.

8       Q    Okay.  Now, in furtherance of your investigation,

9  did you at some point apply for and obtain search warrants

10  for materials at 80 Columbine Drive and 613 River Road?

11       A    Yes.  Through our investigation I had learned that

12  property belonging to Todd Broxmeyer was located at 80

13  Columbine Drive in the Town of Chenango, Broome County,

14  New York, and also at 613 River Road in the Town of Chenango,

15  Broome County, New York.  Both of those residences are

16  residences of relatives of Todd Broxmeyer.  At 80 Columbine

17  Drive there was some personal property stored, and at 613

18  River Road his vehicle was stored there.  It was a 1999

19  Cutlass, New York registration on it.

20       Q    Did you actually at some point execute a search

21  warrant and recover items from 80 Columbine Drive?

22       A    Yes, I did.

23       Q    Did you recover any computer or computer type

24  equipment from that location?

25       A    Yes.  Actually, I applied for a search warrant,

Jason Ellis - Direct                          70

1    Detective Broderick executed that warrant.  He is one of the

2    detectives that works for me, and part of that property that

3    was recovered from there was a Compaq computer, laptop

4    computer.

5         Q    And did you at some point recover or did someone

6    assisting you recover any items from Mr. Broxmeyer's vehicle?

7         A    Yes.  Vehicle was towed and impounded.  I conducted

8    a search of that vehicle and I recovered an iPod device.

9         Q    And that was inside the car?

10        A    Yes, it was.

11        Q    The car you recovered it from, just generally

12   describing, what type of car was it?

13        A    It was a '99 Cutlass, brown as I recall, the plate

14   number is DZN3047.  Which when we run that registration in

15   the Department of Motor Vehicles data base, it came back to

16   Todd Broxmeyer.

17        Q    Inside that car you found the thing you called the

18   iPod?

19        A    Yes.

20        Q    The Compaq laptop that you recovered from Columbine

21   Drive or that was recovered from Columbine Drive, what was

22   done with that Compaq after it was taken into custody?

23        A    The Compaq and actually the iPod both were taken to

24   the Broome County Security CATS Lab for analysis.

25        Q    Now, Detective Ellis, I'd like to show you two

Jason Ellis - Direct

1  exhibits that have been marked Exhibit 11 and Exhibit 12.  If

2  you take a look at Exhibit 11 and 12, take a look at 11

3  first.  Do you recognize what Exhibit 11 is?

4       A    Yes.  This is the -- actually, there's two

5  photographs contained in this exhibit.  It's a distance shot

6  of the back of the Compaq computer that was recovered at 80

7  Columbine Drive, and the second picture in this exhibit is a

8  close-up of that battery compartment showing that this laptop

9  computer is a product of China.

10                 MR. LOVRIC:  Your Honor, I would offer

11  Exhibits 11 and 12 into evidence.

12                 MR. KILKER:  No objection.

13                 THE COURT:  Receive Government's 11 and 12 in

14  evidence.

15                 MR. LOVRIC:  Judge, I just want to make sure.

16  I believe I offered 6 and 7.

17                 THE COURT:  You did.  They're received.

18  BY MR. LOVRIC:

19       Q    Then, Detective Ellis, briefly again, the Compaq is

20  manufactured where?

21       A    It says it's a product of China.

22       Q    And the Gateway computer?

23       A    Also made in China.

24       Q    Now, the iPod you mentioned that was recovered from

25  Mr. Broxmeyer's vehicle?

Jason Ellis - Direct                                    72

1        A     Yes.

2        Q     Just from your basic knowledge, what's an iPod?

3        A     It's a device that people use to store music.  You

4   can store videos on it, depending on what type of iPod it is.

5   You can store pictures on it.  And now they even have one

6   that's a telephone, you can e-mail and do all sorts of

7   technological maneuvers with, if you will.

8        Q     In the -- after you seized the iPod, did you at

9   some point then take it over to the CATS Unit to be analyzed?

10       A     Yes.

11       Q     And after that iPod was analyzed, did you have the

12  opportunity to view videos found on that iPod?

13       A     Yes.

14       Q     Were there approximately four video clips found on

15  that iPod?

16       A     Yes, there were four.

17       Q     And what did you see when you saw those videos,

18  what did you observe?

19       A     The videos depicted a male performing oral sex on a

20  female, and at one point during the one video I identified

21  the male, because I saw his face, as being Todd Broxmeyer.

22  And there were also videos on there of a female using her

23  finger to perform masturbation.

24       Q     And the video where you identified Mr. Broxmeyer,

25  what was he doing, videoing his face or his head?

Jason Ellis - Direct

73

1    A    He was performing oral sex on a female.  At one

2   point he lifted his head and is able to see his face.

3    Q    And I take it, were those shots of that activity

4   fairly close shots on the genitals of the girl that was

5   depicted in those images?

6    A    Yes.  That was the case in all four videos.

7    Q    So, for example, based on what you saw in those

8   four videos, could you identify the girl?

9    A    No, I could not.

10    Q    But in one you were able to identify

11   Mr. Broxmeyer's face?

12    A    That's correct.

13    Q    Detective Ellis, I showed you a little bit earlier,

14   I'd like to now show it to you again, Government Exhibit 13

15   marked for identification.  If you can take a look at Exhibit

16   13 and generally tell us what is contained in that clip,

17   batch of documents in Exhibit 13?

18    A    These are the text messages from December 21, 2007

19   that were provided to us from Verizon in relation to Todd

20   Broxmeyer's phone.

21    Q    And in the course of your investigation, did you

22   actually receive a search warrant, apply and receive a search

23   warrant from a court to permit you to obtain those materials

24   in Exhibit 13 from Verizon Wireless?

25    A    Yes.

Jason Ellis - Direct

74

1    Q    And in looking at Exhibit 13, whose telephone, by

2    whose I mean which person in connection with this

3    investigation, are those text messages related to, whose

4    telephone?

5    A    Todd Broxmeyer's telephone appears on here as well

6    as Katie Thorp's.

7    Q    Okay.

8         MR. LOVRIC:  Your Honor, I would offer Exhibit

9    Number 13 into evidence.

10        MR. KILKER:  No objection, Judge.

11        THE COURT:  Receive Government's 13 in

12   evidence.

13   Q    Detective Ellis, in Exhibit 13, have you had a

14   chance to look through earlier today for some of the pages of

15   Exhibit 13?

16   A    Yes.

17   Q    And in that Exhibit, are there locations where the

18   cell telephone of Mr. Broxmeyer is texting the cell telephone

19   of Katie Thorp?

20   A    Yes.

21   Q    And vice-versa, is there texting from the Katie

22   Thorp phone to Mr. Broxmeyer?

23   A    Yes.

24   Q    And in the text messages that are located in this

25   exhibit, are there places where Mr. Broxmeyer's telephone is

Jason Ellis - Direct

1    texting Katie Thorp's requesting images be sent to him?

2        A    Yes.

3        Q    Is there in this exhibit a text message from

4    Mr. Broxmeyer's cellphone to Katie Thorp's whereby he tells

5    her that he's saving these images on his Verizon Pix account?

6        A    Yes.

7             MR. LOVRIC:  Those are all the questions I

8    have at this time, Judge.

9             THE COURT:  Okay.  Mr. Kilker, you may

10   cross-examine.

11            MR. KILKER:  Yes, your Honor.

12   CROSS-EXAMINATION

13   BY MR. KILKER:

14       Q    Good afternoon, Detective.

15       A    Good afternoon.

16       Q    When you first spoke with Mr. Broxmeyer about

17   images being sent and received, he indicated to you that they

18   were just joking, right?

19       A    Those were his words, yes.

20       Q    And when you spoke to him about the images, did he

21   identify specifically what images he was talking about or did

22   you identify the images to him?

23       A    No.

24       Q    Just in general?

25       A    Correct.

Jason Ellis - Cross                                76

1      Q     And some of these things that were sent were of

2   clothed people as well as unclothed, right?

3      A     Yes.

4      Q     Now, you were shown a photo of Brittany Branco with

5   some whip cream on her.  How old was Brittany in that

6   photograph?

7      A     All I can recall is she was under 18 years of age

8   in that photo.

9      Q     Do you recall whether that photo was taken after

10  she was 18?

11     A     No, I do not.

12     Q     Did she -- strike that.  That image that Brittany I

13  understand identified the image as being her, right?

14     A     Yes.

15     Q     And you had an interview with Brittany?

16     A     Officers that assisted in this case did, yes.

17     Q     You didn't, yourself, speak to her?

18     A     No.

19     Q     About the photograph?

20     A     No.

21     Q     Or about how old she was?

22     A     No.

23     Q     These contacts that you referred to, including

24  Alesha Widdall, Jackie Bendick, Katie Thorp, Katie Mueller,

25  Lance Mueller, at least as far as those contacts go, they

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Jason Ellis - Cross

1  were either hockey players of Mr. Broxmeyer or their parents,

2  right?

3      A     That's correct.

4      Q     And Lance Mueller is Kayla Mueller's father, right?

5      A     Yes.

6      Q     And Lance Mueller was -- or, Kayla Mueller was a

7  player, right?

8      A     Yes.

9      Q     Katie Thorp was a player?

10     A     Yes.

11     Q     Jackie Bendick was a player?

12     A     Yes.

13     Q     And Alesha Widdall was a player?

14     A     Yes.

15     Q     And when you interviewed them, did they indicate to

16 you that he would have to schedule team meetings and needed

17 their numbers for things such as that and practices and such?

18     A     They indicated that was some of the conversation

19 going back and forth, yes.

20     Q     You testified about a Pix Place account and

21 indicated that in words of Mr. Lovric sort of a safe deposit

22 box of sorts.  This Pix Place account, do you know if you

23 don't have a camera on your cellphone and a photo is sent to

24 you, whether that automatically goes into a Pix Place

25 account?

Jason Ellis - Cross

1      A     I don't know.

2      Q     In Exhibit 2 we saw a slew of photographs of bare

3  breasts and private parts, genitals of females.  You have no

4  idea how old those girls are, do you?

5      A     No, I don't.

6      Q     You refer to video clips where individuals were

7  engaging in intercourse.  You don't know how old they were

8  either, do you?

9      A     No, I don't.

10     Q     You talked about an iPod and you said you

11  identified Mr. Broxmeyer as being on that iPod image.  Isn't

12  it true that his girlfriend told you that those photographs

13  and those images were of her and him?

14              MR. LOVRIC:  Objection.

15              THE COURT:  Sustained.

16     Q     Were you able to identify the woman?

17     A     No, I was not.

18     Q     So you don't know how old that woman was?

19     A     No.

20     Q     The text messages that you testified to, those were

21  received or taken from whose phone?

22     A     The messages are there, those are the records I

23  believe are Katie Thorp.

24     Q     Now those records were as of December 21, is that

25  right, 2007?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

Jason Ellis - Cross

79

1      A    Or in that day yes.

2      Q    Just texts of that day, right?

3      A    It might also show if a picture was sent, it might

4  show in that document.

5      Q    What I basically mean is, there's no other text or

6  text messages from any other day other than December 21?

7      A    No.  We didn't obtain records of other text

8  messages from other days.

9      Q    Did you obtain any text messages that correlated

10  with any photographs that you retrieved of minors?

11      A    Not that I recall, no.

12              MR. KILKER:  I have nothing further.

13              THE COURT:  Mr. Lovric, any redirect?

14              MR. LOVRIC:  No, I don't, Judge.

15              THE COURT:  Okay.  Thank you, Detective

16  Sergeant Ellis, you may step down, please.

17              (Witness excused).

18              THE CLERK:  Sir, please come forward and state

19  your appearance for the record.

20              THE WITNESS:  James Thompson.

21  JAMES THOMPSON, having been called as a witness, being duly

22  sworn, testified as follows:

23              THE COURT:  Okay Mr. Lovric.

24              MR. LOVRIC:  May I, Judge.

25

James Thompson - Direct

1   DIRECT EXAMINATION

2   BY MR. LOVRIC:

3        Q    Good afternoon, Mr. Thompson.

4        A    Good afternoon.

5        Q    Mr. Thompson, can you just for the members of the

6   jury tell them again your full name, where you work and your

7   title?

8        A    Yes.  My name is James Thompson.  I work for Broome

9   County Government Security Division, I'm an assistant

10  director.

11       Q    And Mr. Thompson, can you tell the members of the

12  jury a little bit about the Broome County Security Division

13  and a unit called the CATS Unit, or Computer Analysis and

14  Technical Services Unit?

15       A    The CATS Unit, or Computer Analysis and Technical

16  Services Unit, is a subunit of Broome County Government

17  Security Division.  I've been involved in the CATS Unit since

18  its inception in 2000.  And CATS provides digital forensic

19  services for law enforcement agencies in six Central New York

20  counties.

21       Q    And how long have you worked for the Broome County

22  Security Division, approximately?

23       A    Twelve years.

24       Q    And during the last number of years, have you been

25  directly associated with the CATS Unit, the forensic analysis

James Thompson - Direct                      81

1  unit?

2      A    I have.

3      Q    And what are your primary or some of your duties

4  within the CATS Unit?

5      A    I serve as the laboratory director and I'm the

6  chief computer forensic analyst within the CATS Unit.

7      Q    And in the course of your duties, do you perform,

8  yourself, in addition to other duties, actual forensic

9  analysis of computers or other electronic storage devices?

10     A    Yes, I do.

11     Q    And for approximately how long have you been doing

12 that kind of work, actual forensic analysis?

13     A    Since 2000.

14     Q    And have you in the course of performing these

15 forensic analysis duties, have you from time to time

16 testified in courts of law?

17     A    I have.

18     Q    Does that include in both state and federal court?

19     A    Yes, it does.

20     Q    And in connection with your duties specifically

21 relating to forensic analysis, have you also received

22 training and education in this field?

23     A    Yes, I have.

24     Q    Can you briefly tell us about that, just, you know,

25 briefly outlining the kind of training and hands-on

James Thompson - Direct

82

1    experience that you received in forensic analysis?

2         A    Certainly.  I've received over 600 hours of

3    computer forensic training from places such as the National

4    White Collar Crime Center, the FBI, Guidance Software Corp

5    and, Federal Law Enforcement Training Center to name a few.

6         Q    And have you also from time to time also taught and

7    actually given course work, lectures in the field of computer

8    forensic analysis?

9         A    Yes.  I usually instruct at the Broome County

10   Police Academy.

11        Q    And in addition to your training as you described

12   and also as an instructor, do you from time to time also

13   attend various presentations locally and federally to keep up

14   with the field of computer forensic analysis?

15        A    Yes, I do.

16        Q    Now, in your work at the CATS Unit, is there some

17   rough approximation, would you say of about how many pieces

18   of electronic equipment you have either yourself worked on

19   forensically analyzing or supervised other technicians that

20   also work under you?

21        A    The CATS Unit averages 40 to 50 computer forensic

22   cases annually.  It's difficult to say exactly how many

23   pieces of electronic media we see.  In recent years each case

24   seems to involve multiple computers and multiple CD, DVD,

25   flash media such as thumb drives, digital cameras and

James Thompson - Direct

1    cellphones, so the number's increasing.  I think if I had to

2    pick a quick average, it would be about three to four

3    different pieces of media per case that we deal with.

4        Q    Okay.  And at least at this point in the

5    supervisory position, do all of those items that are analyzed

6    even by other forensic analysts, do they all at some point

7    come through you prior to the final report going to the

8    agency?

9        A    Yes.  Prior to the final report being delivered to

10   the case agents, every case that goes through the CATS Unit,

11   whether it be video or computer forensic, is reviewed by me

12   and I sign off on each case.

13       Q    Now, in connection with your computer forensic

14   analysis, do you in -- you or a representative from your lab,

15   do you actually prepare a report summarizing, itemizing your

16   analysis of what you performed and the results of what you

17   found on that particular item?

18       A    Yes, we do.

19       Q    And at some point Mr. Thompson, did you become

20   involved in assisting law enforcement agencies working on a

21   matter dealing with a Todd Broxmeyer?

22       A    I did.

23       Q    And did you have the opportunity to actually do

24   computer forensic analysis of a number of items brought to

25   your laboratory for testing and analysis?

84

1      A     Yes, I did.

2      Q     Now, at some point did you receive from the Broome

3  County Sheriff's Department a Gateway laptop that was brought

4  to your lab to be analyzed forensically belonging to

5  Mr. Broxmeyer?

6      A     Yes.

7      Q     And did you, in fact, conduct that analysis?

8      A     I did.

9      Q     And in connection with that, did you then at some

10 point prepare a report that was provided to the law

11 enforcement agency?

12     A     Yes, I did.

13     Q     Now, I'd like to show you what I've marked as

14 Government's Exhibit Number 3 for identification.  Now if you

15 could take a look at Exhibit 3.  And the first thing,

16 Mr. Thompson, as you're looking at Exhibit 3, you'll notice

17 on each page at the bottom right-hand corner there is a red

18 number consecutively paging all the pages of Exhibit 3.  Do

19 you see that?

20     A     I do.

21     Q     Okay.  Can you just take a look at Exhibit 3

22 generally and tell us if you recognize what is contained in

23 that entire exhibit?

24     A     Yes, I do.

25     Q     And just very generally speaking, what is contained

James Thompson - Direct

1    in Exhibit 3, the entire exhibit?

2        A    The entire exhibit.  These are photographs, images,

3    graphic image files that were found on the Gateway laptop

4    computer.

5        Q    Okay.  Of Mr. Broxmeyer's?

6        A    Yes.

7        Q    Okay.  What I'd like to do first is, when you

8    analyzed the Gateway laptop that was brought to you, I take

9    it you performed a number of analyses to try to locate and

10   find different kinds of materials, whether they're images or

11   documents or things of that sort.  Would that be a fair

12   statement?

13       A    That's fair.

14       Q    And then at some point when you identified or found

15   images, did you prepare in your report the copies of the

16   images that you found on that Gateway laptop?

17       A    Yes.

18       Q    And are a good number of those images, perhaps not

19   all of them, but a good number contained in that Exhibit 3

20   that you actually found on Mr. Broxmeyer's laptop?

21       A    They are.

22       Q    Now, in Exhibit 3, if you could look at the first

23   partition and just tell us what the first page number and the

24   last page number of the first partition is just so we know

25   that as we're talking about it.

James Thompson - Direct

1    A    The first page number is 1 and the final page

2  number is 9.

3    Q    Okay.  And pages 1 through 9, do they contain

4  images, meaning photographic images?

5    A    They do.

6    Q    And just generally telling us, what are 1 through 9

7  in terms of where you found them on the laptop?

8    A    These images, 1 through 8 of these images were --

9  are pictures that were posted on a web site called

10  ShareImages.com.  The ninth image is actually a file that was

11  resident on the hard drive that represents its residual from

12  internet surfing, and it resembles a magazine cover for a

13  site called Just Teen site.

14    Q    Okay.  Maybe, Mr. Thompson, if you could let me ask

15  you a couple questions.  I think I may simplify this a little

16  bit.  All the images in Exhibit 3, are those images found on

17  Mr. Broxmeyer's laptop?

18    A    Yes.

19    Q    Okay.

20             MR. LOVRIC:  I would offer Exhibit 3 into

21  evidence.

22             MR. KILKER:  No objection.

23             THE COURT:  Receive Government's 3 in

24  evidence.

25    Q    Then if I could, Mr. Thompson, I have on the

James Thompson - Direct

1  computer screen now page 1.  Do you see that?

2      A    I do.

3      Q    And that's in that first divider part of this

4  Exhibit 3.  Page 1 is an image, and that image, in what

5  capacity was that image found, or when you did forensic

6  analysis, how did you come upon that image?

7      A    By actual visual review of every graphic that was

8  in the case, and this image is located and book marked as

9  something I'd want to go back and refer to.

10     Q    So a copy of that image was found on

11  Mr. Broxmeyer's laptop?

12     A    Correct.

13     Q    And then were you able to determine based on either

14  information in the computer or information in the image as to

15  where that image may have come from?

16     A    Yes.  Actually, I believe in the file name, which

17  appears at the bottom of that page, that image comes from a

18  web site referred to as ShareImages.com.

19     Q    And do you know what that web site is?

20     A    ShareImages.com is a photo sharing web site where a

21  user can upload pictures for others to see, and if he has

22  permission from the poster, can go in and view pictures that

23  others have posted.

24     Q    Okay.  And then image 2 that I have on the screen

25  now, and putting on the screen image 3, 4, 5 and on in that

James Thompson - Direct

1    first section, are those images also images that were found

2    on the laptop of Mr. Broxmeyer and that came from this

3    ShareImages web site?

4        A    Yes, they were.

5        Q    And the ShareImages web site, were you able to at

6    least currently locate where the server of that web site is

7    located?

8        A    Yes.  I did several traces and I did come up with a

9    location.

10       Q    Okay.  Where is that?

11       A    To be honest with you, it escapes my memory.  I

12   believe you have it there.

13       Q    Okay.  Well, I can show you -- let me -- I'll show

14   you and mark as Government Exhibit 14.  When you did the

15   actual search, were you forensically able to find the

16   location of that server that contained those ShareImages?

17       A    Yes.  The server is in Marina del Rey, California.

18       Q    And then is there another location that references

19   in addition to California, another location of the web

20   posting or web site?

21       A    Well, the registrant, the person who that

22   ShareImages.com name is registered to is located in Pompano

23   Beach, Florida.

24       Q    And so Mr. Thompson, if, for example, if

25   Mr. Broxmeyer or anybody on this laptop, this Gateway, was

James Thompson - Direct

1    looking at, was viewing these images, or downloading or

2    saving, whatever they may have been doing, they would have

3    actually been communicating with the server in California, is

4    that fair?

5         A    Ultimately, yes.

6         Q    Now, I'm going to show you the second partition

7    that starts at page 10 and ends at page 32.  Do you see that?

8         A    I do.

9         Q    Does that also contain images that were found on

10   Mr. Broxmeyer's computer?

11        A    These images --

12        Q    Excuse me.  I'm sorry.  Go ahead.

13        A    These particular images weren't found on the

14   computer.  In examining the internet history or web browsing

15   history, there were certain links in that history track, if

16   you will, that when I examined those links, I was able to

17   actually go to the web site and see what the user of the

18   computer was looking at.

19        Q    When you examined Mr. Broxmeyer's computer, you

20   found something in that computer that gave you all the

21   information for you to go out and find the image that he had

22   at one point been to view or to download or whatever the case

23   may be?

24        A    That's correct.

25        Q    Okay.  So this section 2, 10 through 32, are those

James Thompson - Direct

1  those type of images that you were able to go out and to

2  locate based on the information in the Gateway laptop?

3      A    Yes.

4      Q    And were those images from a different or the same

5  site that we just talked about, that ShareImages?

6      A    These images were all from ShareImages.com web

7  site.

8      Q    So this second section, 10 through 32, these images

9  are from that site that we just talked about.  That 1 through

10  8 images were actually located on Mr. Broxmeyer's laptop?

11      A    Yes.

12      Q    Okay.  Does that make sense?  Did you understand

13  what I was saying, Mr. Thompson?  Did you understand?

14      A    I'm sorry?

15      Q    You were looking at me, so I'm just asking.

16      A    No.  No, I'm fine.

17      Q    I'm going to turn now to section 3, and this

18  section is numbered 33 through 51, and at the top it reads,

19  bookmark graphics.  Do you see that?

20      A    I do.

21      Q    Okay.  What is contained in this section 3 where it

22  starts off with the graphic, bookmark graphics?

23      A    These are images that when visually reviewing the

24  graphic content of the media in this particular case that I

25  felt at the time were probative images, and I bookmarked

James Thompson - Direct

1    those images from the body of the media again for inclusion

2    in the final report.

3        Q    So these are photo images that were found on the

4    Gateway laptop that in your analyzing you put them into a

5    special section because you were looking for certain kind of

6    material, I take it?

7        A    Yes.

8        Q    Okay.  And I'm just going to picture number 35.  I

9    have on the screen now.  Girl holding a camera in the shower.

10   Picture 36.  Picture 37.  Picture 38.  Picture 39 I'm

11   showing.  Picture 40.  Picture 41.  Picture 45.  Picture 48 I

12   have on the screen now.  Girl appearing to have either

13   shaving cream or whip cream on her genitals and breasts.  You

14   found an image, this image, in that section or on that

15   Gateway laptop?

16       A    I did.

17       Q    And did you actually find several copies of this

18   same image?

19       A    I believe there were four or five copies of that

20   particular image on the laptop.

21       Q    I'll flip back to 47.  There's 48.  Now I'm

22   flipping to 49.  That's it.

23            So those were multiple copies of that image that

24   you found on the laptop?

25       A    Yes.

James Thompson - Direct

1      Q      Now I'm going to flip to the next section of the

2    Exhibit 3, and that begins with page 52, and it goes to 293.

3    And what is contained in this last section of Exhibit 3?

4      A      These are more images of the same that were

5    included in the last section.  Images that I bookmarked from

6    the total totality of the images that were in the case.

7      Q      Okay.  So this, in other words, contains the bulk

8    of other images that were contained on that laptop?

9      A      Yes.

10     Q      In examining these photographs, I'm looking now at

11   an image, excuse me, page 53, and to the right top there's

12   just an image on the page appears to be a girl in the

13   background.  Did you also find pictures like this of what

14   appear to be girls engaged in some type of a sport?

15     A      Yes, I did.

16     Q      And then turning to page 70, excuse me.  Picture

17   70.  A girl in the mirror in underwear?

18     A      Yes.

19     Q      71, girl on a couch with her legs spread apart

20   naked.  77, a close-up of girl lying on her back, vagina in

21   the picture.  87.  91, a girl out of the shower.  99, another

22   girl in a shower.

23            Mr. Thompson, would it be fair to say that the

24   photographs in that last section, in addition to the

25   bookmarked photographs that you bookmarked, most, if not all,

James Thompson - Direct                                93

1  appear to show what appear to be young girls in various

2  either nudity or in sexual acts including intercourse or

3  other acts?

4       A    That's a fair statement.

5       Q    Now, in connection with your analysis, did you also

6  analyze a Compaq computer that was brought to you by the

7  Broome County Sheriff's Department?

8       A    Yes, I did.

9       Q    I'd like to show you what's been marked as Exhibit

10  4.

11            MR. KILKER:  Yes.

12       Q    If you can take a look at that and tell us what

13  Exhibit 4 has in it.

14       A    Yes.

15       Q    What is Exhibit 4?  What's contained in that

16  exhibit?

17       A    Exhibit 4 has another section of bookmarked graphic

18  files similar to the ones that were bookmarked on the Gateway

19  computer marked bookmark graphics.  And it's got a contact

20  sheet followed by the individual images.

21       Q    And were those images that are contained in Exhibit

22  4, were those images that you found on Mr. Broxmeyer's Compaq

23  computer?

24       A    Yes, they are.

25            MR. LOVRIC:  I would offer Exhibit 4 into

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Thompson - Direct

1    evidence.

2             MR. KILKER:  No objection, your Honor.

3             THE COURT:  Receive Government's 4 in

4    evidence.

5        Q    Mr. Thompson, on Exhibit 4 I'm going to put very

6    briefly on the monitor, page 5, Exhibit 4.  Did you find some

7    images like page 5 where there appears to be partial picture

8    of breasts of a girl and then something to indicate that the

9    image was being changed or altered in some way?

10       A    Well, this particular image is consistent with a

11   partially downloaded image so the file appears to be corrupt.

12       Q    Okay.

13       A    In this particular case so, yes, I found many like

14   this.

15       Q    Okay.  And then, for example, page 7, image of a

16   girl in a shower.  Page 11, multiple images of a girl, girls

17   depicted in sexual poses.  Picture number 13, girl in

18   apparently some type of sexual act with a male.

19       A    Yes.

20       Q    Now, the images that were found on Exhibit 3 and

21   Exhibit 4, when you did your analysis, I take it one of the

22   things that you were looking for was images of a sexual

23   nature?

24       A    Yes.

25       Q    And that both of those Exhibits 3 and 4 primarily

James Thompson - Direct

1    include images of a sexual nature, would that be a fair

2    statement?

3         A    They do.

4         Q    Now, did you also in analyzing and looking at the

5    Gateway and Compaq computers, did you also determine the

6    location and manufacturing of the hard drive of the computer?

7         A    I did.

8         Q    And just very basically what's a hard drive of a

9    computer.  What is that?

10        A    The hard drive in any computer is basically an

11   electrical mechanical device that is the storage center for

12   all the information on the computer, including the operating

13   system files that actually make the computer run and any user

14   created, user generated information, also stored on a hard

15   drive.

16        Q    Okay.  And I'd like to show you Exhibits 8 and 9.

17   If you take a look at Exhibit 8 and 9 and just tell us if you

18   recognize 8 and 9?

19        A    I do.

20        Q    What is 8?

21        A    Exhibit 8 is a photocopy that I made of the hard

22   drive from the Gateway computer.

23        Q    And does that Exhibit 8, does that indicate the

24   place of manufacturing of the Gateway?

25        A    It indicates the place of manufacture of the hard

James Thompson - Direct

1    drive itself, which is Thailand.

2         Q    Of the hard drive.  Excuse me.  Then image 9, what

3    is that?

4         A    Image 9 is a photocopy of the hard drive from the

5    Compaq computer.

6              MR. LOVRIC:  I would offer Government Exhibit

7    8 and 9 into evidence, your Honor.

8              MR. KILKER:  No objection, your Honor.

9              THE COURT:  Receive Government's 8 and 9.

10        Q    Just for the record again, Mr. Thompson, the

11   Gateway hard drive as you described it, that was manufactured

12   in what country?

13        A    Thailand.

14        Q    How about the Compaq hard drive?

15        A    Singapore.

16        Q    And the images that you identified in Exhibit 3,

17   which was images from the Gateway, were all of those

18   materials that are shown in Exhibit 3, were all of those

19   contained on that hard drive that is depicted or shown in

20   Exhibit Number 8?

21        A    Yes.  With the exception of the pictures that I

22   linked to from the internet history.

23        Q    And then, likewise, the Exhibit 4 pictures that we

24   saw that came from the Compaq hard drive, were all of those

25   found on that Exhibit Number 9?

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Thompson - Direct                                    97

1        A    Yes, they were.

2        Q    And then were you also at some point asked to

3   review and do a forensic analysis of an iPod device?

4        A    Yes, I was.

5        Q    And just very briefly we've heard a little bit

6   about the iPod.  What's an iPod?

7        A    An iPod device is just another electronic,

8   electromechanical type of device that stores information.

9   It's obviously marketed as a device that people can use to

10  download music and video files from the internet, that's its

11  prime function, but because it is basically just another

12  piece of removable media, it's capable of storing any type of

13  computer file.

14       Q    And were you provided an iPod that was recovered

15  from Mr. Broxmeyer's vehicle?

16       A    Yes.

17       Q    And did you at some point review materials or

18  things found on the memory of that iPod?

19       A    Yes, I did.

20       Q    And in front of you you have Exhibit Number 10.  Do

21  you see that?

22       A    Yes, I do.

23       Q    And what is Exhibit Number 10?

24       A    Exhibit Number 10 is a photocopy that I made of the

25  iPod device that I examined.

James Thompson - Direct                                98

1      Q     And is that a photocopy of the iPod that we're

2  talking about that you forensically examined?

3      A     Yes.

4            MR. LOVRIC:  I would offer Government Exhibit

5  Number 10 into evidence.

6            MR. KILKER:  I don't have any objection,

7  Judge.

8            THE COURT:  Receive Government's 10 in

9  evidence.

10     Q     Where was Mr. Broxmeyer's iPod manufactured?

11     A     The back of the iPod is marked assembled in China.

12     Q     And did you have an opportunity to view any videos

13  that were found on that iPod?

14     A     Yes.  I believe this iPod contained three or four

15  short video files.

16     Q     Can you just very generally describe the nature of

17  videos that you observed or saw?

18     A     All of the video files that I observed on this iPod

19  involved sexual acts.

20     Q     Was there a male and a female person participating

21  at some point?

22     A     Yes.

23     Q     Now, last couple questions, Mr. Thompson.  In

24  examining the Gateway and Compaq computers, were you able to

25  determine through your forensic look on those computers

James Thompson - Direct                                    99

1  whether you could tell if the computers were at some point

2  used to access sexual oriented sites?

3       A    Certainly.  Yes.

4       Q    Were you able to determine what kind of sites one

5  or both of these computers were going to in order to visit

6  sites, web sites?

7       A    A lot of the sites were sites that dealt with or at

8  least advertised that they dealt with teenage modeling,

9  teenage sex sites.

10      Q    Okay.

11           MR. LOVRIC:  Those are all the questions I

12  have, your Honor.

13           THE COURT:  Okay.  Mr. Kilker.

14           MR. KILKER:  Thank you, your Honor.

15  CROSS-EXAMINATION

16  BY MR. KILKER:

17      Q    Good afternoon, Mr. Thompson.

18      A    Good afternoon.

19      Q    The images that are contained in Exhibit 3 and 4,

20  did you have to go on to a web site to obtain those images?

21      A    With the exception of the images I believe it was

22  in section 2 of Exhibit 3.

23      Q    Yes.

24      A    No.

25      Q    Where were those images?  Did they get stored on to

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Thompson - Direct

1    a computer if you visit a web site?

2        A    Yes, they do.

3        Q    There's memory sort of where whoever might have

4    used the computer, that gets etched into the computer, so you

5    can look and see where somebody had gone, is that right?

6        A    There's a part of the operating system that's

7    called temporary internet files that some of the images would

8    normally get put into, just residual from normal internet

9    browsing.

10       Q    When you say it's residual from normal internet

11   browsing, they're not saved on to the computer, is that

12   right, I mean intentionally downloaded?

13       A    In some cases they are.  But a lot of the files,

14   especially if they're very small in size, aren't

15   intentionally saved but they're there if you go to the web

16   site or not.

17       Q    Did you -- when you were looking at this computer

18   and you were clicking on those temporary internet files and

19   opening them, is that how you got the images?

20       A    No.

21       Q    How do you do it?

22       A    Again, the images were located by a visual review

23   of the all the graphic images that are present on the media

24   that we examined, so we actually go through and look at every

25   image that's in the case.

James Thompson - Direct

1    Q    Okay.  Now, does that mean those images are

2  actually saved on to the computer so you can easily retrieve

3  them?

4    A    Absolutely.

5    Q    You go into the temporary internet files and open

6  them up?

7    A    You could go into the temporary internet files and

8  open them, yes.

9    Q    This site that you referred to is ShareImages.com?

10    A    Yes.

11    Q    And can that web site be accessed from another web

12  site, for example?

13    A    Accessed from another web site in the manner of a

14  link?

15    Q    Yes.

16    A    I'm assuming.  Sure.

17    Q    In that web site, which is obviously shared images,

18  that -- can you tell if the user of the Gateway or the Compaq

19  in this particular case posted anything to those sites?

20    A    I did not find any indication that there was

21  posting done.

22    Q    So these appear to be images that were opened on

23  the ShareImages that got saved on to the computer somehow?

24    A    These appeared to be images that were viewed on the

25  ShareImages.com web site.

James Thompson - Direct

1    Q    If you were to go on to ShareImages.com and look on

2  the site, do you know what those photos are before you open

3  them?

4    A    The way ShareImages.com works is you are required

5  to have access to certain images that are on that site, so if

6  a person were to post images, say, of their family on there,

7  they could restrict access to their members of their family

8  that may be in different places of the world that have access

9  to computer.  So it's not -- you can't go on there and just

10  get into anybody's pictures.  You actually have to -- at

11  least they advertise that you have to have passwords to get

12  into certain folders that have pictures.

13    Q    Now, those folders, do you know what's in those

14  folders before you gain access to them?

15    A    By their very name it would be indicative of what's

16  in the folders, and it would be just by visually looking at

17  the web site, it's not conclusive that you would know exactly

18  what's in those folders.

19    Q    So you could go, for example, to the

20  ShareImages.com web site, there would be some folders there

21  you would not know what those images are, is that right?

22    A    That's correct.  You would need passwords to get

23  into those folders.

24    Q    And once there is an open folder, in other words,

25  if you click on the folder and on to an image or whatever

James Thompson - Direct

1  pops up after that folder is open, does that then create an

2  imprint on the computer?

3      A     When you open a folder, in ShareImages that would

4  indicate that you would need a password to open that folder,

5  and the images that you look at would possibly be deposited

6  in a temporary internet files folder, that's thumb nail

7  images.

8      Q     So that's a yes, right?

9      A     Yes.

10     Q     Okay.  Thank you.  Now, on these pictures or

11 photographs, they don't identify the age of the people

12 involved, does it?

13     A     No, it doesn't.

14     Q     You have no way of knowing how old these

15 individuals are?

16     A     I do not.

17     Q     And in connection with the iPod that you viewed,

18 you have no idea how old the people in those videos are,

19 right?

20     A     No, I do not.

21     Q     The Exhibit Number 3 and 4, which are in, does it

22 identify on those pictures that it's, for example, coming

23 from an adult web site?

24     A     Not necessarily.  Some of them it may, but a lot of

25 the images that were taken from those two exhibits would be

James Thompson - Direct

1  identified with file names that have nothing to do with adult

2  web sites.

3      Q    And by files names, is that what a particular photo

4  was saved as something?

5      A    Yes.

6      Q    And can you give us an example of what that is?

7      A    An example of file name?

8      Q    Sure.

9      A    It could be anything.  In this particular case

10 there were some files that were recovered from unallocated

11 space that were deleted and I managed to forensically recover

12 them that would have file names that are long strings of

13 numbers and letters.  Some of them would have file names of

14 girls names, for example.

15     Q    So they varied, these file names vary?

16     A    Certainly.

17     Q    They're not specifically identifiable as being, for

18 example, Youngteens.com or something?

19     A    No.  When a file is deposited in a temporary

20 internet files folder, it often gets renamed, so if you were

21 looking at a web page with ten different images on it, those

22 images could be deposited in your temporary internet files

23 folder and they're going to come up with names that really

24 don't make any sense to a user.

25     Q    And again, you can't identify the ages of any of

James Thompson - Direct

1    the people involved in any of the photographs, is that right?

2         A    No.

3              MR. KILKER:  That's all I have, Judge.

4              THE COURT:  Mr. Lovric.

5              MR. LOVRIC:  Just two questions.

6    REDIRECT EXAMINATION

7    BY MR. LOVRIC:

8         Q    Mr. Thompson, Mr. Kilker asked you about gaining

9    access to the ShareImages site.  And if I understand

10   correctly from your answer then, if Mr. Broxmeyer was going

11   to the ShareImages, he would have had to have some kind of

12   password access to these images that you were able to retrace

13   and locate?

14        A    Some permission has to be given in order for those

15   folders to be shared and who they're sharing with.

16        Q    Okay.

17        A    Yes.

18        Q    And then my final question is:  Did you actually

19   find evidence in examining either the Gateway or the Compaq

20   of sites being accessed that advertised teen porn web sites?

21        A    Yes.  Some of the, I believe in Exhibit 3, the last

22   file of the first section was indicative of that, where it

23   was more or less a magazine cover that I think it said just

24   teen sites.

25        Q    Okay.

VICKY ANN THELEMAN, RPR, CRR
UNITED STATES DISTRICT COURT

James Thompson - Redirect

106

1          MR. LOVRIC:  That's all I have.

2          THE COURT:  Mr. Kilker.

3    RECROSS-EXAMINATION

4    BY MR. KILKER:

5       Q    Is it possible to gain access to those sites from

6    an adult web site?

7       A    Any web site can link you anywhere.

8       Q    If I were to go on an adult web site and there's a

9    link there, I click it, it can take me to ShareImages.com or

10   anywhere?

11      A    ShareImages -- first, it could take you there but,

12   again, you would need special permission to access the

13   folders, but it certainly can take you in that example that

14   you just gave to a teenage site.  Sure, the link is there,

15   you can go there.

16          MR. KILKER:  Thank you.

17          THE COURT:  Mr. Lovric, anything further?

18          MR. LOVRIC:  Nothing further, Judge.

19          THE COURT:  Thank you, Mr. Thompson.  You may

20   step down, sir.

21          (Witness excused).

22          THE COURT:  All right, ladies and gentlemen.

23   It's just about 5:00 and that's going to conclude the

24   presentation of evidence for today.  However, tomorrow of

25   course is another day.  I checked my schedule, I see the

James Thompson - Recross

1    clerk has scheduled a 9:30 matter for me that won't take any

2    longer than 15 minutes, so if you can be all ready to go at

3    9:45 tomorrow, that would work.

4              Let me advise you not to discuss the case

5    among yourselves, with anybody else or permit anyone to

6    discuss it with you.  Have a pleasant evening and we'll see

7    you tomorrow morning.

8              (Jury excused).

9              *              *              *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N


            I, VICKY ANN THELEMAN, RPR, CRR, Official

Court Reporter in and for the United States District

Court, Northern District of New York, DO HEREBY

CERTIFY that I attended the foregoing proceedings,

took stenographic notes of the same, and that the

foregoing is a true and correct transcript thereof.




                              _____

                              VICKY ANN THELEMAN, RPR, CRR
                              Official U.S. Court Reporter




                    VICKY ANN THELEMAN, RPR, CRR
                    UNITED STATES DISTRICT COURT